**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| Bader Ahmed Kaiksow Group<br>4016 AL-QARYA<br>Road 469<br>Sitra, Bahrain<br><br>      Plaintiff,<br><br>v.<br><br>Angelo Benedetti, LLC<br>c/o Taft Service Solutions Corp.<br>425 Walnut St., Ste. 1800<br>Cincinnati, Ohio 45202<br><br>   and<br><br>Angelo Benedetti Holdings, Inc.<br>c/o Taft Service Solutions Corp.<br>425 Walnut St., Ste. 1800<br>Cincinnati, Ohio 45202<br><br>   and<br><br>Albert E. Benedetti<br>4397 Killarney Drive<br>Richfield, Ohio 44286<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>**COMPLAINT**<br>)<br>**(JURY DEMAND**<br>**ENDORSED HEREON)**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Plaintiff Bader Ahmed Kaiksow Group ("**Plaintiff**" or "**BAK Group**"), by and through

counsel, for its Complaint against Angelo Benedetti, LLC ("**Benedetti, LLC**"), Angelo Benedetti

Holdings, Inc. ("**Benedetti Holdings**"), and Albert E. Benedetti ("**Albert**") (collectively the

"**Defendants**") states as follows:

## INTRODUCTION

At its heart, this is a fraud case related to Defendants' unlawful sale of a multi-million dollar asphalt reheating and recycling machine to Plaintiff. Defendants fraudulently induced BAK Group to enter into a purchase agreement and sales representative agreement concerning Defendants' building of an asphalt reheating and recycling machine. BAK contracted with Defendants to purchase a machine specifically designed to repave long stretches of roadway in the Kingdom of Bahrain ("**Bahrain**") and the Gulf Cooperation Council region (which also includes Kuwait, Oman, Qatar, Saudi Arabia, and the United Arab Emirates) (collectively the "**GCC Region**").

BAK Group intended to use the equipment to perform demonstrations for various government entities for the purpose of securing their agreement to utilize the machines in contracts for lucrative government road projects. By entering into the separate sales representative agreement, BAK Group positioned itself to earn commissions on sales of the asphalt reheating and recycling machines in Bahrain and the GCC Region.

Unknown to BAK Group, Defendants fraudulently concealed that they had actually manufactured the subject machine for ***another*** customer; for an entirely ***different purpose.*** Defendants perpetrated this fraud while simultaneously representing to BAK Group that the subject machine was not only "new", but also designed and manufactured specifically for BAK Group's stated purpose of repaving long stretches of roadway. Defendants knew that the equipment would not perform for BAK Group's stated purpose yet continued their fraudulent scheme to off-load a different machine originally intended for a different customer.

As a result, BAK Group encountered significant and extended performance issues with the equipment. Instead of disclosing that these performance issues were caused because the equipment

2

had been built for an entirely different purpose, Defendants doubled down on their fraudulent scheme by promising BAK Group that the performance issues would be rectified through BAK Group's purchase of *additional* parts and equipment from Defendants. In the end, the machine could not be used for its intended purpose, which interfered with BAK Group's contractual and business relations with potential customers and caused BAK Group significant damage.

To add insult to injury, Defendants breached the Parties' Arbitration Agreement, causing unnecessary delay and extraordinary costs over the last eleven (11) months while this dispute was pending before the International Chamber of Commerce (the "**ICC**") as an arbitration proceeding. As more fully described below, Defendants refused to pay their contractually agreed share of the Arbitration costs which led to the dismissal of the ICC Arbitration and necessitated the filing of this lawsuit.

## PARTIES

1. Plaintiff BAK Group is a limited liability company registered in Bahrain with a principal place of business at building 4016 AL-QARYA in Bahrain. BAK Group is a collection of businesses that seek to provide innovative solutions to customers and companies in the food distribution, engineering, trading, information technology, travel, and real estate markets. BAK Group seeks to bring the latest international products to the local markets in Bahrain and the GCC Region.

2. Defendant Benedetti, LLC is a limited liability company registered in the state of Ohio with a principal place of business at 94 First Avenue, Cleveland, Ohio 44146. Benedetti, LLC builds and sells pre-heating and asphalt Re-Heat Recycling machines for use to lay recycled asphalt.

3.     Defendant Benedetti Holdings is a for-profit corporation organized in the state of Ohio.  Upon information and belief Benedetti Holdings maintains a principal place of business at 94 First Avenue, Cleveland, Ohio 44146, and was created by Albert and/or Benedetti, LLC for the sole purpose of attempting to shield Albert and/or Benedetti, LLC's assets and/or income from creditors and/or judgments.

4.     Defendant Albert is an individual residing at 4397 Killarney Drive, Richfield, Ohio 44286.  Upon information and belief, Albert is the President and majority owner of Benedetti, LLC and Benedetti Holdings.

## JURISDICTION AND VENUE

5.     Pursuant to 28 U.S.C. §1332(a)(2), this Court has subject matter jurisdiction over this litigation because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are all citizens of different states within the meaning of 28 U.S.C. §1332(c)(1).

6.     This Court has personal jurisdiction over all Defendants.

7.     Venue is proper pursuant to at least 28 U.S.C. § 1391(b)(1) because all Defendants are residents of the State in which the district is located.

8.     As noted above, BAK Group previously initiated arbitration proceedings related to this dispute with ICC (the "**Arbitration**").  BAK Group commenced the Arbitration pursuant to the Purchase and Regulation of Use Agreement between Benedetti, LLC, fka Angelo Benedetti, Inc., and BAK Group (the "**Purchase Agreement**").  A true and accurate copy of the Purchase Agreement is attached as **Exhibit 1**.

9.     Defendants' refusal to pay their share of Arbitration fees caused the dismissal of the Arbitration and the filing of this litigation.

## FACTUAL BACKGROUND

**The Contractual and Business Relationship Between BAK Group and Defendants.**

10.     Benedetti, LLC designs and develops certain asphalt recycling machines it refers to as "The (REHEAT) Asphalt Recycling Machine" (the "**REHEAT Machine**").[1]

11.     In 2012, BAK Group's Director, Hasan Bader Kaiksow ("**Hasan**") contacted Benedetti, LLC to inquire as to the purchase of the REHEAT Machine.

12.     Prior to his inquiry to Benedetti, LLC, Hasan had been in communications with the Ministry of Works, Road Projects & Maintenance Department for Bahrain (the "**Ministry**") regarding the inclusion of the REHEAT Machine in all Ministry tenders, a process wherein the Ministry (or any government) invites vendors to bid for the right to work on government projects or provide goods or other services. The government "puts out a tender" to ask for offers to do work on a contract basis.

13.     BAK Group intended to purchase the REHEAT Machine in order to perform demonstrations for the Ministry and for other departments of work in the GCC Region so that the Ministry and other departments of work would require use of the REHEAT Machine for government projects.

14.     On August 24, 2012, Benedetti, LLC and BAK Group executed a Letter of Understanding which was a precursor to the Purchase Agreement and a companion representative agreement (the "**Sales Rep Agreement**"). A true and accurate copy of the Letter of Understanding is attached as **Exhibit 2.**

15.     BAK Group intended to use the REHEAT Machine to repave long stretches of roadway in Bahrain and in other areas of the GCC Region (the "**Intended Use**").

---

[1] See Schedule A of Exhibit 1.

16.     BAK Group, through Hasan, repeatedly communicated its Intended Use of the REHEAT Machine to Benedetti, LLC's owner, Albert.

17.     On October 10, 2012, Benedetti, LLC and BAK Group entered into the Sales Rep Agreement wherein BAK Group was appointed as Benedetti, LLC's exclusive representative to secure sales of Benedetti, LLC REHEAT Machines in Bahrain and the GCC Region.  A true and accurate copy of the Sales Rep Agreement is attached as **Exhibit 3**.

18.     Pursuant to the Sales Rep Agreement, Benedetti, LLC agreed to pay BAK Group a 5% commission for all sales of the REHEAT Machine secured by BAK Group (*See Ex. 3 – Sales Rep Agreement, at Section 7.3*).

19.     As a Benedetti, LLC sales representative, BAK Group intended to use the REHEAT Machine to perform demonstrations for prospective customers in order to secure sales for the benefit of Benedetti, LLC, that would, in turn, entitle BAK Group to a 5% commission (*See Ex. 3 – Sales Rep Agreement, at Section 7.3*).

20.     In October 2012, Benedetti, LLC advised BAK Group that Benedetti, LLC would begin to "manufacture" BAK Group's equipment upon receipt of BAK Group's payment.

21.     In mid-2013, BAK Group brought members of the Ministry to Benedetti, LLC's headquarters in Cleveland, Ohio so that members of the Ministry could see a REHEAT Machine in use.

22.     Instead of presenting the Ministry with a demonstration of a REHEAT Machine, Benedetti, LLC showed the Ministry various roadways and claimed that the asphalt on those roadways had been recycled using a REHEAT Machine.

23.     In July 2013, BAK Group requested that Benedetti, LLC build a brand new, specified REHEAT Machine for BAK Group in accordance with the Ministry's specifications and

6

the Intended Use.  In response, Benedetti, LLC promised and induced BAK Group that Defendants would design, build and deliver a brand new, specified REHEAT Machine.

24.    On September 12, 2013, the Ministry issued correspondence containing a draft of Ministry tender jobs including the Benedetti, LLC REHEAT Machine specifications.  A true and accurate copy of the September 12, 2013 correspondence is attached as **Exhibit 4.**  Hasan shared a copy of the September 12, 2013 correspondence with Albert.

**The Parties Enter Into the Purchase Agreement; BAK Group Pays for the Equipment; Bendetti, LLC Represents it is Building the Equipment; Then Delivers the Equipment to BAK Group.**

25.    On January 15, 2014, pursuant to the foregoing activity – and based upon the business opportunities presented to BAK Group by the Ministry and Benedetti, LLC - Benedetti, LLC and BAK Group entered into the Purchase Agreement, wherein Benedetti, LLC acknowledged BAK Group's Intended Use of the REHEAT Machine "for use to lay new recycled road asphalt in Bahrain, Kuwait, United Arab Emirates, Oman, and Qatar and Saudi Arabia (*See Ex. 1 – Purchase Agreement, at Recitals*).

26.    Pursuant to the Purchase Agreement, BAK Group agreed to purchase, and Benedetti, LLC agreed to sell, the REHEAT Machine described as follows: "**New** 2013 Benedetti ReHeat Asphalt Pavement Heater (APH-20)…" and "**New** 2013 Benedetti ReHeat Recycler (APR-20)…" (collectively, the "**Equipment**") (*See Ex. 1 – Purchase Agreement, at pgs. 14-15*).

27.    BAK Group agreed to purchase the Equipment for $2,500,000 and for the Equipment to be delivered to Bahrain for $75,000, resulting in a total purchase price of $2,575,000 (the "**Purchase Price**").  A true and accurate copy of the invoice for the Equipment is attached as **Exhibit 5**.

28.     BAK Group secured a line of credit with Kuwait Finance House in order to pay the Purchase Price (the "**Line of Credit**").

29.     Benedetti, LLC was named the beneficiary on the Line of Credit and received the Purchase Price through four equal draws against the Line of Credit through PNC Bank, each in the amount of $643,750.  A true and accurate copy of the Line of Credit with the referenced draw schedule in favor of Benedetti, LLC is attached as **Exhibit 6**.

30.     In October 2013, Benedetti, LLC confirmed receipt of the first installment payment for purchase of the Equipment and agreed to begin manufacturing the Equipment.

31.     Benedetti, LLC provided BAK Group with a "Build Schedule" providing a timeline for manufacturing new, specified Equipment per the Purchase Agreement.  A true and accurate copy of the Build Schedule is attached as **Exhibit 7**.

32.     While Benedetti, LLC was supposedly manufacturing the Equipment, BAK Group requested photographs of the Equipment being built.  In response to the request, Benedetti, LLC provided BAK Group with various photographs depicting the purported new construction of the Equipment.  True and accurate copies of the photographs are attached as **Exhibit 8**.

33.     Unbeknownst to BAK Group, the photographs provided by Benedetti, LLC did not actually depict the building of the Equipment, and upon information and belief, instead depicted the building of another REHEAT Machine.

34.     BAK Group received the Equipment in Bahrain on May 5, 2014.

**The Equipment Repeatedly Fails to Perform.**

35.     Shortly after receiving the Equipment, BAK Group arranged for a demonstration of the Equipment with the Ministry.  BAK Group arranged and paid for members of Benedetti, LLC to travel from Cleveland, Ohio to Bahrain for the initial demonstration of the Equipment for

the Ministry.  That demonstration was performed on June 20, 2014. The Equipment failed to adequately perform during that demonstration.

36.    On July 10, 2014, Benedetti, LLC advised BAK Group that BAK Group would need to purchase various additional tools to ensure performance of the Equipment at a cost of $6,670.

37.    On July 23, 2014, BAK Group advised Benedetti, LLC of continued performance issues with the Equipment.  Benedetti, LLC responded by advising that it was normal for REHEAT Machines to have issues the first time they are used.

38.    In September 2014, BAK Group arranged to perform another demonstration of the Equipment for representatives of the Public Works and Services Department, Government of Ras Al Khaimah, United Arab Emirates (the "**UAE Public Works & Services Department**").

39.    BAK Group paid for several Benedetti, LLC representatives to travel to the United Arab Emirates to (a) inspect and service the Equipment so as to ensure the Equipment was in good working order for the UAE Public Works & Services demonstration; and (b) assist with the September 2014 UAE Public Works & Services demonstration.

40.    Benedetti, LLC, through its representatives, once again advised BAK Group that issues with the Equipment would be remedied through the purchase of *additional* equipment from Benedetti, LLC.

41.    Relying on the foregoing representations, BAK Group purchased additional equipment from Benedetti, LLC in order to achieve functionality of the Equipment.

42.    The September 2014 demonstration for the UAE Public Works & Services Department called for the Equipment to perform over a 100-meter stretch of road. The Equipment performed adequately during that initial demonstration.

43. In November 2014, BAK Group advised Benedetti, LLC that BAK Group was working to secure partnerships with Saudi Arabia and UAE which would require these countries to include Benedetti, LLC REHEAT Machines in any/all of their department of transportation tenders.

44. In November 2014, BAK Group once again voiced concerns to Benedetti, LLC that the Equipment was not functioning properly and that, as a result, BAK Group could not secure commitments from the Ministry, other governmental authorities in the GCC Region, and potential customers per the Sales Rep Agreement.

45. In response, Benedetti, LLC again advised BAK Group that they would need to purchase *additional* Benedetti, LLC parts and equipment to ensure performance of the Equipment and would need to locate and secure experienced operators for the Equipment.

46. In December, 2014, the UAE Public Works & Services Department awarded BAK Group a job to repave a 16km stretch of road for approximately $1,400,000 (the "**UAE Job**"). A true and accurate copy of the UAE Public Works & Services Department award letter is attached as **Exhibit 9**.

47. On January 22, 2015, BAK Group and the UAE Public Works & Services Department signed an agreement for the UAE Job. A true and accurate copy of the UAE Job contract is attached hereto as **Exhibit 10**. BAK Group advised Benedetti, LLC of the award of the UAE Job.

48. In January 2015, due to the continued performance issues of the Equipment, Benedetti, LLC advised BAK Group that Benedetti, LLC would send two Benedetti, LLC representatives to the UAE to provide professional labor service on the Equipment at *an additional* cost of $8,500.

10

49.     In February 2015, two Benedetti, LLC representatives traveled to the UAE and purportedly performed "labor services" on the Equipment in advance of the commencement of the UAE Job.

50.     In February 2015, after Benedetti, LLC representatives performed "labor services" on the Equipment, BAK Group began to perform the UAE Job using the Equipment.

51.     Almost immediately after beginning to perform the UAE Job, the Equipment did not perform as expected.

52.     In March 2015, the UAE Public Works & Services Department advised BAK Group that BAK Group would have two weeks to correct the Equipment's performance issues relevant to the UAE Job, otherwise the UAE Public Works & Services Department threatened to cancel the UAE Job contract.  Benedetti, LLC team members were present in the UAE with BAK Group when the UAE Public Works & Service Department advised BAK Group of the two week deadline.

53.     BAK Group communicated the UAE Public Works & Services Department March 2015 warning to Benedetti, LLC, and in response, Benedetti, LLC blamed the Equipment's performance issues on improper road selection.

54.     BAK Group continued to attempt to perform the UAE Job.

55.     On April 26, 2015, the UAE Public Works & Services Department sent a letter to BAK Group advising that on April 30, 2015 a UAE Public Works & Services Department representative would inspect the UAE Job, and more specifically, the Equipment's performance on the UAE Job.  A true and accurate copy of the April 26, 2015 UAE Public Works & Services Department correspondence is attached as **Exhibit 11**.

56.     On May 3, 2015, the UAE Public Works & Services Department sent correspondence to BAK Group indicating: "Referring to the… contract signed with your group on

11

Thursday (January 22, 2015), **following repeated field visits by our technical team, it has been found that the quality of the executed works is technically unacceptable despite giving you more than one opportunity to improve the execution performance.  We regret to inform you of the cancellation of the contract signed with you...**" A true and accurate copy of the May 3, 2015 UAE Public Works & Services Department correspondence is attached as **Exhibit 12**.

57.     The performance issues with the Equipment persisted throughout 2015 and into 2016.  In February 2016, Benedetti, LLC advised BAK Group that it would need to purchase additional valves for the Equipment to ensure performance at an *additional* cost of $6,200 (plus shipping).   BAK Group purchased the suggested valves based upon Benedetti, LLC's representations that the valves would fix the Equipment's performance issues.

58.     In September 2016, Benedetti, LLC advised BAK Group that it would need to purchase a flow meter for the Equipment in order to ensure performance at an *additional* cost of $6,458.  BAK Group purchased the suggested flow meter upon Benedetti, LLC's representations that the flow meter would fix the Equipment's performance issues.

59.     Despite the referenced failures of the Equipment, by December 2016, BAK Group had made significant progress towards becoming an approved contractor with the Ministry.  At this time, BAK Group advised Benedetti, LLC that if BAK Group was able to perform a successful road demonstration for the Ministry, the Ministry would include the REHEAT Machine specification in all Ministry tenders, thereby requiring any contractor bidding on Ministry tenders to either purchase REHEAT Machines through BAK Group, as Benedetti, LLC's exclusive representative in the region (which would entitle BAK Group to a commission per the terms of the Sales Rep Agreement); or to lease the Equipment from BAK Group.

60.     In December 2016, BAK Group further advised Benedetti, LLC of BAK Group's renewed efforts to include REHEAT Machine specifications in government tenders within the United Arab Emirates and Saudi Arabia.

61.     The demonstration of the Equipment requested by the Ministry required use of the Equipment on long stretches of roadway, consistent with the Intended Use of the Equipment.

62.     In May 2017, BAK Group once again shared its concerns regarding the performance of the Equipment to Benedetti, LLC.  In response, Benedetti, LLC suggested that BAK Group make several passes on the roadway with the Equipment pre-heater before cutting; or purchasing an additional re-heater from Benedetti, LLC.

63.     On May 21, 2017 the Equipment again failed to adequately perform during the requested demonstration for the Ministry, and the Ministry declined to include the REHEAT Machine in its tenders.

64.     In reliance upon the direction and assurances of Benedetti, LLC regarding resolution of issues affecting the performance of the Equipment, BAK Group continued its efforts to include Benedetti, LLC REHEAT Machine specifications in government tenders, and to try to secure sales of REHEAT Machines to prospective Benedetti, LLC customers pursuant to the Sales Rep Agreement.

65.     In February 2018, BAK Group identified prospective purchasers of REHEAT Machines in Bahrain.  However, due to the Equipment's failures during the Ministry demonstrations those prospective purchasers decided against the purchase of REHEAT Machines and the sales were not completed.

66.     In July 2018, BAK Group received a Letter of Intent from the Ministry indicating the Ministry's intention to include REHEAT Machine specification in all Ministry tenders (the "**Letter of Intent**"). A true and accurate copy of the Letter of Intent is attached as **Exhibit 13**.

67.     The Ministry once again required a successful demonstration of the Equipment before officially including the REHEAT Machine specifications in its tenders.

68.     In October 2018, BAK Group advised Benedetti, LLC that BAK Group *still* had not made a single dollar on its investment due to the Equipment's repeated failures to perform.

69.     In March 2019, BAK Group agreed to purchase an *additional* $3,000 worth of valves from Benedetti, LLC in an effort to address the Equipment's performance issues.

70.     Beginning in early 2020, because of the COVID-19 pandemic, BAK Group was unable to perform demonstrations of the Equipment or to otherwise conduct business with the Ministry or other governmental entities with respect to the REHEAT Machine(s) for an extended period of time.

71.     BAK Group renewed its efforts in 2022, when the COVID-19 pandemic began to be controlled, and once again prepared to perform a demonstration of the Equipment for the Ministry.

72.     On May 20, 2022, Benedetti, LLC sent correspondence to the Ministry, providing detailed instructions on how to correct the Equipment's performance issues (the "**Benedetti Instructions**"). A true and accurate copy of the Benedetti Instructions is attached as **Exhibit 14**.

73.     On June 1, 2022, the Ministry sent BAK Group a Quality Audit Report detailing observations by the Roads-Project Assessment Committee after evaluating the results of a demonstration performed by the Equipment (the "**Quality Audit Report**"). A true and accurate copy of the Quality Audit Report is attached as **Exhibit 15**.

14

74.     The Quality Audit Report indicated, "Riding quality achieved after recycling the existing wearing course layer reflected difficulties encountered in both East and West Bound driving directions. **Noticeable number of irregularities have been recorded as reflected in the Test Report… This exceeds the maximum number of irregularities allowed by the Ministry in such road category…** On the other hand, the responsible Area Engineer also confirmed receipt of many complaints on the riding quality [of the roads that were repaved using the Equipment] as raised by local residents being regular users of the subject roads… However, the riding quality is still an issue…" (*See Ex. 15 – Quality Audit Report, at Section 3*).

75.     On June 12, 2022, the Ministry sent BAK Group additional correspondence regarding ongoing demonstrations using the Equipment (the "**June 12, 2022 Ministry Letter**"). A true and accurate copy of the June 12, 2022 Ministry Letter is attached as **Exhibit 16**.

76.     The June 12, 2022 Ministry Letter stated, "…[The Equipment] failed to give a ride-able asphalt surface in long roadways, and the reason for this is not yet resolved. **In all cases, [the Equipment] is supposed to be utilized for maintaining long distances of asphalt-paved highways,** due to the difficulty in mobilization, which is not defensible for small areas. We can allow for more trials, if you wish, but this Ministry will not bear the cost of rectifying the failed product of [the Equipment] if occurred in future. Therefore, please decide whether to continue with this scenario until you reach to an acceptable product, or to avoid going into more losses associated with rectification work under your own cost." (*See Ex. 16 – June 12, 2022, Ministry Letter*).

77.     On July 13, 2022, Hasan sent Benedetti, LLC email correspondence (a) indicating the continued problematic performance issues of the Equipment; (b) confirming the recent failure of the Equipment during its demonstration for the Ministry; (c) stating that the BAK Group had

not recouped a single dollar on its investment; and (d) asking Benedetti, LLC for help in addressing these ongoing issues.

78.    In response, Benedetti, LLC again suggested the performance problems could be cured if BAK Group purchased *additional* Benedetti, LLC tools and equipment for $3,500 to help with the rideability issues.

79.    BAK Group continued to communicate performance issues with the Equipment to Benedetti, LLC and continued to rely on suggested troubleshooting techniques as communicated by Benedetti, LLC including the purchase of *additional* Benedetti, LLC tools and equipment. Despite these efforts, the performance issues remained.

80.    On August 27, 2023, Benedetti, LLC sent BAK Group email correspondence indicating Benedetti, LLC's understanding of the performance issues with the Equipment (the "**August 27, 2023 Email**"). A true and accurate copy of the August 27, 2023 Email is attached as **Exhibit 17**.

81.    In the August 27, 2023 Email, Benedetti, LLC offered two potential solutions: (a) the purchase of a *new* REHEAT Machine for approximately $3.25M; or (b) modifying the Equipment at an *additional* cost between $350,000 and $500,000. (*See Ex. 17 - August 27, 2023 Email*).

82.    As a follow-up to the August 27, 2023 Email, Benedetti, LLC sent BAK Group an invoice for proposed modifications to the Equipment indicating a price of $486,000.

83.    After enduring years of: (a) unsuccessful demonstrations of the Equipment; (b) potentially millions of dollars of lost business opportunities; (c) accumulated interest associated with the Line of Credit; and (d) tens of thousands of dollars spent on additional Benedetti, LLC

tools and equipment intended to remediate performance issues associated with the Equipment, BAK Group declined to spend even more money to "cure" problems with the Equipment.

84. BAK Group advised Benedetti, LLC that it would not accept Benedetti, LLC's proposal. The Equipment remains unused and stored in BAK Group's storage facilities.

**Historical Fraud Underlying Sale of the Equipment by Defendants to BAK Group**

85. In the Spring of 2024, BAK Group *first learned* of the extensive fraud that had been perpetrated on it by Defendants.

86. Unbeknownst to BAK Group, sometime in 2012, prior to BAK Group's purchase of the Equipment, Benedetti, LLC contracted to build and sell the Equipment to an entirely *different* customer based in the United States (the "**Domestic Customer**").

87. The Domestic Customer had indicated to Benedetti, LLC that the Domestic Customer desired a REHEAT Machine be designed for use in *parking lots* and therefore should be smaller and lighter than a typical REHEAT Machine.

88. Benedetti, LLC built the REHEAT Machine (the Equipment) pursuant to the specifications of the Domestic Customer.

89. Because the Domestic Customer specified a smaller and lighter machine built specifically for parking lot use, the Equipment was not suitable for the Intended Use on long stretches of roadway and would have (a) bounced up and down when used on long stretches of roadway; and (b) created rideability issues with roadways that had been recycled using the Equipment.

90. Ultimately, the Domestic Customer returned the Equipment to Benedetti, LLC in 2012.

91. The timing of the return of the Equipment coincided with BAK Group's interest in designing and purchasing a *new* REHEAT Machine.

92. Although it had promised to do so, **rather than building a new machine for BAK Group pursuant to BAK Group's needs and Intended Use, Benedetti, LLC passed off the Equipment as being new and sold it to BAK Group**.

93. To facilitate its fraudulent inducement and concealment, neither Benedetti, LLC nor Albert disclosed to BAK Group that: (a) the Equipment was used; (b) the Equipment was originally built for the Domestic Customer, not the BAK Group; (c) the Equipment was returned by the Domestic Customer; (d) the Equipment was smaller and lighter than a typical REHEAT Machine, and was manufactured and designed to pave parking lots; (e) the Equipment was not built for BAK Group's Intended Use of paving long stretches of roadway; (f) the Equipment was modified by adding larger cutting blades, a road paving screed, and a rear furnace to make the Equipment appear that it would be suited for the Intended Use; (g) the Equipment was insufficient to perform long road paving; (h) the performance issues and failed demonstrations were likely the result of the manufacture and design of the Equipment; (i) Benedetti, LLC employees who were responsible for the design, engineering, manufacturing, troubleshooting, repairs, and maintenance of the Equipment had told Albert and other Benedetti employees that the Equipment was too small and too light to accomplish BAK Group's Intended Use of being able to repave long stretches of road; (j) Defendants' proposed "solutions" to the problems would never solve the problems raised by BAK Group; and (k) Defendants' purported photographs of a new REHEAT Machine being built were false (collectively, the "**Fraudulent Conduct**").

94. Benedetti, LLC sold the Equipment to BAK Group to avoid the cost associated with building a new REHEAT Machine for BAK Group's Intended Use.

18

95.     Defendants concealed its fraudulent scheme from BAK Group and fraudulently induced it to enter into the Purchase Agreement and Sales Rep Agreement.

**Defendants Fail to Comply with ICC Arbitration Rules Causing The Arbitration to be Dismissed.**

96.     On July 25, 2024, Plaintiff initiated the Arbitration pursuant to and in compliance with the Parties' Arbitration Agreement.

97.     The Arbitration Agreement is contained within Section 20 of Exhibit 1, which states: "All disputes arising out of or in connection with this Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules."

98.     In filing the Arbitration, BAK Group paid a $5,000.00 non-refundable filing fee.

99.     Article 37(1) of the ICC Arbitration Rules states: "After receipt of the Request, the Secretary General may request the claimant to pay a provisional advance in an amount intended to cover the costs of the arbitration (a) until the Terms of Reference have been drawn up; or (b) when the Expedited Procedure Provisions apply, until the case management conference. Any provisional advance paid will be considered as a partial payment by the claimant of any advance on costs fixed by the Court pursuant to this Article 37."

100.    On or about August 7, 2024 the ICC determined a provisional advance on costs in the amount of $62,000.

101.    On August 27, 2024, BAK Group submitted payment to the ICC for the provisional advance on costs in the amount of $57,000 (as BAK Group's non-refundable filing fee of $5,000 was to be credited towards the provisional advance on costs).

102.    Defendants filed their Answer in the Arbitration on October 3, 2024.

103.    The Arbitration proceeded, and BAK Group incurred significant attorneys' fees related to, among other things: (a) selecting an Arbitrator; (b) negotiating a case management schedule; (c) preparing for and participating in a case management conference; (d) developing Plaintiff's evidence and witness testimony; (e) negotiating the drafting of the Arbitration Terms of Reference, as required by the ICC Arbitration Rules; and (f) conducting discovery.

104.    Article 37(2) of the ICC Arbitration Rules states: "As soon as practicable, the Court shall fix the advance on costs in an amount likely to cover the fees and expenses of the arbitrators, the ICC administrative expenses and any other expenses incurred by ICC related to the arbitration for the claims which have been referred to it by the parties… **The advance on costs fixed by the Court pursuant to this Article 37(2) shall be payable in equal shares by the claimant and the respondent.**" (emphasis added).

105.    On December 23, 2024, the ICC determined the total advance on costs to be $190,000 and issued payment requests to Plaintiff and Defendants for their respective shares of the total advance on costs. A true and accurate copy of the December 23, 2024 ICC correspondence and associated payment requests are attached as **Exhibit 18**.

106.    Article 37(6) of the ICC Arbitration Rules states: "When a request for an advance on costs has not been complied with, and after consultation with the arbitral tribunal, the Secretary General may direct the arbitral tribunal to suspend its work and set a time limit, which must be not less than 15 days, on the expiry of which the relevant claims shall be considered as withdrawn."

107.    Defendants knew that the Arbitration claims would be withdrawn if Defendants refused to comply with their ICC Arbitration payment obligations with respect to the advance on costs.

108.   On January 13, 2025, Plaintiff timely paid its share of the ICC advance on costs in the amount of $33,000.

109.   Despite the ICC providing Defendants with multiple1 extensions to comply with their advance on costs payment obligations, Defendants did not make such payment.

110.   Defendants refused to comply with their ICC fee obligations in a concerted effort to cause the Arbitration claims to be withdrawn.

111.   Ultimately, on May 27, 2025, the ICC issued correspondence indicating that the "the claims are considered withdrawn as of May 26, 2025." A true and accurate copy of the May 27, 2025 ICC correspondence is attached as **Exhibit 19**.

## Count I – FRAUDULENT INDUCEMENT, MISREPRESENTATION, AND CONCEALMENT
### (Against All Defendants)

112.   BAK Group restates and incorporates by reference the allegations contained in the paragraphs above as if fully restated herein.

113.   The Purchase Agreement is a binding and enforceable agreement between BAK Group and Benedetti, LLC.

114.   The Purchase Agreement was the product of extensive negotiations between BAK Group and Benedetti, LLC which contemplated, among other things, the sale to BAK Group of a newly manufactured REHEAT Machine built to BAK Group's specifications and for BAK Group's Intended Use.

115.   BAK Group's receipt of a newly manufactured REHEAT Machine which was built to BAK Group's stated specifications and for its Intended Use was material to the contemplated transaction.

116. Benedetti, LLC sold BAK Group used, returned equipment that was originally built for a different customer, and for an entirely different purpose.

117. Defendants fraudulently concealed the Fraudulent Conduct including, but not limited to, the fact that the Equipment was used, returned, or built for a purpose entirely different than that requested by BAK Group.

118. Defendants' false statements of material fact and/or concealment of the Fraudulent Conduct for which the Equipment was manufactured were made and/or concealed knowingly in order to induce and deceive BAK Group into negotiating and entering into the Purchase Agreement and the Sales Rep Agreement.

119. BAK Group justifiably relied upon Defendants' false statements and/or concealments in negotiating and ultimately entering into the Purchase Agreement and Sales Rep Agreement.

120. As a result of Defendants' Fraudulent Conduct, false statements, inducement, and/or concealments, BAK Group has been damaged in an amount in excess of $75,000.

121. The aforementioned Fraudulent Conduct of Defendants was undertaken with actual malice evidencing a conscious disregard for the rights of BAK Group that warrants an award of punitive damages and attorneys' fees.

### Count II – BREACH OF CONTRACT AS TO THE PURCHASE AGREEMENT
### (Against Benedetti, LLC)

122. BAK Group restates and incorporates by reference the allegations contained in the paragraphs above as if fully restated herein.

123. The Purchase Agreement is a valid and enforceable agreement between BAK Group and Benedetti, LLC.

124.    BAK Group has made all payments owed to Benedetti, LLC for the purchase of the Equipment.

125.    BAK Group has also fulfilled all obligations imposed upon it by the Purchase Agreement.

126.    Benedetti, LLC has breached the Purchase Agreement by failing to provide BAK Group with a newly manufactured REHEAT Machine built to BAK Group's specifications and for its Intended Use.

127.    Benedetti, LLC possesses no legal justification for its breach of the Purchase Agreement.

128.    As a direct result of Benedetti, LLC's breach of the Purchase Agreement, BAK Group has and will suffer substantial damages in excess of $75,000.

### Count III – BREACH OF CONTRACT AS TO THE PURCHASE AGREEMENT'S ARBITRATION AGREEMENT
### (Against all Defendants)

129.    BAK Group restates and incorporates by reference the allegations contained in the paragraphs above as if fully restated herein.

130.    The Purchase Agreement's Arbitration Agreement is a valid and enforceable agreement between BAK Group and Defendants.

131.    BAK Group has fully performed its obligations under the Arbitration Agreement by initiating this dispute with the ICC, following all ICC rules, and timely making all of its required payments related to the Arbitration.

132.    Defendants have breached the Arbitration Agreement by failing to comply with ICC Rules, and specifically among other things, not submitting required payments to the ICC.

133.    Defendants' failure to make such payments caused the Arbitration claims to be withdrawn.

134.    Defendants posses no legal justification for its breach of the Arbitration Agreement.

135.    As a direct result of Defendants' breach of the Arbitration Agreement, BAK Group has and will suffer damages in excess of $75,000, plus reasonable attorneys' fees and expenses.

## Count IV – TORTIOUS INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONS
### (Against all Defendants)

136.    BAK Group restates and incorporates by reference the allegations contained in the paragraphs above as if fully restated herein.

137.    BAK Group maintains contractual and business relations with the Ministry, other governmental entities, and prospective customers.

138.    Defendants have knowledge of BAK Group's contractual and business relations.

139.    Defendants have taken intentional actions including, but not limited to, the Fraudulent Conduct in order to cause a breach and/or termination of the contractual and business relations between BAK Group and the Ministry, other governmental entities, and prospective customers.

140.    Because of Defendants' actions, BAK Group has lost contractual and/or business relations with the Ministry, other governmental entities (including loss of the UAE Job), and prospective customers.

141.    As a direct result of Defendants' interference with BAK Group's contractual and business relations by Defendants, BAK Group has and will suffer damages in excess of $75,000, plus reasonable attorneys' fees and expenses.

24

142.     The aforementioned interference with BAK Group's contractual and business relations by Defendants was undertaken with actual malice evidencing a conscious disregard for the rights of BAK Group that warrants an award of punitive damages and attorneys' fees.

## Count V – NEGLIGENT MISREPRESENTATION
### (Against Benedetti, LLC)

143.     BAK Group restates and incorporates by reference the allegations contained in the paragraphs above as if fully restated herein.

144.     Benedetti, LLC and BAK Group entered into at least two separate business transactions: (a) the Purchase Agreement; and (b) the Sales Rep Agreement.

145.     Benedetti, LLC had a pecuniary interest in both business transactions with BAK Group.

146.     In conjunction with both business transactions with BAK Group, Benedetti, LLC falsely and/or negligently advised BAK Group that it would receive a new REHEAT Equipment, and that the Equipment would be built to BAK Group's specifications for the Intended Use on long stretches of roadway.

147.     Despite Benedetti, LLC's representations, Benedetti, LLC sold BAK Group equipment that was originally built for another customer, was used by another customer, was returned by another customer, and was built for use in parking lots.

148.     Benedetti, LLC's misrepresentations induced BAK Group to enter into the Purchase Agreement and Sales Rep Agreement; and to cause BAK Group to continue to pay Defendants for services and products that would not resolve performance issues with the Equipment.

149.     BAK Group justifiably relied upon Benedetti, LLC's representations with respect to the Equipment.

150.    Benedetti, LLC failed to exercise reasonable care and/or competence when it communicated to BAK Group that the Equipment was newly manufactured and would be built for BAK Group's specific purposes.

151.    As a direct result of Benedetti, LLC's misrepresentations, BAK Group has and will suffer substantial damages in excess of $75,000.

### Count VI – PERSONAL LIABILITY OF ALBERT BENEDETTI
**(BAK Group's Claim for Piercing the Corporate Veil Against Albert Benedetti)**

152.    BAK Group restates and incorporates by reference the allegations contained in the paragraphs above as if fully restated herein.

153.    At all times relevant herein, Albert exercised complete dominion and control over all aspects of Benedetti Holdings and Benedetti, LLC's management and operations such that Benedetti Holdings and Benedetti, LLC had no separate mind, will, and/or existence of their own.

154.    Specifically, and at all times relevant herein, Albert exercised control over, and used Benedetti Holdings and Benedetti, LLC in such a manner as to defraud and harm BAK Group.

155.    Upon information and belief, Benedetti Holdings and Benedetti, LLC was grossly undercapitalized.

156.    Specifically, and at all times relevant herein, upon information and belief, Albert disregarded legal formalities and failed to maintain arm's length relationships between himself and Benedetti Holdings and/or Benedetti, LLC; and Albert failed to observe normal and customary corporate formalities and procedures, such as holding meetings for Benedetti Holdings and Benedetti, LLC's members and failing to prepare, maintain and retain their corporate records.

157.    Albert is the alter-ego and/or mere instrumentality of both Benedetti Holdings and Benedetti, LLC.

26

158.    Albert used his dominion and control over Benedetti Holdings and Benedetti, LLC in such a manner as to commit fraud, an illegal act, and/or other unlawful and unjust acts against BAK Group.

159.    Albert utilized Benedetti Holdings and Benedetti, LLC, to intentionally mislead and deceive BAK Group, as outlined herein, which caused BAK Group to continue its business relationship with Albert, Benedetti Holdings and/or Benedetti, LLC.

160.    As a direct and proximate result of Albert's control and actions, BAK Group has suffered unjust loss and injury, for which Albert is personally liable.

161.    By virtue of the foregoing, this Court should pierce the corporate veil and permit BAK Group to have judgment against Albert for his actions and omissions as set forth herein.

162.    As a direct and proximate result of Albert's actions as outlined herein, BAK Group has and will suffer damages in excess of $75,000, plus reasonable attorneys' fees and expenses.

163.    The aforementioned misconduct of Albert was undertaken with actual malice evidencing a conscious disregard for the rights of BAK Group that warrants an award of punitive damages and attorneys' fees.

## REQUEST FOR RELIEF

WHEREFORE, BAK Group seeks judgment against Defendants Angelo Benedetti, LLC, Angelo Benedetti Holdings, Inc., and Albert E. Benedetti as follows:

1. On Count I of the Complaint for Fraudulent Inducement, Misrepresentation, and Concealment against all Defendants, BAK Group requests judgment in its favor against all Defendants for compensatory damages, punitive damages, and reasonable attorneys' fees and expenses.

2. On Count II of the Complaint for Breach of Contract as to the Purchase Agreement against Benedetti, LLC, BAK Group requests judgment in its favor against Benedetti, LLC for compensatory damages.

3. On Count III of the Complaint against all Defendants for Breach of the Purchase Agreement's Arbitration Agreement, BAK Group requests judgment in its favor against all Defendants for compensatory damages, including reasonable attorneys' fees and expenses.

4. On Count IV of the Complaint for Tortious Interference with Contractual and Business Relations against all Defendants, BAK Group requests judgment in its favor against all Defendants for compensatory damages, punitive damages, and reasonable attorneys' fees and expenses.

5. On Count V of the Complaint for Negligent Misrepresentation against Benedetti, LLC, BAK Group requests judgment in its favor against Benedetti, LLC for compensatory damages.

6. On Count VI of the Complaint for Personal Liability against Albert E. Benedetti, BAK Group requests judgment in its favor against Albert E. Benedetti for compensatory damages, punitive damages, and reasonable attorneys' fees and expenses.

7. For pre-judgment and post-judgment interest.

8. For an award of attorneys' fees.

9. For such other further and appropriate relief as the Court deems appropriate.

Respectfully submitted,

/s/ Oliver L. Herthneck
Phillip A. Ciano (#0066134)
Brent S. Silverman (#0062859)
Oliver L. Herthneck (#0091648)
**CIANO & GOLDWASSER, L.L.P.**
3201 Enterprise Parkway, Suite 350
Cleveland, Ohio 44122
Tel: (216) 658-9900
Fax: (216) 658-9920
E-mail: pac@c-g-law.com
E-mail: bss@c-g-law.com
E-mail: olh@c-g-law.com
*Attorneys for Plaintiff*

## JURY DEMAND

Pursuant to Fed R. Civ. P. 38, Plaintiff Bader Ahmed Kaiksow Group hereby requests a trial by jury on all triable issues.

/s/ Oliver L. Herthneck
Oliver L. Herthneck

Angelo Benedetti Incorporated
Purchase and Regulation of Use Agreement
01 September 2013

# PURCHASE AND REGULATION OF USE AGREEMENT

This purchase and regulation of use agreement ("Agreement") is by and between

**Angelo Benedetti, Inc. ("Seller")**

And

**Bader Ahmed Kalksow (commercial registration number 15188-2) ("Purchaser")**

## RECITALS

WHEREAS, the Seller desires to sell, and the Purchaser desires to purchase, a pre heating and asphalt Re-Heat Recycling machine ("Equipment") for use to lay new recycled road asphalt in Bahrain, Kuwait, United Arab Emirates, Oman, and Qatar and Saudi Arabia ("Territory"). The specifications for the Equipment are more fully described in the attached Schedule A ("Equipment Specifications");

and

WHEREAS, the Seller desires to grant to the Purchaser the right within the Territory to operate the Equipment in the performance of Re-Heat (Recycled Hot Emulsified Asphalt Treatment) recycling services which are more fully described in the attached Schedule B ("Re-Heat Specifications");

and

WHEREAS, the Purchaser desires to work cooperatively with the Seller for the purposes of pursuing opportunities and markets for the performance of Re-Heat recycling services

Purchaser's Initials

Seller's Initials

Page 1 of 10



NOW, THEREFORE, the parties hereto agree as follows:

1.    **Purchase of the Equipment**

The Seller sells to the Purchaser and the Purchaser purchases from the Seller, the Equipment, subject to and in accordance with the terms set out herein.

2.    **Purchase Price**

The Purchase Price for each set of Equipment is USD 2,500,000.00 (two million five hundred thousand US dollars only).  The Equipment will be available CIF Bahrain, for an additional USD 75,000.00 (seventy five thousand US dollars only, making the total Purchase Price USD 2,575,000.00 (two million five hundred seventy five thousand US dollars only) per set.  (The "Purchase Price").   The Purchaser shall purchase two sets of Equipment from the Seller using the below payment method with first payment of each order, as per clause (ii), to have been received by the Seller prior to 31/12/14. This payment date may be relaxed at the sole discretion of the Seller if requested to do so by the Buyer in good faith. The Purchaser shall pay the Purchase Price to the Seller to the account chosen by Seller as follows:

**Account Details:**

| | |
|---|---|
| Bank Name: | PNC Bank |
| Address: | 524 East Aurora Road, Macedonia, Ohio, 44056-180 |
| Account Number: | 4244174822 |
| Branch Code: | 0382 |
| Swift Code: | PNCCUS33NJ |

**Payment Terms:**

(i)    The Purchaser shall pay the Purchase Price for each purchase to the Seller with a Red Clause Letter of Credit ("LC") that is advised through and confirmed by PNC Bank, Global Trade Service Operations, located at 2 Tower Center Blvd. 9th Floor, East Brunswick, NJ 08816, and allows the Seller to draw on the LC under the terms herewith, using the above account details.

(ii)    25% i.e. USD $643,750.00 (six hundred forty three thousand seven hundred and fifty US dollars only) of the total Purchase Price shall be received upon presentation of a sight draft.

(iii)    25% i.e. USD $643,750.00 (six hundred forty three thousand seven hundred and fifty US dollars only) of the total Purchase Price shall be paid 60 days after the presentation of the draft mentioned in (ii).

(iv)    25% i.e. USD $643,750.00 (six hundred forty three thousand seven hundred and fifty US dollars only) of the total Purchase Price shall be paid 60 days after the presentation of the draft mentioned in (iii).

(v)    25% i.e. USD $643,750.00 (six hundred forty three thousand seven hundred and fifty US dollars only) of the total Purchase Price shall be paid upon completion with confirmation of shipment.

Purchaser's Initials:        Seller's Initials:        Page 2 of 20

(vi)  Any delays in the payments from the above clause (ii) and (iii) requires prior written agreement from the seller, which shall not be unreasonably withheld. In the event that payment is late without prior approval the order shall be deemed cancelled and all previous payments forfeit and this agreement terminated.

Prices for additional sets of equipment to be negotiated prior to purchasing due to fluctuating costs and market values.  Any increases in subsequent equipment or parts prices shall be reasonable, and based on annual inflation plus any justified increases to material and input costs.

**3.    Terms of Delivery**

The Seller covenants and agrees to ship the Equipment CIF Bahrain, on or before 210 (two hundred and ten) days from receipt by the Seller of the payment in Paragraph 2(i) from the Purchaser provided all subsequent payment terms are met by the Purchaser, namely Paragraph 2 (ii), (iii), (iv). All logistical costs and expenses, in the amount of USD 75,000.00 (seventy five thousand USD only), shall be paid by the Purchaser.  The Seller shall notify the Purchaser in writing as soon as the Equipment has shipped.  The following must be collected upon shipment and submitted to the issuing bank for final payment of the LC;

(i) Signed commercial invoice in triplicate showing separately the price and net weight of each type of goods and must indicate origin of goods and name and address of manufacturer / processor / producer.

(ii) Signed Packing List in triplicate showing number of package(s) or carton(s).

(iii) Certificate of Origin issued in one original and one copy showing the name and address of manufacturer /processor / producer and must be legalized by local chamber of commerce.

(iv) Full set of three clean onboard ocean bills of lading made out to order of Kuwait Finance House (Bahrain) marked Freight Paid.

(v) Insurance policy or certificate in negotiable form blank endorsed for not less than 110% of invoice value irrespective of percentage covering.  All claims must be payable by a claim setting agent in Bahrain whose full name and address must be expressly stated on policy or certificate.

The date of pickup for particular Equipment shall be deemed the "Delivery Date" for such Equipment for purposes of this Agreement. If the applicable Equipment is not available for shipment within 30 days after the required delivery date specified above (except for delays as a result of force majeure conditions affecting the Seller as described in Paragraph 7 hereof), the Purchaser shall have the right to negotiate the termination of this Agreement.

**4.      Training**

The Seller shall provide the Purchaser's employees or agents training on the proper use, operation, troubleshooting, performance of minor repairs and maintenance of the Equipment (the "Training") for a period of up to thirty (30) uninterrupted days following the delivery of the Equipment to the Purchaser, if requested by the Purchaser. The Training shall be provided on a specified project(s) at no additional charge. The Purchaser however shall be responsible for all travel costs, providing economy grade flights for training  staff to location and including local area transport to work sites, and  food and lodging expenses as per average US standards, related to the Training which will be in addition to the Purchase Price. The work hours for the training staff shall be eight (8) hours per day, five (5) days per week.

**5.      Bill of Sale**

The Seller shall deliver to the Purchaser a Bill of Sale for each piece of the Equipment, transferring title to the applicable Equipment to the Purchaser. A Bill of Sale shall be delivered to the Purchaser contemporaneously with delivery of the Equipment to the Purchaser in accordance with paragraph 3 of this Agreement.

**6.      Warranty / Limitation of Liability**

Angelo Benedetti, Inc. ("ABI") warrants that each new Recycler unit of Re-Heat Recycling equipment ("Equipment") manufactured by ABI shall, for the duration of the warranty period, (i) operate free from defects in material, design or workmanship and (ii) operate in conformance with and otherwise conform to the Equipment specifications, standards and instructions furnished by ABI to initial buyer and those that are described in the patent applications related to the Equipment. The warranty period is for one year, beginning on the date that the Equipment is first used by the initial buyer, or placed in service for a project awarded to the initial buyer, whichever occurs first.

ABI's obligations under this warranty are limited to repairing or replacing, as ABI may elect in its sole discretion, without charge to the original purchaser, the item or items which ABI, after examination, finds to ABI's sole satisfaction to be defective as to material or workmanship.

ABI's obligation under this warranty is subject to the conditions precedent (1) that the claimed defect shall have first appeared during the warranty period; (2) that the original purchaser shall have notified ABI in writing of the claimed defect, which notice shall set forth in reasonable detail the cause (if known) and description of the defect and shall be delivered to ABI within fourteen (14) days after the claimed defect shall have first appeared, and (3) that, unless ABI directs otherwise, the claimed defective item or items shall have been returned to ABI, or to ABI's designee, promptly after the notification, with transportation charges prepaid. Any warranty claim not made in strict compliance with these timelines and procedures shall be conclusively deemed waived. ABI reserves the right to thoroughly examine the Equipment or parts thereof, prior to conducting or approving any repair or replacement, to determine whether the claimed defect is covered by this warranty. The conditions of any test designed to resolve

Purchaser's Initials                    Seller's Initials                    Page 4 of 26

any alleged breach of warranty shall be mutually agreed upon, and ABI shall be notified of and may be represented if ABI so chooses in all such tests that may be made.

Any item repaired or replaced by ABI under this warranty is itself warranted under this warranty for the duration of the warranty period applicable to the Equipment remaining at the time of the repair or replacement, subject, however, to the provisions of this warranty as are applicable to those item or items repaired or replaced by ABI.

This warranty shall extend only to the first purchaser (if any) of the equipment from the initial buyer, and shall not be assigned or transferred to any subsequent purchaser.

This warranty does not apply to or cover:

(1) normal maintenance services or adjustments (with the recognition that the Equipment is used in heavy construction activities which normally requires significant daily, weekly and other maintenance activities in order to properly maintain and preserve the Equipment);

(2) normal wear (with the recognition that the Equipment is used in heavy construction activities which may normally result in significant wear to items including heat blankets, tires, augers, hoses, blades and center mills), provided, however, that the tires for the Equipment are covered against defects only, and not against normal wear;

(3) any item that has been substantially repaired, replaced or altered by a person or entity other than ABI's personnel or authorized service representatives (unless specifically approved in writing in advance by ABI) in a manner which adversely affects the operations or reliability of the item or Equipment, and any damage to the Equipment resulting from such unauthorized and/or improper repair, replacement or alteration;

(4) used or operated substantially in violation of any instructions or training material provided by ABI;

(5) special, incidental or consequential damages including, but not limited to, loss of time, inconvenience, loss of use, or lost profits;

(6) any malfunction resulting from misuse, negligence, alteration, accident or lack of operational knowledge, normal maintenance or adjustments, or resulting from failure to replace items/components suffering from normal wear;

(7) time required to unload or reload the vehicle or item;

(8) replacement of maintenance items including, but not limited to, filters, screens, hydraulic fluid, lubricants, hoses and other incidentals;

(9) transportation fees or charges;

(10) items installed on the Equipment that are not usually included on the Equipment by ABI but which constitute customization of the Equipment directed by the initial buyer, and any damages to the Equipment resulting from the Customized Items; or

(11) any item which is manufactured by a party other than ABI and which is separately warranted by that party, all such other warranties (including but not limited to warranties issued by Ohio Cat, Caterpillar Inc., Algas

Purchaser's Initials: _____     Seller's Initials: _____     Page 3 of 80

SDI International, LLC, Regal-Beloit Corporation, Eaton Aeroquip, Inc., Eaton Hydraulics Inc., Permco, Poclain Hydraulics, Inc., Sauer-Danfoss (US) Company, and/or SunSource), which have been, or if they have not been, hereby are, transferred by ABI to the initial buyer.

This warranty is void if ABI determines that the Equipment or item has been neglected, misused, altered, overpressured or damaged. This warranty is also void if ABI determines that a warranty claim is false or misrepresented, that the Equipment has been damaged in an accident or by an act of God, or that the defect is attributable to use or operation of the vehicle or item in a manner or purpose other than that for which ABI intended or designed the Equipment or item.

THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED (INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PURPOSE AND ANY WARRANTIES ARISING BY OPERATION OF LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, OR USAGE OF TRADE), ALL OTHER REPRESENTATIONS TO THE ORIGINAL PURCHASER, AND ALL OTHER OBLIGATIONS OR LIABILITIES WHATSOEVER, INCLUDING, BUT NOT LIMITED TO, ANY OBLIGATION OR LIABILITY FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL OR CONTINGENT DAMAGE OR EXPENSE, AND ABI NEITHER GIVES NOR ASSUMES, NOR AUTHORIZES ANY OTHER PERSON TO GIVE OR ASSUME, ANY OTHER WARRANTY, OBLIGATION OR LIABILITY ON ABI'S BEHALF, UNLESS EXPRESSLY GIVEN OR ASSUMED IN WRITING BY ABI.

ABI reserves the right to make changes to ABI's products without incurring any obligation to modify or improve previously manufactured products.

7.      Force Majeure

The Seller shall be relieved of liability under this Agreement for failure to perform any of its obligations hereunder to the extent that such failure is caused by or arises out of any event or circumstance beyond the reasonable control of the Seller, including but not limited to acts of God, fire, explosion, flood, compliance with any governmental law, rule or regulation, and strikes or other differences with workers. In the event that the Seller's performance is so affected, the Seller shall notify the Purchaser and the time for performance of this Agreement shall be extended for so long as such event or circumstance persist. The Seller's failure to deliver the Equipment on the date set forth in Paragraph 3 of this Agreement shall relieve the Purchaser of its obligation to make payments as set forth in Paragraph 2 of this Agreement, until delivery is made, and the timing of payments shall be extended for a period of time equal to the period of delay.

8.      Further Assurances

The parties agree that, at any time and from time to time after the execution of this Agreement, they will, upon the request of the other party and at the requesting party's expense, do, execute, acknowledge and deliver, or cause to

Purchaser's Initials _____

Seller's Initials _____

Page 8 of 20

be done, executed, acknowledged or delivered, all such further acts, deeds, assignments, transfers, conveyances or assurances as may be required in order to consummate the transactions contemplated by this Agreement. The parties shall act in good faith to resolve any unforeseen issues that may arise during the performance of this Agreement.

**9.    Exclusivity**

The Seller warrants that it shall not sell Equipment into or allow any other party the right of use of the Equipment in the Territory without prior written approval from the Purchaser.

**10.    Usage and Re-Sale**

The Purchaser acknowledges that the re-sale and/or operation of the Equipment to or in any area outside of the Territory must be agreed to in writing with the Seller prior to such resale or operation. The Purchaser hereby acknowledges that it is aware that the Seller has executed territorial exclusivity agreements with other parties regarding the Equipment outside of the Territory and as such the Purchaser indemnifies the Seller against any and all losses, including consequential losses, incurred by the Seller due to the Purchaser utilising or selling the Equipment in or to areas outside of the herein defined Territory. The Seller shall hold and maintain the right of first refusal if the Equipment is to be offered for re-sale on the open market, which right shall be exercised by written notice to be delivered within thirty (30) days of the Purchaser's written notice to the Seller of its intent to sell, and the terms of purchase shall be for a purchase price and on terms equal to or more favorable to than those offered to a third party. This Paragraph ten (10) will survive the termination of this Agreement.

**11.    Re-Heat Recycling Services**

The Purchaser shall exercise good faith efforts to perform the Re-Heat Recycling Services with trained and qualified personnel, in a good and workmanlike manner. During the validity of this Agreement, Purchaser shall not, directly or indirectly, engage in the manufacture, promotion, sale or use of products competitive with the Equipment that are manufactured or sold by any competitor of the Seller, without the prior written consent of the Seller. Notwithstanding the foregoing, the Purchaser shall have the right at all times to engage in other businesses and ventures for its own respective profit, including the right to supply materials and perform asphalt paving services utilising its traditional methods for any customer or within any market, regardless of whether Re-Heat Recycling Services are available or being considered within such market. While it is the parties' intent to work cooperatively to pursue certain opportunities to perform Re-Heat Recycling Services in various markets the Purchaser shall have no duty or obligation to perform such services with the Equipment where it is unable or unwilling to do so. The relationship of the parties shall be limited to the performance of Re-Heat Recycling Services. Nothing contained herein shall be construed to;

 (i)    create a general partnership between the parties,

Purchaser's Initials _____   Seller's Initials _____  Page 7 of 10

(ii)  authorise any party to act as general agent for the other party, or

(iii)  permit any party to bid- for or to undertake any contracts for the other party.

**12.    Notices**

All notices and other communications required or permitted under this Agreement shall be deemed to have been duly given and made if in writing and if served either by personal delivery to the party for whom intended (which shall include delivery by Federal Express or similar service, or by electronic mail with proof of receipt) or ten (10) business days after being deposited in the relevant origin countries postage/mail service, postage prepaid, registered or certified, return receipt requested, addressed as follows (or at the most recent address specified by notice given to the other party):

> If to the Seller:
> Angelo Benedetti, Inc.
> 94 First Avenue Bedford
> OR 44146
> U.S.A.
> ab@angelobenedetti.com
> Attn: Albert Benedetti, President

> If to the Purchaser:
> Bader Ahmed Kalkso
> Building 4016, Road 469
> Block 604
> Sitra, Kingdom of Bahrain
> Attn: Hassan B Kalksow, Managing Director

**13.    Intellectual Property**

(a)  At the time of delivery of the Equipment, the Seller shall provide the Buyer with two (2) digital copies of any owner's manual, drawings, specifications and other technical documents ("Production Information") relating to the Equipment necessary for the Purchaser to operate, maintain, troubleshoot, and/or perform minor repairs to the Equipment. The Seller grants to the Purchaser a non-exclusive, royalty- free license to reproduce and use the Product Information solely for the purposes of operating, maintaining, repairing and otherwise using the Equipment.

(b)  In the event either party shall learn of any claim or act of any third party that constitutes or may constitute or result in an infringement or other violation of any of the Seller's IP Rights (further described in Schedule C "Seller's IP Rights") in the Territory, such party shall promptly notify the other party in writing. Such

Purchaser's Initials: _____                    Seller's Initials: _____                    Page 8 of 39

notice shall include information with respect to the infringement reasonably necessary to conduct a lawsuit, including any available evidence of such infringement. The Seller shall have the first right, but not the obligation, to institute and prosecute, at its own expense, all actions, suits or proceedings against such violations, and the Seller may, for such purposes, permit the Purchaser to join as a party plaintiff. In the event the Seller and Purchaser (if joined as a party plaintiff) institute(s) an action for such an infringement under this Paragraph 13(b) and a settlement is entered into or monetary damages are awarded in a final non-appealable judgment, the amount paid as a result of such settlement or the monetary damages awarded shall first be applied to the payment of the Seller's and the Purchaser's (if the Purchaser is a joined party plaintiff) actual out-of-pocket expenses, including attorney's fees incurred for the action, and the balance of any such amount shall be divided appropriately between the Seller and Purchaser with reference to the relative monetary injury suffered by each as a result of the infringement for which such amount is recovered. If the Seller fails to initiate proceedings to prevent, or otherwise respond to such an infringement within 120 (one hundred and twenty) days after receipt of written notice of such infringement, the Purchaser shall have the right, upon written notice to the Seller, to initiate and/or prosecute at the Purchaser's sole cost and expense, such legal or equitable proceedings as the Purchaser may deem necessary or appropriate to prevent or terminate such infringement or to recover damages in respect thereof. In the event the Purchaser institutes an action for such an infringement under this Paragraph 13(b) and a settlement is entered into and monetary damages are awarded in a final non-appealable judgment, the amount paid as a result of such settlement or the monetary damages awarded shall first be applied to the payment of the Seller's and the Purchaser's actual out-of-pocket expenses, including actual attorneys' fees incurred for the action, and the balance of any such amount shall be divided appropriately between the Purchaser and the Seller with reference to the relative monetary injury suffered by each as a result of the infringement for which such amount is recovered. The parties shall at all times cooperate with each other and keep each other fully informed with respect to any proceedings initiated and/or prosecuted pursuant to this Paragraph 13(b). The party not in control of the suit or proceedings shall, at the request and expense of the controlling party, render all reasonable assistance, including, providing all information and documents in its possession and any witnesses as are or may be required in the conduct of any proceeding referred to in this Paragraph 13(b).

(c)  Notwithstanding anything contained in this Agreement, the Purchaser shall not enter into any settlement or make any admissions that would affect the rights of the Seller, without first obtaining the written consent of the Seller; and the Seller shall not enter into any settlement or make any admissions that would affect the rights of the Purchaser in the Equipment, ABI Re-Heat Recycling Products, ABI IP Rights or ABI Re-Heat Recycling Services.

(d)  This Paragraph 13 will survive the termination of this Agreement.

14.  Default

Purchaser's Initials                    Seller's Initials                    Page 9 of 38

(a)  A party shall be considered in default of this Agreement if such party breaches any material term of this Agreement, becomes insolvent, dissolves or liquidates, makes a general assignment for the benefit of its creditors, becomes subject to the appointment of a receiver, or files a petition in bankruptcy (whether voluntary or involuntary) ("Events of Default"). Upon an Event of Default by the Seller, the Purchaser shall be entitled to terminate this Agreement following fourteen (14) days written notice from the Purchaser to the Seller and an opportunity for the Seller to cure such Event of Default and to recover all cost, expense and damages incurred by the Purchaser as result of such Events of Default, including recovery of the repayment of all advance payments made to the Seller pursuant to Paragraph 2 of this Agreement if such Event of Default occurs prior to delivery of the Equipment. Upon an Event of Default by the Purchaser, the Seller shall be entitled to terminate this Agreement following fourteen (14) days written notice from the Seller to the Purchaser and an opportunity to cure such Event of Default and to recover all cost, expense and damages incurred by the Seller as a result of such Event of Default. The Seller can immediately terminate this Agreement in the event that the Purchaser breaches the territorial provisions of this Agreement. Any remedies under this paragraph fourteen (14) do not affect either of the parties' ability to claim under any other cause of action e.g. common law.

(b)  The Purchaser's obligations in Paragraph eight (8) to exercise good faith efforts to perform the Re-Heat Recycling Services with trained personnel, and in a workmanlike manner, shall not be considered an Event of Default unless the Purchaser fails to adhere to this obligation after receiving a written notice from the Seller, and the Seller is hindered from being able to promote the Re-Heat Recycling Services or sell related equipment, as a result of such failure.

**15.   General**

(a)  This Agreement sets forth the entire understanding of the parties concerning the subject matter hereof and supersedes any prior oral or written agreements and understandings with respect to the subject matter hereof. This Agreement may be modified only by an instrument in writing that refers to this Agreement and is executed by the parties hereto.

(c)  The failure of either party at any time to require performance of any provision of this agreement shall not affect the right of such party to require performance of that provision or of any other provision in the future. No waiver by either party with respect to a breach of any provision of this agreement shall be construed as a waiver with respect to any continuing or subsequent breach of that provision, or as a waiver of any other right under this agreement

**16.   Binding Effect**

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

Purchaser's Initials.                    Seller's Initials                    Page 30 of 39

**17.    Duration**

This Agreement will commence on the date of the signature hereto by the Seller and shall continue for a period of ten (10) calendar years and is subject to renewal for an additional period, and on terms and conditions agreed on by both parties.

**18.    Counterparts**

This Agreement may be signed in one or more counterparts, each of which shall be deemed an original. The delivery of this Agreement may be made by facsimile or document format (ie.pdf), and such signatures shall be treated as original signatures for all applicable purposes.

**19.    Termination**

In addition to the termination rights otherwise specified in this Agreement, this Agreement may be terminated: (a) upon the written agreement of the parties; or (b) upon written notice from either party to the other party in the event such other party defaults in the performance of its material duties under this Agreement (other than due to the force majeure events described in this Agreement) and such default is not cured in fourteen (14) days after its receipt of written notice specifying the default. Upon termination of this Agreement the rights and obligations of the parties under this Agreement shall terminate excluding specifically surviving clauses; provided, however nothing in this Paragraph nineteen (19) is intended to be construed to limit any party's remedies that are otherwise available to it for breach of an obligation by the other party. In the event that the Purchaser fails to meet any of the requirements of paragraph two (2) of both this Agreement and the respective paragraph two (2) of the General Purchase and Regulation of Use Agreement for Bahrain and Saudi Arabia signed between the parties, this Agreement will terminate immediately.

**20.    Dispute Resolution**

All disputes arising out of or in connection with this Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules.

**21.    Severability**

Purchaser's Initials                    Seller's Initials                    Page 33 of 40

Each of the provisions of this agreement shall be considered as separate terms and conditions and in the event that this agreement is affected by any legislation or any amendment thereto, or if the provisions herein contained are by virtue of that legislation or otherwise, held to be illegal, invalid, prohibited or unenforceable, then any such provisions shall be ineffective only to the extent of the illegality, invalidity, prohibition or unenforceability and each of the remaining provisions hereof shall remain in full force and effect as if the illegal, invalid, prohibited or unenforceable provision was not a part hereof.

**22.    Cession and Assignment clause**

The parties will not be allowed to cede or assign any responsibilities or rights contained herein without the prior written approval of the other party, which shall not be unreasonably withheld.

IN WITNESS HEREOF, the duly authorised officers of the parties have executed this Agreement effective from the date first written above.

For:    Angelo Benedetti Inc.
        Director, duly authorised

Name:   Albert Benedetti
Date:   1-15-14
Place:  Bedford, OH, U.S.A

For:    Bader Ahmed Kaiksow (commercial registration number 19188-2)
        Managing Director, duly authorised

Name:   Hassan Bader Kaiksow
Date:   12/01/2014
Place:  Sitra, Kingdom of Bahrain

Purchaser's Initials                Seller's Initials                Page 14 of 26

Angelo Benedetti Incorporated
Purchase and Regulation of Use Agreement
03 September 2013

## Schedule A

## (Equipment Specifications)

**Recycled Hot Emulsified Asphalt Recycling Machine Specification**

The (REHEAT) Asphalt Recycling Machine, designed and developed by Angelo Benedetti, Inc. utilises a recycling and rejuvenating process to refinish damaged pavement surfaces in one pass and provide final surface course. The REHEAT Asphalt Recycling Machine heats the damaged pavement to a workable temperature via a radiant convection heat source, utilises a series of contoured blades to engage the asphalt surface lifting and dislodging fifty (50) millimeters of the top layer of pavement, immediately adds an asphalt emulsion, mixed in a heated on-board plant to the reclaimed pavement, immediately lays down the newly rejuvenated mix, and compacts the new surface to original grade, all in a single, one step process, comprised of two machines not more than 26 meters total in length, so as to minimise the interruption to traffic and road closures. This surface is 100% recycled and applied as the final driving surface course of asphalt and shall not require an additional asphalt overlay. The equipment produces between 2500m2 to 5000m2 of recycled and rejuvenated asphalt in a typical 8 hour shift under normal environmental conditions. This quantity is neither a minimum nor maximum and is purely for indicative purposes. The variance in the values is due to the nature of the variability of the road surface nature and obstructions therein, environmental factors and the Re-Heat team's proficiency using the equipment and process.

• REHEAT Furnace Unit – A radiant convection heating unit on the first frame structure heats and softens the damaged surface to be recycled. The heating unit includes a plurality of ceramic burners each housed within a fiber block. The burners are fueled by a liquid propane tank housed on the machine and utilise a 50/50 fuel to air ratio. The emissions from the heating of the asphalt pavement are re-circulated by forced air. Unit dimensions are 10m x 2.4m x 2.5m.

• REHEAT Recycling Unit – The recycling equipment unit used for collecting the existing asphalt concrete together (shearing), adding the new material (rejuvenating agent), mixing and paving the recycled mix in a continuous process shall be a self-contained, self-propelled unit designed for this purpose. Unit dimensions are 12.5m x 2.4m x 2.5m.

- For the purpose of this contract, the self-containment requirement for the recycling unit shall mean once the existing asphalt pavement is sheared, it remains contained in the recycling unit, and immediately mixed with the rejuvenating agent. The recycled asphalt concrete is placed for immediate compaction. The recycled asphalt pavement shall not be exposed to atmospheric conditions except when placed for compaction.

- The recycling unit shall be capable of shearing the heated asphalt pavement to the specified depth in a uniform pattern, adding rejuvenator, and loading existing asphalt into a heated mixing plant for a minimum of 30 seconds. The recycling unit shall then be capable of placing and leveling the recycled asphalt pavement in a final surface

Purchaser's Initials                     Seller's Initials                     Page 13 of 34

Angelo Benedetti Incorporated
Purchase and Regulation of Use Agreement
02 September 2013

condition for immediate re-compaction. The rate of application of the rejuvenating agent shall be controlled to maintain the specified application rate in relation to the operating speed of the machine.

• Articulating Frame Structure – The Asphalt Recycling Machine includes a first frame member having a tapered end and connected to a second frame structure having a tapered end. The tapered ends are connected by an articulating pin. The tapered frame design and articulating pin connection allows the Asphalt Recycling Machine to operate around curved and cornered surfaces.

• Wheel Lifts – Wheel lifts are engaged with the wheels of the machine to provide vertical adjustment. The wheel lifts allow each wheel to be independently raised and lowered to a desired height, thereby altering the distance between the machine components and the asphalt surface.

• Shearing Blades – A series of contoured shearing blades are arranged to lift and dislodge the heated and softened asphalt. The shearing blades in conjunction with spiral blades arranged along a horizontal axis and are arranged to funnel dislodged pavement towards the center of the machine.

• Center Mill – The Asphalt Recycling Machine includes a revolutionary center mill designed to further dislodge the reclaimed pavement while also lifting the reclaimed pavement and immediately delivering it to the on-board mixer plant. The center mill includes a series of cutting teeth spirally positioned about the mill to incise the pavement, and a series of paddles or lips positioned between the teeth to lift and deliver the reclaimed asphalt into the on-board mixer plant.

• On-Board Plant – A mixer plant is housed on the Asphalt Recycling Machine to receive and recondition the reclaimed asphalt. The on-board mixer plant includes a trommel to separate usable reclaimed asphalt from unusable reclaimed asphalt. The unusable reclaimed asphalt is redistributed to immediately be re-processed into usable material.

Description

New 2013 Benedetti ReHeat Asphalt Pavement Heater (APH 20): working width 8' to 12'; CAT C4.4 Tier III diesel engine; first & second stage radiant convection heating system, gas operated thermostatically controlled dual Algas vaporizers; heating output pressure regulating valves, front wheel hydrostatic drive; 2-wheel infinitely variable hydraulic drive front axle; 2-speed ranges; all-wheel steering; (4) 425\65\R22.5 foam filled tires; stationary mounted operator control panel; safety package with engine kill switches and emergency shut-off switches for gas system; security package; water spray system; single 3218 liter propane tank; 379 liter tank, 379 liter hydraulic tank; 379 liter water tank; yellow paint.

Purchaser's Initials          Seller's Initials          Page 64 of 20

SPARES – (1) foam filled 425\65\R22.5 tire, (1) vaporizer control, (1) gas relief valve, (1) front steering cylinder, (2) water spray tips, (1) box of high temperature ceramic fiber skirting, (1) box of stainless steel clips, and miscellaneous seal kits.

New 2013 Benedetti ReHeat Recycler (APR-20); CAT C15 Tier III engine; 6 wheel independent hydrostatic drive; front wheel steering; center articulation, 8' to 14' working width single 1MIL BTU furnace; 6'-12' adjustable extension blades; fixed centermill; heated asphalt plant; security package; gas operated thermostatically controlled single Algas vaporizer; (2) foam filled 445\65\R22.5 tires, (4) air filled 445\65\R22.5 tires; micro-motion flow meter system with digital display; paving screed with heat; 946 liter propane tank; 568 liter fuel tank; 1060 liter hydraulic tank, (2) 1983 liter emulsion tanks; 189 liter water tank; yellow paint SPARES – (1) foam filled 17.5 x 25 tire, (1) air filled 445\65\R22.5 tire, (1) vaporizer control, (1) gas relief valve, (3) blade sections, (1) bucket of milling holders, (1) bucket of carbide milling tips, (1) asphalt plant wheel, (1) box of high temperature ceramic fiber skirting, (1) box of stainless steel clips, and miscellaneous seal kits.

Purchaser's Initials _____     Seller's Initials _____     Page 43 of 59

## SCHEDULE B

## (RE-HEAT SPECIFICATIONS)

### 1. Scope

The work covered by this specification consists of furnishing all plant, labour, equipment, and materials in performing all operations by REHEAT Asphalt Surface Recycling in complete and strict accordance with these specifications.

### 2. REHEAT Asphalt Surface Recycling

**A. Description.** This work shall consists of the development of a pavement mix design based upon the gradation and asphalt content of the existing pavement, preparing the surface, heating the pavement, applying rejuvenating agent, shearing, mixing in heated drum mix plant, levelling, laying, re-compacting the pavement surface and related work in accordance with these specifications and details shown on the plan.

**B. Materials.** The asphalt-rejuvenating agent shall be composed of petroleum resin oil base, with a record of satisfactory service as an asphalt-rejuvenating agent. Satisfactory service is being based on the capability of the material to increase the ductility, penetration and durability of the asphalt binder in the recycled asphalt to the specified levels. A letter of compliance shall accompany each shipment delivered to the project from the manufacturer that certifies the material conforms to the manufacturer specifications.

**C. Pavement Mix Design.** No work shall begin until the appointed consulting engineer has approved a mix design. This mix design shall provide the application rate of rejuvenation agent in order to meet the specified penetration values.

All costs associated with the development of the mix design shall be considered incidental and are to be included in the unit price bid for Item Special-REHEAT Asphalt Surface Recycling.

**D. Equipment.** The recycling equipment unit used for collecting the existing asphalt concrete together (shearing), mixing, and paving the recycling mix in a continuous process shall be self-contained, self propelled unit designed for this purpose.

For the purpose of this contract, the self-containment requirement for the recycling unit shall mean once the existing asphalt pavement is sheared, it remains contained in the recycling unit, and immediately mixed with the rejuvenating agent. The recycled asphalt pavement shall not be exposed to atmospheric conditions except when placed for compaction.

Purchaser's Initials                    Seller's Initials                    Page 14 of 30

Angelo Iannahotti Incorporated
Purchase and Regulation of the Agreement
01 September 2013

The heating units shall be of sufficient capacity to heat the pavement material as necessary for efficient processing, but be designed as to minimise the damage to the asphalt binder.

The recycling unit shall be capable of loosening the heated asphalt pavement to the specified depth in a uniform pattern, adding rejuvenator, and loading existing asphalt into a heated mixing plant for a minimum of 30 seconds. The recycling unit shall then be capable of placing and levelling the recycling asphalt pavement in a condition for immediate re-compaction  The rate of application of the rejuvenating agent shall be adjustable to maintain the specified application rate in the relation to the operating speed of the machine. The mixing shall take place in a heated rotating drum mix plant for at least 30 seconds in such a manner as to ensure complete blending. The recycling unit shall also have an adjustable, heated screed capable of placing the mixture to the required cross-section of the existing pavement.

Compaction equipment shall meet the applicable requirements.

E. Weather Limitations. The minimum surface temperature shall be 4.5°C and minimum air temperature shall be 10°C and rising.

F. Construction. The existing pavement shall be heated to allow for loosening of material without excessive fracturing of the aggregate and allow for adequate re-compacting. The pavement is then hot sheared to the specified depth as measured by a depth probe behind the screed on a finished, un-compacted surface with an average of three depth probe checks across the width of the pavement.

The rejuvenator is applied in a uniform fashion at the proper application rate, as determined to meet specification. It is then mixed for a minimum of 30 seconds. The newly recycled material shall be placed at the minimum temperature 107°C at the screed. Surface texture shall be uniform and consistent with no segregation or excessive asphalt cement.

The amount of additive added to the mix shall be monitored by yield calculations.

Temperature processing limits shall be established. Exposure of the existing pavement to temperatures in excess of 177°C shall be limited to furnace heat transfer areas only.

Compaction shall be performed in accordance with required specifications.

G. Traffic. Traffic shall not be allowed on the compacted pavement until it has cooled sufficiently to prevent dislodging of the aggregate. Any areas, which are damaged by traffic, shall be repaired at no additional cost, as directed by the consulting engineer.

Purchaser's Initials

Seller's Initials

**H. Finished Pavement.** The finished pavement shall meet the following tolerances:

- The finished surface shall meet the local specified surface requirements.
- The modified binder shall have a Penetration Value (25°C, 100g, 5 sec.) of 45 to 65.
- The recycled pavement after compaction shall have a density (percent of maximum Theoretical density) of 92 to 96.
- The gradation of the recycled pavement shall be within +5 percent of the original pavement on the amount passing the 4.75 mm (No. 4) sieves.
- The gradation of the recycled pavement on all sieves, except for the 4.75 mm (No. 4) Sieve, shall be within the gradation bands of the original pavement type (i.e., 404,446 Type 1H, 448 Types 1, etc.).
- All costs associated with the testing or any other documentation necessary to verify these requirements shall be a separate line item bid for item Special – Testing.

**I. Method of Measurement.** The measured quantity of REHEAT Asphalt Surface Recycling including surface preparation, heating, rejuvenating, mixing and compacting shall be the actual number of square metres completed and accepted.

- The quantity of asphalt rejuvenating agent shall be the number of litres applied
- The basis for testing shall be lump sum payment.
- The basis for mobilisation shall be lump sum payment.

**J. Basis of Payment.** Payment for accepted quantities will be made at the contract price for:

| Item | Unit | Description |
|---|---|---|
| Special | Square metre | REHEAT Asphalt Surface Recycling |
| Special | Litre | Asphalt Rejuvenating Agent |
| Special | Lump sum | Testing |
| Special | Lump sum | Mobilisation |

Purchaser's Initials

Seller's Initials

Page 38 of 84

## SCHEDULE C

## (SELLER'S IP RIGHTS)

(A) Title: Recycling Asphalt Apparatus-US, Patent 8,016,515; and

(B) Title: Recycling Asphalt Apparatus-Mexican Patent MX/A/2008/013924

Purchaser's Initials _____    Seller's Initials _____    Page 10 of 33

## EXHIBIT A

## (BILL OF SALE)

KNOW ALL MEN BY THESE PRESENTS, that Angelo Benedetti, Inc. ("Seller" does hereby grant, bargain, sell, convey, transfer, assign, set over and deliver unto _____ ("Purchaser"), pursuant to the terms of that certain Purchase Agreement, dated as of _____ by and between Seller and Purchaser (the "Agreement"), all of Seller's right, title and interest in and to the Equipment (as such term is defined in the Agreement), as the same exists on the date hereof. The Seller agrees that it will hereafter execute and deliver any further assignments, instruments of transfer, bills of sale or conveyance which may be necessary or which may be deemed necessary by Purchaser fully to vest in Purchaser title to the Equipment hereby conveyed.

This Bill of Sale is made, executed and delivered for and upon the consideration provided in the Agreement and is subject to the terms and conditions of the Agreement (including, without limitation, the disclaimers and limitations on warranty and liability of Seller contained therein). This Bill of Sale is intended only to restate, and not in any manner modify, amend, enlarge or limit the terms of the Agreement as set forth therein. To the extent that any provision of this Bill of Sale is inconsistent with the Agreement, the provisions of the Agreement shall govern.

EXECUTED as of _____

Signature:

Name:

Purchaser's Initials: _____    Seller's Initials: _____    Page 38 of 39



**ANGELO BENEDETTI, INC.**

94 First Avenue   Cleveland, OH 44146
440.439.3420      440.439.9418
www.angelobenedetti.com

Att:   Hassan Bader Kalksow                                    24/08/2012
       Bader Ahmed Kalksow
       Managing Director

                          **Letter of Undertaking**

This letter serves to confirm that both parties, namely, Angelo Benedetti Inc. and Bader
Ahmed Kalksow (commercial registration 15188-2) have reached a preliminary
understanding, provided certain terms and conditions are met and agreed to between
the parties, to enter into the following agreements:

- Representative Agreement (Saudi Arabia and Bahrain)
- Representative Agreement (Kuwait, UAE, Oman and Qatar)
- Purchase and Regulation of Use Agreement (Saudi Arabia and Bahrain)
- Purchase and Regulation of Use Agreement (Kuwait, UAE, Oman and Qatar)

Should the required deposit outlined in the Saudi Arabia and Bahrain Purchase and
Regulation of Use Agreement clause 2(i) not be received by Angelo Benedetti Inc. from
Bader Ahmed Kalksow on or before the 31/12/2012 all rights, responsibilities and
agreements shall be void.

As it is against Angelo Benedetti Inc. company policy to grant exclusivity prior to a
deposit being placed to secure a territory we hereby offer you first option for a period of
thirty (30) days from the date of receipt of a firm offer from a third party, in the event
that that should occur prior to 31/12/2012. The first option can be exercised by placing
the above deposit with Angelo Benedetti Inc. within the first option period. Should
Bader Ahmed Kalksow decline the first option either in writing or tacitly this
undertaking will become void.

In good faith Angelo Benedetti Inc. assures Bader Ahmed Kalksow that it will not
actively pursue marketing activities within these territories prior to the 31/12/2012.

Signature hereto below confirms the party's agreement with the above understanding.


Hassan Bader kalksow
Managing Director
Bader Ahmed kalksow


Albert Benedetti
President
Angelo Benedetti Incorporated

**EXHIBIT**

**2**

# SALES REPRESENTATION AGREEMENT

Entered into and between

Angelo Benedetti Inc.

and

Bader Ahmed Kalksow (commercial registration 15188-2)



EXHIBIT
3

THIS AGREEMENT is made and entered into by and between Angelo Benedetti Inc, a company organized and existing in accordance with the laws of Ohio, United States of America, with its registered office at 94 First Avenue, Cleveland, Ohio, hereinafter referred to as "COMPANY", and

Bader Ahmed Kaikaow, a company organized and existing in accordance with the laws of

_Kingdom of Bahrain_, with its registered office at

_Building 4016, Road 469, Block 604, Sitra, Kingdom of Bahrain_

herein after referred to as REPRESENTATIVE, herein represented by

_Hassan B. Kaikaow_

WHEREAS    COMPANY wants to expand its business activity in Bahrain and Saudi Arabia, hereinafter referred to as the "TERRITORY", relative to all products made by the COMPANY;

WHEREAS    COMPANY desires to name and appoint REPRESENTATIVE to act as COMPANYS' representative for the commercialization, sale, lease etc. of its products within the TERRITORY;

WHEREAS    REPRESENTATIVE agrees to act as a representative for COMPANY within the TERRITORY in this regard.

NOW, THEREFORE, IN CONSIDERATION OF THE ABOVE PROMISES AND THE MUTUAL COVENANTS HEREINAFTER SET FORTH, THE PARTIES HERETO AGREE AS FOLLOWS:

1.    APPOINTMENT

1.1

COMPANY hereby grants to REPRESENTATIVE the appointment as a representative for the promotion and sale of COMPANY products, hereinafter referred to as "PRODUCTS", described in EXHIBIT 'A' herein, which is hereby incorporated as an integral part of this Agreement, to COMPANY customers, within the TERRITORY.

1.2

With regard to the extent of said appointment it is the mutual intent of the parties that during the term of the representation REPRESENTATIVE shall:

a)    Foster good relationships with COMPANY customers;
b)    Create mutual opportunities for both COMPANY customers and COMPANY;
c)    Place orders to the COMPANY;



d) Monitor orders/shipments and deliveries to COMPANY customers within the TERRITORY;

e) Clear shipments and organize the on-freight of these shipments;

f) Ensure that correct required documents are timely received for product clearing;

g) Ensure product payment within the agreed-upon credit terms;

h) Assemble suitable and appropriate market intelligence of competitor behavior in the TERRITORY;

i) Manage all customer complaints in the event of product non-compliance.

j) Ensure a continuous and high-quality relationship and communications with COMPANY;

k) Provide strategic regional input to business strategy towards business growth.

1.3 REPRESENTATIVE hereby accepts to be the representative for COMPANY within the TERRITORY, in accordance with the foregoing and the other terms and conditions of this Agreement.

2. **TERRITORY**

The TERRITORY is understood to be Bahrain and Saudi Arabia.

3. **EXCLUSIVITY**

REPRESENTATIVE shall be the exclusive representative for the promotion and sale of PRODUCTS within the TERRITORY.

4. **CONDITIONS FOR PERFORMANCE OF THE REPRESENTATION**

4.1. REPRESENTATIVE shall perform its duties under this Agreement in a professional manner and the utmost good faith.

5. **PRICES**

5.1. COMPANY shall provide REPRESENTATIVE with price lists and other written terms and conditions governing its business.

6. **ORDERS**

6.1. All orders shall be in writing pursuant to COMPANY's general business conditions as stipulated by COMPANY.

6.2. COMPANY shall have the unconditional right to accept or reject any and every order acting reasonably and without delay. However, upon the receipt of each order COMPANY shall, within 5 (five) days, advise REPRESENTATIVE of its intentions to accept or reject the order. In the absence of such notice, REPRESENTATIVE shall consider such order as accepted.

6.3. Upon notification of the intention to accept the order, REPRESENTATIVE shall obtain all necessary information and documents for the execution of such order and shall advise COMPANY of any and all applicable regulations, terms and conditions.

7. **REMUNERATION**

7.1. REPRESENTATIVE shall be entitled to a commission remuneration which amount shall be considered net of all taxes that may incur upon the payment being remitted from United States of America.

7.2. The buyer will pay the purchase price in several installments to the COMPANY; therefore the commission fee will be paid to the REPRESENTATIVE in line with the payment of the buyer. Overdue or outstanding payments from customers will not be eligible for commission payments.

7.3. The commission rate shall be 5% of the EXW price of the Benedetti equipment only sold directly to third parties introduced by the REPRESENTATIVE.

7.4. Any and all payments to be effected by COMPANY to REPRESENTATIVE shall be made to
the REPRESENTATIVE's nominated bank account, the details of which are to be supplied by the REPRESENTATIVE to the COMPANY in advance of such payments being due.

8. **TERM**

8.1. This Agreement shall be valid as from the date of the signature hereto by the Seller and continue for a period of ten (10) calendar years and is subject to renewal for a period, and on terms and conditions, agreed on by both parties. This Agreement may be terminated by mutual agreement by both parties and/or by any other provisions provided for in this Agreement.

Page 4 of 10



8.2     Upon expiration of the present Agreement, any reciprocal obligations will terminate. However, any order received during the validity of this Agreement will be completed according to its terms, and the obligations of the parties in relation thereto shall be performed.

8.3     Upon termination of this Agreement the REPRESENTATIVE will not be allowed to continue to describe or portray himself as a representative of the COMPANY.

8.4     In the event that the REPRESENTATIVE fails to meet any obligation set out in clause 2 of the Purchase and Regulation of Use Agreement for this territory this Agreement will immediately become void and be considered terminated.

9.      **FORCE MAJEURE**

9.1.    Neither party shall be liable to the other for failure to perform, in whole or in part, any of the terms and conditions of the Agreement, if it is prevented from performing them due to events beyond its control.

9.2.    Events of Force Majeure shall include, but not be limited to, fire, storm, flood, earthquake, explosion war, rebellion, insurrection, sabotage, epidemic, labor dispute, transportation embargoes, any law or administrative regulation or directive, enacted now or hereafter by any government, competent authority or court which has jurisdiction in matters related to this Agreement.

9.3.    If an event constituting Force Majeure should interfere with the performance of one party, that party shall promptly inform the other about such event in detail and shall endeavor to remove the causes thereof with all possible and reasonable speed. In such a case, the party claiming Force Majeure may be instructed by the other party to perform its duty through all reasonable means.

10.     **NOTICE**

10.1.   All communications between the parties, or notice in connection herewith, shall only be valid if made in writing, hand delivered or sent by registered airmail, postage prepaid, or by telex, cable, telefax or email, addressed to the intended recipient at the following addresses:



If to COMPANY: To the attention of
Al Benedetti
94 First Avenue
Cleveland
Ohio 44146
Tel: 001 440 439 3420
Fax: 001 440 439 3418
Email:  info@angelobenedetti.com

If to REPRESENTATIVE: To the attention of

Name: Hassan Bader Kaiksow

Address: Building 4016, Road 469, Block 604, Sitra, Kingdom of Bahrain

Tel: 00973- 17731717, Fax: 00973-17 735 095, mobile: 00973-39968806

Email: hkaiksow @ mentech online .com

**11.    WAIVERS**

11.1.

The tolerance of any violation of the present Agreement does not mean any
tolerance of any other subsequent violation and will not be interpreted as a "de
facto" novation or amendment to the Agreement.

**12.    HEADINGS**

12.1.

The headings in this Agreement have been inserted for convenience only and shall
not be utilized for the interpretation of this Agreement.

**13.    REPRESENTATIONS AND WARRANTIES**

13.1.

REPRESENTATIVE hereto represents and warrants to COMPANY as follows:

a)    REPRESENTATIVE has taken all actions necessary to execute and deliver this
Agreement and to fulfill the obligations hereunder, and to consummate the
transactions contemplated by this Agreement;

b)    that to the knowledge of the REPRESENTATIVE there does not exist any judicial action,
demand or investigation be it by government or otherwise, currently in progress or
pending, that could impede or affect the obligations deriving from this Agreement;

c)    that no other contract or Agreement related to the object of the present Agreement exists.

13.2.

The representations and warranties object of this clause 13 shall remain valid, without any limitation, and shall be considered implicitly ratified by the parties hereof with regard to any addenda that may be entered into by the parties hereunder.

14.    IRREVOCABILITY

14.1.

This Agreement is irrevocable and binding on the parties, their heirs, successors or permitted assigns, at whatever title, and prevails over any other Agreement or contract previously signed between the parties, with the condition that neither of the parties may assign or transfer their rights or the obligations to perform as set forth in this Agreement, to third parties, except upon prior approval by the other party.

15. GENERAL PROVISIONS

15.1.

No alteration, amendment, change, modification, waiver, or addition to this Agreement shall be valid or binding unless the same is in writing and signed by duly authorized representatives of the parties, or by the parties themselves.

16.    OFFICIAL LANGUAGE

16.1.

The present Agreement is drafted in the English language and shall be the only valid and binding document reflecting the Agreement between the parties and shall govern any dispute over the terms and obligations arising under the contract.

17.    GOVERNING LAW

17.1.

This Agreement shall be governed and construed in accordance with the laws of the State of Ohio, United States of America, to the exclusion of its rules on conflict of laws. If any part or portions hereof shall be determined to be invalid, illegal or unenforceable in whole or in part, neither the validity of the remaining part of such term nor the validity of any other term of this Agreement shall in any way be affected thereby.

18.   **ARBITRATION**

18.1

All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules.

**IN WITNESS WHEREOF**, the parties hereby have caused this Agreement to be executed in 2 (two) copies of identical content.

SIGNED  _____

As a duly authorised officer of Bader Ahmed Kaiksow

NAME IN BLOCK CAPITALS   HASSAN B KAIKSOW

Place   Sitra, Kingdom of Bahrain

Date   19/10/2012

SIGNED  _____

As a duly authorised Officer of Angelo Benedetti Limited

NAME IN BLOCK CAPITALS   ANGELO BENEDETTI

Date   10/10/12

Place   WOVE, OH USA

**EXHIBIT A**

**Recycled Hot Emulsified Asphalt Recycling Machine Specification**

The (REHEAT) Asphalt Recycling Machine, designed and developed by Angelo Benedetti, Inc. utilizes a recycling and rejuvenating process to refinish damaged pavement surfaces in one pass and provide final surface course. The REHEAT Asphalt Recycling Machine heats the damaged pavement to a workable temperature via a radiant convection heat source, utilizes a series of contoured blades to engage the asphalt surface lifting and dislodging 2 inches of the top layer of pavement, immediately adds an asphalt emulsion, mixed in a heated on-board plant to the reclaimed pavement, immediately lays down the newly rejuvenated mix, and compacts the new surface to original grade, all in a single, one step process, comprised of two machines not more than 85 feet total in length, so as to minimise the interruption to traffic and road closures. This surface is 100% recycled and applied as the final driving surface course of asphalt and shall not require an additional asphalt overlay.

• REHEAT Furnace Unit - A radiant convection heating unit on the first frame structure heats and softens the damaged surface to be recycled. The heating unit includes a plurality of ceramic burners each housed within a fiber block. The burners are fueled by a liquid propane tank housed on the machine and utilise a 50/50 fuel to air ratio. The emissions from the heating of the asphalt pavement are re-circulated by forced air.

• REHEAT Recycling Unit - The recycling equipment unit used for collecting the existing asphalt concrete together (shearing), adding the new material (rejuvenating agent), mixing and paving the recycled mix in a continuous process shall be a self-contained, self-propelled unit designed for this purpose.

- For the purpose of this contract, the self-containment requirement for the recycling unit shall mean once the existing asphalt pavement is sheared, it remains contained in the recycling unit, and immediately mixed with the rejuvenating agent. The recycled asphalt concrete is placed for immediate compaction. The recycled asphalt pavement shall not be exposed to atmospheric conditions except when placed for compaction.

- The recycling unit shall be capable of shearing the heated asphalt pavement to the specified depth in a uniform pattern, adding rejuvenator, and loading existing asphalt into a heated mixing plant for a minimum of 30 seconds. The recycling unit shall then be capable of placing and leveling the recycled asphalt pavement in a final surface condition for immediate re-compaction. The rate of application of the rejuvenating agent shall be controlled to maintain the specified application rate in relation to the operating speed of the machine.

• Articulating Frame Structure – The Asphalt Recycling Machine includes a first frame member having a tapered end and connected to a second frame structure having a tapered end. The tapered ends are connected by an articulating pin. The tapered frame

design and articulating pin connection allows the Asphalt Recycling Machine to operate around curved and cornered surfaces.

• Wheel Lifts – Wheel lifts are engaged with the wheels of the machine to provide vertical adjustment. The wheel lifts allow each wheel to be independently raised and lowered to a desired height, thereby altering the distance between the machine components and the asphalt surface.

• Shearing Blades – A series of contoured shearing blades are arranged to lift and dislodge the heated and softened asphalt. The shearing blades in conjunction with spiral blades arranged along a horizontal axis and are arranged to funnel dislodged pavement towards the center of the machine.

• Center Mill – The Asphalt Recycling Machine includes a revolutionary center mill designed to further dislodge the reclaimed pavement while also lifting the reclaimed pavement and immediately delivering it to the on-board mixer plant. The center mill includes a series of cutting teeth spirally positioned about the mill to incise the pavement, and a series of paddles or lips positioned between the teeth to lift and deliver the reclaimed asphalt into the on-board mixer plant.

• On-Board Plant – A mixer plant is housed on the Asphalt Recycling Machine to receive and recondition the reclaimed asphalt. The on-board mixer plant includes a trommel to separate usable reclaimed asphalt from unusable reclaimed asphalt. The unusable reclaimed asphalt is redistributed to immediately be re-processed into usable material.



**Ministry of Works**

Ref. : CED/RS/L.1971/2013
Date : 12 September 2013

To All Tenderers

Dear Sir,

**ASPHALT SURFACING AND REINSTATEMENT TERM CONTRACT
(2013-2015)
PROJECT NO.: RDS-13-02-000
TENDER NO.: RDS-13/0004
ADDENDUM NO. 1**

Reference is made to the above matter

Please find attached Addendum No 1 as in Appendix A

This Addendum shall form part of the tender documents

All other terms and conditions shall remain the same.

Please confirm receipt and acceptance of this Addendum by signing and returning the attached form of acceptance

Yours faithfully

**Sameer A.Karim Affouni
Director In Charge, Cost Engineering Directorate**

cc    AUS, TS
       AUS, Roads
       Director, RPMD





EXHIBIT
4



وزارة الاشغـــال
Ministry of Works

## APPENDIX A

## ASPHALT SURFACING AND REINSTATEMENT TERM CONTRACT (2013-2015) ADDENDUM NO. 1 – ITEM R21, WEARING COURSE IN-SITU RECYCLING

*The Ministry acknowledges that technical specifications pertaining to in-situ pavement recycling incorporated in the 'Conditions of Particular Application' of the tender requires specialized equipment and expertise.*

*Item 21 in Page RDS-13-02-000/41 of the Bill of Quantities shall be priced by the Tenderer to include these following services:*

 *i.) Choices and provision of materials to be add to that in the existing layer (Clause 2.6.15.6.2)*
 *ii.) Mix Design (Clause 2.6.15.6.3)*
 *iii.) Equipment (Clause 2.6.15.6.5)*
 *iv.) Construction Requirements (Clause 2.6.15.6.5)*
 *v.) Traffic Management and Control (Clause 2.6.15.6.6)*

12-20

**2.6 15.6    In-Situ Asphalt Surface Recycling**

**2.6.15.6 1    Scope**

The work covered by this specification consists of furnishing all plant, labour, equipment, and materials necessary for performing all asphalt surface recycling operations in accordance with Ministry specifications.

**2.6 15.6.2    Materials**

Asphalt concrete components added to the existing mix, including mineral aggregate and binder, should conform to the 2009 Ministry's general construction standards. The asphalt-rejuvenating agent, added to the recycled asphalt recovered from the existing pavement, should compose of petroleum resin oil base with a record of satisfactory service as an asphalt-rejuvenating agent. Satisfactory service is being based on the capability of the material to increase ductility, penetration and durability of the asphalt binder in the recycled asphalt to the specified levels. A letter of compliance shall accompany each shipment delivered to the project from the manufacturer certifying that the material conforms to the manufacturer specifications.

**2.6 15.6.3    Pavement Mix Design**

No work shall begin until the Engineer has approved a mix design prepared by the Contractor. This mix design shall be performed prior to commencement of construction after performing in situ and lab tests on samples collected from the existing asphalt layer targeted for recycling to determine the nature and condition of the material in that layer. These are tests necessary for determining the type and quantity of materials that should be added during the recycling operation, which include:

   a   Rejuvenator agent

   b   Virgin aggregates

   c   Virgin binder

The mix design shall provide the application rate of rejuvenation agent in order to meet the specified penetration values. All costs associated with the development of the mix design shall be considered incidental and are to be included in the unit price corresponding to the in-situ recycling item shown in the BOQ.

**2.6.15.6.4    Equipment**

The recycling equipment unit used for collecting the existing asphalt concrete together (shearing), mixing, and paving the recycling mix in a continuous process shall be self-contained, self-propelled unit designed for this purpose. For the purpose of this contract, the self-containment requirement for the recycling unit shall mean once the existing asphalt pavement is sheared, it remains contained in the recycling unit, and immediately mixed with the rejuvenating agent. The recycled asphalt pavement shall not be exposed to atmospheric conditions except when placed for compaction. The heating units shall be of sufficient capacity to heat the pavement material as necessary for efficient processing, but be designed so as to minimize the damage to the asphalt binder.

The recycling unit shall be capable of loosening the heated asphalt pavement to the specified depth in a uniform pattern, adding rejuvenator, and loading existing asphalt into a heated mixing plant for a minimum of 30 seconds. The recycling unit shall then

be capable of placing and levelling the recycling asphalt pavement in a condition for immediate re-compaction. The rate of application of the rejuvenating agent shall be adjustable to maintain the specified application rate in relation to the operating speed of the machine. Mixing shall take place in a heated rotating drum mix plant for at least 30 seconds in such a manner as to ensure complete blending. The recycling unit shall also have an adjustable, heated screed capable of placing the mixture to the required cross-section of the existing pavement. Compaction equipment shall meet the applicable requirements

All construction equipment's (e g. recycling machine, rollers, etc.) needed during the construction phase shall be provided by the contractor. These equipment's which were proven to provide excellent workmanship during the trials shall be used during the construction phase and shall not be changed unless otherwise permitted by the engineer

### 2.6 15 6.5    Construction

The existing pavement shall be heated to allow for loosening of material without excessive fracturing of the aggregate and allow for adequate re-compacting. The pavement is then hot sheared to the specified depth as measured by a depth probe behind the screed on a finished, un-compacted surface with an average of three depth probe checks across the width of the pavement

The rejuvenator should be applied in a uniform fashion at the proper application rate, as determined to meet specification. It is then mixed for a minimum of 30 seconds. When recycling asphalt mixes consisting of a neat binder only, the newly recycled material shall be placed at the minimum temperature of 110°C at the screed. For mixes with a modified binder, the placement temperature should account for influence of binder modification on the binder viscosity. Surface texture shall be uniform and consistent with no segregation or excessive asphalt cement.

The amount of additive added to the mix shall be monitored by yield calculations. Temperature processing limits shall be established. Exposure of the existing pavement to temperatures in excess of 177°C shall be limited to furnace heat transfer areas only. Compaction shall be performed in accordance with Ministry specifications.

### 2.6.15.6.6    Traffic Control

Traffic control on the job site is the responsibility of the Contractor and should conform to Ministry Specifications. Traffic shall not be allowed on the compacted pavement until it has cooled sufficiently to prevent dislodging of the aggregate. Any areas, which are damaged by traffic, shall be repaired at no additional cost, as directed by the Engineer.

### 2.6.15.6.7    Finished Pavement

The finished pavement shall meet the following tolerances:

i)  The road profile produced by the finished surface shall meet surface requirements and profile established in the as-built plan of the original road surface and the Contractor should establish all measures necessary for satisfying this requirement in planning relevant paving operations

ii)  The recycled pavement after compaction shall have a density (percent of maximum Theoretical density) of 97

iii)  The gradation of the recycled pavement shall be within the grading enveloped shown in the table below

TABLE 1 Grading and Binder Content Requirement

| BS SIEVE SIZE | WEARING COURSE | |
|---|---|---|
| 37.5 mm | . | |
| 28 mm | 100 | |
| 20 mm | 89 | 100 |
| 14 mm | 80 | 93 |
| 10 mm | 69 | 83 |
| 5 mm | 56 | 70 |
| 2.36 mm | 44 | 58 |
| 1.18 mm | 35 | 49 |
| 600 | 25 | 38 |
| 300 | 18 | 28 |
| 150 | 9 | 16 |
| 75 | 4 | 8 |
| Binder Content | 4 | 8 |

All costs associated with testing or any other documentation necessary to verify these requirements shall be included in the Contractor quoted price for "Square meter of a complete recycled asphalt layer"

2.6.15.6.8    **Method of Measurement**

The measured quantity will be "Square meters of recycled road surface layer (50mm deep) completed according to Ministry of Works Specifications", which include lab and site testing, mix design, surface preparation, mobilization, heating, rejuvenating mixing and compacting

| Item | Description | Unit | Qty | Rate | Amount BD | Fils |
|------|-------------|------|-----|------|-----------|------|
| | _Sub-bases flexible road bases and surfacing as described (cont'd)_ | | | | | |
| R18 | Wearing course type GHD 20, depth 50 mm | m2 | 500 | | | |
| R19 | depth 60 mm | m2 | 500 | | | |
| R20 | depth 75 mm | m2 | 350 | | | |
| R21 | Wearing course in situ Asphalt Recycle; depth 50 mm | m2 | 100,000 | | | |
| R22 | Road oil & Tack coat Road oil sprayed on sub-base | m2 | 60,000 | | | |
| R23 | Tack coat sprayed on asphalt surface | m2 | 60,000 | | | |
| R24 | Removal of existing asphalt by cold planing to reduce level depth not exc. 5mm | m/ | 10,000 | | | |
| R25 | to reduce level depth exceeding 5mm | m3 | 4,000 | | | |
| R26 | _Regulating course in making up levels including fair shaping feather as required_ asphalt type, GB28 / GL10 / GW20 | m3 | 3,800 | | | |
| R27 | type "A" sub bases | m3 | 450 | | | |
| R28 | _Extra over rate_ Extra over any type and thickness of asphalt for laying by hand | m2 | 15,000 | | | |
| | _Note ._ _Extra over rate for laying by hand is not applicable for reinstatement works doing by milling and overlay method_ | | | | | |
| | _Kerbs, channel and edgings as Standard Specification for Construction Works 2009; clause 1.9 of Roadworks (module 19)_ Precast concrete kerbs, half battered; 125 x 250mm; as Standard Detail SRCD 10 01 and 10.02; | | | | | |
| R29 | straight or curved to radius exceeding 12m | m | 500 | | | |
| R30 | curved to radius not exceeding 12m | m | 50 | | | |
| | **Total to Summary Part 'A'** | | | | | |

ASPHALT SURFACING AND REINSTATEMENT TERM  CONTRACT  RDS 13-02-000/PAGE 41



# ANGELO BENEDETTI, INC.

94 First Avenue   Cleveland, OH 44146
tel 440.439.3420 | fax 440.439.3418
website www.angelobenedetti.com

## Proforma Invoice

| | |
|---|---|
| **Seller:** Angelo Benedetti, Inc.<br>94 First Avenue<br>Cleveland, Ohio 44146<br>United States of America | |

| | |
|---|---|
| **Proforma Invoice No.:**<br>01114 | **Proforma Invoice Date:**<br>09/12/2013 |
| **Customer P.O. No.:**<br>APHR-22 | **Customer P.O. Date:**<br>9/12/13 |
| **Currency:**<br>USD | **Payment Terms:**<br>25% ($643,750.00) at sight<br>25% ($643,750.00) after 60 days<br>25% ($643,750.00) after 120 days<br>25% ($643,750.00) upon shipment |
| **Shipping Terms:**<br>CIF Bahrain<br>Kuwait Finance House | **Country of Origin:**<br>United States of America |
| **Freight:**<br>Export | **Packing:**<br>Containers |

**Buyer:** Bader Ahmed Kaiksow<br>Building 4016, Road 469<br>Block 604<br>Sitra, Kingdom of Bahrain

| Item No. | Brief Description | Qty | Unit Price | Total |
|---|---|---|---|---|
| APH-22 | New 2013 Benedetti ReHEAT Asphalt Pavement Heater | 1 | $1,000,000.00 | $1,000,000.00 |
| APR-22 | New 2013 Benedetti ReHEAT Recycler | 1 | $1,500,000.00 | $1,500,000.00 |
| | Freight and Insurance | 1 | $75,000.00 | $75,000.00 |
| | | | Total: | $2,575,000.00 |

Note:
1. All products come with a one (1) year manufacturer warranty
2. Latest shipment date 04/15/2014



EXHIBIT
5

| MPA | | | Message Preparation – Message Report |
|---|---|---|---|

| Operator | III | | |
|---|---|---|---|
| | | **Message Identifier** | |

**Message Preparation Application:** Message Modification
**Action:** Message disposed to the Text Modification Queue
**Unique Message Identifier:** 1 CITIUS33XXX 700     ILCKFH-13000   13714

**Message Header**

| FIN | MT1700  FIN MT 700- Issue of Documentary Credit | | |
|---|---|---|---|
| Priority: | Normal | | |
| Monitoring: | None | | |
| Sender: | | | |
| | Unit: | None | |
| | Institution: | KFHOBHBMXXX | |
| Receiver: | | | |
| | Institution: | CITIUS##XXX | CITIBANK N.A. |
| | | | NEW YORK, NY |
| | | | US |

**Message Text**

*27: Sequence of Total*
    1/1
*40A: Form of Documentary Credit*
    Irrevocable
*20: Documentary Credit Number*
    1
*23: Reference to Pre-Advice*
*31C: Date of Issue*
    130909
*40E: Applicable Rules*
    UCP LATEST VERSION
*31D: Date and Place of Expiry*
    140601 USA
*50: Applicant*
    Kuwait Finance House – Bahrain
    Bahrain World Trace Center, West
    Tower, 19th Floor, P.O. Box 2066,
    Manama, Bahrain
*59: Beneficiary: - Name & Address*
    Angelo Benedetti, Inc.
    94 First Avenue
    Cleveland, Ohio 44146
    USA
*32B: Currency Code, Amount*
      USD    [US DOLLAR]
      2575000.00     #2,575,000.00#
*39A: Percentage Credit Amt Tolerance*
*39B: Maximum Credit Amt Tolerance*
    NOT EXCEEDING
*39C: Additional Amounts Covered*
 *41:D – Available With... By*
    Credit Available with PNC Bank

*42C: Drafts at...*
FIELD 47A CLAUSES NO. 3, 4, 5, AND 6
*42: A – Drawee – FI BIC*
    PNCCUS33       PNC BANK, N.A.
                Pittsburgh, PA USA
*42M: Mixed Payment Details*
*42P: Deferred Payments Details*
*43P: Partial Shipments*
    NOT ALLOWED
*43T: Transshipment*
    ALLOWED



EXHIBIT
6

44A: *Pl of Tking in Chrg/ of Rceipt*
44E: *Port of Loading*
      *USA*
44F: *Port of Discharge*
      *BAHRAIN*
44B: *Pl of Final Dest / of Delivery*
44C: *Latest Date of Shipment Release*
      *140415*
44D: *Shipment Period*
45A: *Description of Goods &/or Services*
      PURCHASE OF PRE-HEATING AND ASPHALT RE-HEAT RECYCLING MACHINE, CIP BAHRAIN
46A: *Documents Required*

      1. Signed commercial invoice in triplicate showing separately the price and net weight of each type of goods and must indicate origin of goods and name and address of manufacturer/processor/producer.
      2. Signed Packing List in triplicate showing number of packages or cartons.

      3. Certificate of origin issued in one original and one copy showing the name and address of manufacturer/processor/producer and must be legalized.

47A: *Additional Conditions*

      1. The original documents should be dispatched to us by courier to KUWAIT FINANCE HOUSE-BAHRAIN B.S.C. © Global Trade Finance, P.O. Box 2066, Manama, Kingdom of Bahrain, Bahrain World Trade Center, West Tower, 19th Floor, Tel: 00973 77777777 Fax: 00973 77000150.

      2. EXCEPT AS EXPRESSLY STATED OR OTHERWISE PROVIDED HEREIN, THIS LETTER OF CREDIT IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (2007 REVISION) INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NO. 600 (THE UCP 600).

      3. TWENTY FIVE PERCENT I.E. USD 643,750.00 (SIX HUNDRED FORTY THREE THOUSAND SEVEN HUNDRED FIFTY US DOLLARS ONLY) OF THE TOTAL PURCHASE PRICE SHALL BE MADE AVAILABLE TO THE SELLER UPON PRESENTATION OF A SIGHT DRAFT.

      4. TWENTY FIVE PERCENT I.E. USD 643,750.00 (SIX HUNDRED FORTY THREE THOUSAND SEVEN HUNDRED FIFTY US DOLLARS ONLY) OF THE TOTAL PURCHASE PRICE SHALL BE MADE AVAILABLE TO THE SELLER, UPON PRESENTATION OF A SIGHT DRAFT DATED 60 DAYS AFTER PRESENTATION OF THE DRAFT MENTIONED IN ITEM #4.

      5. TWENTY FIVE PERCENT I.E. USD 643,750.00 (SIX HUNDRED FORTY THREE THOUSAND SEVEN HUNDRED FIFTY US DOLLARS ONLY) OF THE TOTAL PURCHASE PRICE SHALL BE MADE AVAILABLE TO THE SELLER, UPON PRESENTATION OF A SIGHT DRAFT DATED 60 DAYS AFTER PRESENTATION OF THE DRAFT MENTIONED IN ITEM #5.

      6. THE REMAINING TWENTY FIVE PERCENT, I.E. USD 643,750.00 (SIX HUNDRED FORTY THREE THOUSAND SEVEN HUNDRED FIFTY US DOLLARS ONLY) BALANCE OF THE TOTAL PURCHASE PRICE, WILL BE PAID TO THE SELLER UPON PRESENTATION OF THE DOCUMENTS UNDER ITEM 46A.

47B: *Charges*

      ALL CHARGES OUTSIDE BAHRAIN ARE FOR THE ACCOUNT OF THE BENEFICIARY.

48: *Period for Presentation*

      Documents to be presented within 21 days after shipping release date

49: Confirmation Instructions

      CONFIRM

50: A – Reimbursing Bank – FI BIC

      CITIUS33                 CITIBANK, N.A.

                                 New York, NY USA

**78: Instr to Payg/Accptg/Negotg Bank**

1) Must be advised to us by tested TLX 5 working days prior to value date.

2) Negotiations under reserve guarantee and antedated docs is not acceptable.

3) Discrepancy fee for USD 100 or its equivalent will be deducted from proceeds of any drawings if docs are presented with discr. notwithstanding any instruction to the contrary.

4) In the event chgs on beneficiary a/c please collect yr chgs from beneficiary before releasing the original instrument to them.

**57: A – Advise Through Bank – FI BIC**

PNCCUS33                              PNC Bank, N.A.

                                     Pittsburgh, PA US

**72: Sender to Receive Information**

Please acknowledge receipt



# ANGELO BENEDETTI, INC.

94 First Avenue    Cleveland, OH 44146
tel 440.439.3420    fax 440.439.3418
website www.angelobenedetti.com

## Build Schedule - APH-22/ APR-22

| Payment Due Date | Payment Amount | % Complete | Build Progress |
|---|---|---|---|
| 08/19/13 | Initial Deposit $625,000.00 | 25% | APH-22 ~ Order components to begin build<br><br>APR-22 ~ Order components to begin build |
| 11/18/13 | $1,250,000.00 | 50% | **APH-22**<br>~ Substructure assembled<br>~ Propane, diesel, water, hydraulic tanks mounted<br>~ Furnaces mounted<br>~ Control station assembled<br>~ Tires & axles mounted<br>~ Decks, partial railing, vaporizer and blower mounted<br>**APR-22**<br>~ Substructure assembled<br>~ Propane, diesel, water, hydraulic rejuvenator tanks mounted<br>~ Fabrication & assembly of furnace boxes |
| *03/17/2014 | $625,000.00 | 100% | **APH-22**<br>~ Engine, pumps, vaporizers, & motors mounted<br>~ Electrical, hydraulic hosing, testing & final adjustments<br>~ Prep & final paint<br>**APR-22**<br>~ Furnace mounted<br>~ Engine, pumps, vaporizer, & motors mounted<br>~ Blades, centermill, asphalt plant mounted<br>~ Screed & control panels mounted<br>~ Tires & axles mounted<br>~ Electrical, hydraulic hosing, testing & final adjustments<br>~ Prep & final paint |

*Estimated completion date based on the initial deposit being received 08/19/2013.

* Any delays in the initial deposit will result in delays in the completion date.



EXHIBIT
7



EXHIBIT

4

















**Government of Ras Al Khaimah**

**Public Works and Services Department**

December 25, 2014

Ref: DSH/1127/2014

To: BADER AHMED KAIKSOW GROUP W L L

Greetings,

Subject: Maintenance and Rehabilitation Works for Seeji Shawka Road

The Public Works and Services Department extends its best regards and sincerest wishes for continued success and prosperity. Referring to the subject mentioned above, and to the quotation submitted by your esteemed company under letter number BAK/TG/MR/RH/13/014 dated December 14, 2014, we are pleased to inform you of our approval to commence the required works for the aforementioned road.

Accordingly, please provide us with the start date and the schedule for the works.

We thank you for your prompt response to our request and appreciate your cooperation.

Sincerely,

Ahmed Mohamed Ahmed Al Hammadi

General Manager

(There is a hand signature and stamp)





EXHIBIT

9



  

2014 / 12 / 25

2014 / 1127 /

الصادرة / بموجبة سدر أحمد شيكمو للتجارة

B١K/H C/٢NR/١C١/٢/ ٧٠١٤

م. أحمد محمد **أحــمـد الحمادي**

**الـــمـديـر الـعـام**





**Government of Ras Al Khaimah**

**Public Works and Services Department**

### Agreement Contract

On Thursday, January 22, 2015, an agreement was made between:

1- The Government of Ras Al Khaimah - Public Works and Services Department, represented by Engineer Ahmed Mohamed Al Hammadi, in his capacity as the General Manager of the Department (First Party)

2- BADER AHMED KAIKSOW GROUP W L L, represented by Mr HASAN BADER AHMED SALMAN KAIKSOW, in his capacity as the Administrative Manager (Second Party)

**Preamble**

1. Given the First Party's desire to pave and rehabilitate the road connecting Kadra and the main road Kalba - Sharjah passing through Shawka using the technology of recycling part of the asphalt surface layer by heating with a thickness of 4 cm

2. Referring to the letter issued by the First Party to the Second Party dated December 25, 2014, Ref No DSH/1127/2014, regarding assigning the Second Party the contract work, which includes its approval of the Second Party's letter and its attachments dated December 14, 2014, BK/TG/MR/RH/13/014,

3. and considering that the final cost of the project is based on the principle of re measurement, meaning the project cost is estimated according to the actual quantities of work carried out

**Therefore, the parties have agreed on the following:**

1- The Second Party commits to carrying out paving and rehabilitation works for a road covering an area of 128,000 00 square meters, using asphalt recycling technology by heating with a thickness of 4 cm





EXHIBIT
10



2- The Second Party commits to performing maintenance works for the aforementioned road according to the attached plans

3- The parties agreed that the total value of the project would be five million four hundred seventeen thousand United Arab Emirates Dirhams only (5,417,000.00 AED), according to the schedule of quantities and prices listed below. In the event of any change in the quantities, whether an increase or decrease, this will be taken into account within a margin of 25%. If the executed quantities exceed the predetermined rate or ratio, the parties will agree on this in an annex to this contract. In the case of a decrease, the Second Party will return the difference from the total amount mentioned above to the First Party.

BILL NO.1 GENARAL ITEMS

| No | Description | Unit | Quant | Rate | Amount U.A.E Dhs |
|---|---|---|---|---|---|
| A | CONTRACTUAL REQUIREMENTS Mobilization & Demobilization | | | | |
| A.. | | | | | |
| A.. | | | | | |
| | Total Carried to Grand summary | | | | |

BILL NO. 02 PREPARATION

| No | Description | Unit | Quant | Rate | Amount U.A.E Dhs |
|---|---|---|---|---|---|
| B | Temporary Works | | | | |
| B. | | | | | |
| B. | | | | | |
| B. | | | | | |
| B. | | | | | |
| C | Survey Works | | | | |
| | | | | | |
| | | | | | |
| | Total Carried to Grand Summary | | | | |





**BILL NO. 3: Road Works**

| No. | Description | Unit | Quant. | Rate | Amount U.A.E. Dhs. |
|---|---|---|---|---|---|
| 0 | Hot in Place Asphalt Recycling Recycling of the road surface for depth up to 40mm using Hot in Place recycling Technology | | | | |
| | Hot in Place asphalt recycling | | | | |
| f | Fresh asphalt materials for leveling works | | | | |
| 11 | Wearing Course | | | | |
| 12 | Sand Asphalt | | | | |
| | **Total Carried to Grand Summary** | | | | 5,246,000.00 |

**GRAND SUMMARY**

| | Description | Amount U.A.E. Dhs. |
|---|---|---|
| Bill no. 1 | GENERAL ITEMS | 24,000.00 |
| Bill no. 2 | PREPARATIONS | 147,000.00 |
| Bill no. 3 | ROAD WORKS | 5,246,000.00 |

4- The Second Party shall carry out the contract works within a period of four months starting from February 22, 2015. In the event that these works are not completed within the specified period, the Second Party shall notify the First Party of the additional time required to complete the works. A penalty of 15,000.00 AED will be imposed for each day of delay, provided that the total penalty does not exceed 10% of the contract value.

5- The First Party shall make payments for the value of the works to the Second Party based on the actual progress of the works on-site and in accordance with the schedule of quantities and prices referred to above, within thirty days from the date of the invoice submitted by the Second Party.



6- A deduction of 10% from the value of each payment for the executed works shall be made, and upon completion of the works under this contract, the First Party shall settle accounts with the Second Party based on the actual executed quantities on-site  A retention of 5% of the total value of the executed works shall be deducted as a performance guarantee to remain with the First Party until the end of the maintenance period, which is twelve months from the initial acceptance date of the works

7- The Second Party is obligated to secure the road during the execution period by making the necessary diversions and installing clear signage along with flashers every 50 meters, as well as providing a sufficient number of skilled workers for asphalt works

8- The Second Party is responsible for removing all debris resulting from the works and transporting it away from the site

9- The Second Party must take care and caution during the execution of the works and is obliged to preserve public and private properties

10- The Second Party's responsibility is limited only to the works above the initial base layer received from the First Party

11- The parties agreed to resolve any disputes or disagreements amicably within 30 days, and in case of failure, the Ras Al Khaimah court shall have jurisdiction to look into and decide on the disputes.

12- This contract is drafted in two original copies in Arabic, each party keeping an original copy for implementation upon agreement, and in acknowledgment of the above and as evidence of what this contract contains, it has been signed by the parties legally authorized to represent them



Thus, the parties have agreed,



First Party

Stamp of Government of Ras Al Khaimah

(Handwritten signature)

Engineer Ahmed Ahmed Al Hammadi

For/ Public Works and Services Department


Second Party

Stamp of BADER AHMED KAIKSOW GROUP W L L

(Handwritten signature)

Hasan Bader Ahmed Kaiksow

For/ BADER AHMED KAIKSOW GROUP W.L L





Manama Kingdom of Bahrain
973 7584595
894571
info@innnityplus-nnine.com
www.innnityplusonline.com

  







مكتب ترجمة معتمد
Manama Kingdom of Bahrain
973 17564696
89467
info@infinityplusonline.com
www.infinityplusonline.com

دفعة ملايين زار بعمليه وسيعه
قدر الف درهم صرفي (فقط 4,617,000.00 درهم اماراتي لا غير ) وذلك طبقا لجدول
الكويات والاشعار تمارخ فيه ... ... ... ... ... ... ... ... ... ... الزياده او
... ... ... ... ... ... ... (%) ... ... ... اقام ... زياده الكميات المسدد عن
... ... ... ... ... ... ... ... ... ... ... ... ... ...
... ... ... ... ... ... ...

### BILL NO. 1. GENERAL ITEMS

| No | Description | Unit | Quant | Rate | Amount U.A.E Dhs |
|---|---|---|---|---|---|
| A | **CONTRACTUAL REQUIREMENTS** **Mobilization & Demolib ...** | | | | |
| A.a | Mobilization of plant | | | | |
| A.b | Demolition | | | | |
| | **Total Carried to Grand Summary** | | | | **74,000.00** |

### BILL NO. 02 PREPARATIONS

| No | Description | Unit | Quant | Rate | Amount U.A.E. Dhs |
|---|---|---|---|---|---|
| B | **Temporary Works** | | | | |
| B1 | Protection and keep ... ... areas and properties ... ... Authority Standard | | | | |
| B2 | Tidying and clearing ... ... after recycling | | | | |
| B3 | Health and safety ... ... RAK Authority Standard | | | | |
| B4 | Coordination ... ... Authorities | | | | |
| C | **Survey Works** | | | | |
| C1 | Survey of the ... ... and levels follow ... ... | | | | |
| C2 | survey of the road ... ... ... y ... | | | | |
| | **Total Carried to Grand Summary** | | | | 14,000.00 |



INFINITYPLUS
Media & PR
Translation Office



**BILL NO 3. Road Works**

| No | Description | Unit | Quant | Rate | Amount U.A.E. Dhs |
|---|---|---|---|---|---|
| 0 | Hot in Place Asphalt Recycling Recycling of the road surface for depth up to 40mm, using Hot in Place recycling Technology. | | | | |
| | | | | | |
| 1 | Fresh asphalt materials for kerb, works | | | | |
| | | | | | |
| | Various items | | | | |
| 1/ | Metal work | | | | |
| | | | | | |
| | **Total Carried to Grand Summary** | | | | **5,246,000.00** |

**GRAND SUMMARY**

| | Description | Amount U.A.E. Dhs |
|---|---|---|
| Bill no 1 | GENERAL ITEMS | |
| Bill no 2 | PREPARATIONS | 24,000.00 |
| Bill no 3 | ROAD WORKS | 147,000.00 |
| | | 5,246,000.00 |













Manama, Kingdom of Bahrain
+973 17569696
894671
info@infinityplusonline.com
www.infinityplusonline.com

**Government of Ras Al Khaimah**

**Public Works and Services Department**

April 26, 2015
DSH/451/2015

To the Esteemed Bader Ahmed Kaiksow Trading Group,

Mr. Hassan Bader Ahmed Kaiksow,

Greetings,

**Project: The road project connecting Kadra and the main road Kalba - Sharjah passing through Shawka**

**Subject: Technical Status Report on the Maintenance and Rehabilitation Works of Seeji - Shawoka Road Using Recycling Technology with Heating**

The Public Works and Services Department extends its best greetings and sincerest wishes for continued success. Referring to the subject mentioned above, and following our letter number DSH/368/2015 dated April 1, 2015, a technical committee from the Public Works and Services Department will visit the project site next Thursday, dated April 30, 2015, to review the progress stages and the quality of execution. This visit will determine the final decision on whether your group will continue to execute the aforementioned project.

Please accept our highest respect and appreciation

Eng. Ahmed Mohamed Ahmed Al Hammadi
General Manager





EXHIBIT
11



Archive

**Projects and Roads Management**

**Office of the General Manager**

**T +971 7228 5688, F +971 7 227 0035**

**P O Box: 1661, R.A.K United Arab Emirates**

www.pwsd.rak.ze





Manama  Kingdom of Bahrain
+973 17564695
89467 1
infoaninfinityplusonline.com
www.infinityplusonline.com

K...s Al Kh...

Public Works & Services De...

2015  04  26

457  2015

السادة    مجموعة بدر أحمد كبكسو للتجارة

السيد    حسن بدر أحمد كبكسو

المشروع:    الطريق الواصل بين قدره و الطريق، الرئيسي كلفاء    رقم المار عم شوكة

الموضوع:    تقرير الوضع الفني لأعمال صيانة و إعادة تأهيل با رق سيحي    شوكة باستخدام تقنية إعادة التدوير مع السفلي

2015  J60

2015/04 01

حمد محمد أحمد الحمادي

المدير العام





**Government of Ras Al Khaimah**

**Public Works and Services Department**

May 3, 2015

DSH/2015/509

To the Esteemed BADER AHMED KAIKSOW TRADING GROUP W.L.L,

Mr. Hasan Bader Ahmed Kaiksow,

Greetings,

**Project: The road project connecting Kadra and the main road Kalba - Sharjah passing through Shawka**

**Subject: Termination of the Road Construction Contract**

The Public Works and Services Department extends its best greetings and sincerest wishes for continued success

Referring to the subject mentioned above, and to the contract signed with your group on Thursday (January 22, 2015), following repeated field visits by our technical team, it has been found that the quality of the executed works is technically unacceptable despite giving you more than one opportunity to improve the execution performance.

We regret to inform you of the cancellation of the contract signed with you, hoping for future cooperation between us

We thank you for your cooperation

Please accept our highest respect and appreciation

Eng. Ahmed Mohamed Ahmed Al Hammadi

Department Manager





(Handwritten signature)

CC:

Archive

Office of the General Manager

Projects and Roads Department / N M









**Government** of
**Ras Al Khaimah**
Public Works & Services Department



KINGDOM OF BAHRAIN
of Works, Municipalities
and Urban Planning
The Minister



مملكة البحرين
وزارة الأشغال وشؤون البلديات والتخطيط العمراني
الوزير

No: OL/ AUR / 982 /2018
Date: 19ᵗʰ July 2018

M/s UCO Engineering W.L.L.
PO Box 70447
Kingdom of Bahrain.

Fax Number: 17 735 095

Dear Sir,

### ROADS PROJECTS:
### TERM CONTRACT FOR ASPHALT SURFACING & REINSTATEMENT WORKS 2017-2019
### CONTRACT NUMBER: RPD-18/018
### LETTER OF AWARD

1.  We refer to your tender submission dated 21ˢᵗ February 2018 for the above project

2.  You are hereby informed that your above tender has proved successful and that accordingly, subject as hereinafter mentioned, the Ministry of Works, Municipalities Affairs and Urban Planning of the Government of the Kingdom of Bahrain ("The Ministry") hereby awards you the Contract for the above project in the sum of Bahraini Dinars **One Million Three Hundred Fifty Seven Thousand One Hundred and Forty Two (BD 1,357,142.000)**.

3.  The commencement of the works shall be fourteen (14) days from the Engineer's order to commence

4.  In accordance with Clause 9.1 of the Conditions of Contract you are required to submit a Performance Bond in the form of bond set out in the Tender Documents to the value of 10% of the amount of the Contract Sum within TEN (10) DAYS of receipt of this letter of award. Failure to produce the bond within Ten (10) days of the date of reminder notice will:-

    a.  render this Letter of Award null and void,

    b.  entitle the Ministry to forfeit the Initial Bond without further notification to you and without legal action against you and

    c.  entitle His Excellency the Minister of Works, Municipalities Affairs and Urban Planning to bar you from participating in any future tenders for a period of not less than one year.

5.  Your attention is drawn to the requirement that the Performance Bond is to be issued by any bank or insurance company that is licensed by the Central Bank of Bahrain and Ministry of Industry and Commerce to operate in the Kingdom of Bahrain

هاتف 5511 754 1 +973، فاكس 2511 753 1 +973، ص.ب 21021، مملكة البحرين
Tel: +973 1 754 5511, Fax: +973 1 753 2511, P.O. Box 21021, Kingdom of Bahrain

EXHIBIT
13

**KINGDOM OF BAHRAIN**
**stry of Works, Municipalities**
**ffairs and Urban Planning**



6. You are reminded that you are required to place insurances with one of the Government approved insurers and to deposit the policies and receipts in respect of premiums paid with the Ministry prior to the earlier of entering on site and commencing the works.

7. Unless and until a formal contract is prepared and executed your above tender together with this letter shall constitute a binding contract between you and this Ministry.

8. All bonds, insurance policies and receipts are to be delivered to the Director, Cost Engineering Directorate, Ministry of Works, Municipalities Affairs and Urban Planning.

9. Please confirm receipt and acceptance of the terms and conditions of this letter by signing and returning to us the attached duplicate.

Yours faithfully,

**Essam Bin Abdulla Khalaf**
H.E. The Minister of Works,
Municipalities Affairs & Urban Planning

We hereby acknowledge receipt of the Original of this letter of which this copy forms a tru and accurate duplicate copy. On behalf of M/s UCO Engineering W.L.L., we confir acceptance of the terms and conditions as contained in this letter.

Name: *Eduardo A. Cayanan* Signature:

Date: 24 / 07 / 2018

For and on behalf of:

UCO Engineering W.L.
PO Box 704
Kingdom of Bahr

Telephone: +973 17545555, Fax: +973 17155499, P.O.Box: 5, Manama, Kingdom of Bahrain E-mail: info@works.g info@works.gov.bh



# ANGELO BENEDETTI, INC.

94 First Avenue    Cleveland, OH 44146
440.439.3420        440.439.3418
www.angelobenedetti.com

May 20, 2022

*Ministry of Works, Municipalities Affairs and Urban Planning*
*Roads Projects & Maintenance Directorate*
*Kingdom of Bahrain*

Dear Sir,

Angelo Benedetti, Inc. is the original equipment manufacturer of the Re-Heat asphalt recycling equipment being utilized in the region. Our equipment has been time-tested and approved in the United States and around the world over the past decade. Our Patented process has been utilized for over 63 years in operation by various federal, state, and local governments.

In consideration of the recent field visit trial of our Benedetti expert and his examination of the design mix of wearing course being used in the Kingdom of Bahrain, the material maximum size is 20mm and the mix design density is 2.54. This mix, when relayed, has a higher value of strength and ultimately should not require the same depth and thickness as our standard specification elsewhere.

We recommend the process of heating the existing asphalt from 160-180 Degrees Celsius with a recycling depth up to 30mm- 35mm from the wearing course and possibly adding virgin material to the recycled asphalt. Plant prepared asphalt mixture can always be added in different proportions to produce the target thickness after compaction. Due to your unique situation, we also recommend the attached method statement for recycling with the Benedetti machines to be followed for the above-mentioned cutting depth.

Following the attached method statement and compacting this heated recycled asphalt creates an excessive bond between all measuring layers and uniformly seals all cracks directly under the newly applied layer of recycled asphalt.

Please free to contact my office should you have any further questions regarding this document submitted. Thank you.

Best Regards,

Albert Benedetti,
President
Angelo Benedetti, Inc.



EXHIBIT
**14**



## ANGELO BENEDETTI, INC.

94 First Avenue   Cleveland, OH 44146
440.439.3420      440.439.3418
www.angelobenedetti.com

## Method Statement:

### Rehabilitation of Road pavement by Re-heat recycling
### Introduction:
The process involves, elevating the temperature of the top 75mm of the existing road using the Benedetti heating unit. Scarifying at least the top 30mm layer and channeling the scarified material into the mixer of the paving unit. At the mixer, an additional amount of rejuvenator will be added to correct the viscosity and replenish the loss in the binder and produce a mix simulating the original applied mix. A rejuvenator called Cyclogen is the type recommended by Benedetti. Moreover, a plant-prepared asphalt mixture (GW-20-TM5) shall be added to the recycled asphalt in the hopper of the paving unit, mixed by an auger, and laid to produce the target thickness after compaction.

### Section of RAR Road



**Equipment in use:** Benedetti Paver machine, Benedetti Heating machine, Milling Machine, 10T Roller, 3T Roller, PTR

## 4 Stage Methodology



**PROCESS FLOW CONFIGURATION
REHEAT & ASPHALT RECYCLING**

STAGE 3 RECYCLING AND LAYING → STAGE 2 CUTTING → STAGE 1: HEATING

ASPHALT ROAD

ADDING 10MM TARGET
AFTER COMPACTION
40MM

CUTTING DEPTH: 30 - 35MM

HEATING TEMPERATURE 160-180o C
HEAT PENETRATION 75MM
NO. OF HEATING PASSES: 5 - 6 PASSES

ROLLING PASSESS
INITIAL STR: 2 PASSES &
All Passes - Full Width
FINAL STR: 1 PASSES

## Stage 1: Milling of Road:

After desired levels are marked. Milling is done for a width of 50cm wherever the Preheating or Recycling machine cannot be accessed. The milled portion will be properly cleaned and finished with a combination of recycled asphalt and plant-produced asphalt- GW-20-TM5 as per standards and specifications.

## Stage 2: Heating the Existing Asphalt Road (BENEDETTI Heating Machine)

- The heater machine will run along the length of the existing road within the marked limit of heating.
- The asphalt road will be monitored by the technician until a target heat temperature of 160o-180oC temperature is obtained.
- The heat penetration to the existing road will be around 75mm.

Existing Road Surface    Pavement depth heated by the RAR Heating unit
→
75 mm

## Stage3: Cutting the Heated Existing Road (BENEDETTI Paver Machine)

- After the heating temperature is achieved, the recycling paver machine is introduced to and shall be placed in position at the target depth to cut 30mm-35mm.



- A rejuvenator (Cyclogen) will be added while recycling is in progress to rejuvenate the asphalt mixture, correct the viscosity and replenish bitumen loss during the heating

  **Note:** Enclosed is the certificate of rejuvenator materials that are in use in the recycling process. The amount of rejuvenator introduced in the recycling will be determined based on the test carried out on the existing road prior to the recycling operation.

## Rejunivator Dosage Ltr/m2



### Addition of Seed Mix

UCO engineering plant will produce the mix that will be used as seeding or additional asphalt material (GW-20-TM5). The seed mix will be added to the scarified existing pavement making it possible to achieve a target i.e. 50mm but allowable construction variation may be considered.

This seeding asphalt materials shall be added into recycled asphalt simultaneously during the process.



### Stage 4: Recycled Asphalt Compaction – Do not recommend the use of vibration during the rolling operation. Will cause fracture to the surface.

- RAR asphalt should comply with the minimum required laying and rolling temperature prior to rolling and Compaction.
- Mix Delivery Temperature: 140c Temperature Minimum
- Laying Temperature: 135c Temperature Minimum
- Rolling Temperature: 130ctemperature minimum.
- Commence rolling the laid loose asphalt behind the Recycler.

*Initial rolling with 10T tandem Steel Roller will be as follows.*

- Approximately three passes of standard Rolling without Vibration.
- Wait 5-10 minutes and allow the roadway to cool sufficiently enough for the final PTR roller.

*Final rolling with 14T PTR will be as follow. After the initial Rolling.*

- Provide approximately one to two (at most) rolling passes of the PTR roller. PTR will provide kneading action on the Asphalt Mat and contribute to additional densification on the pavement during rolling. *NOTE- Over rolling/compaction WILL CAUSE DAMAGE TO THE ASPHALT SURFACE.*

- Rolling shall start from the joint side to the curbside. Always pinch the centerline joint for uniform blending.

- Rolling passes must overlap around 25cm on each linear rolling, and the same at the joint.

- Routinely inspect the asphalt mat during rolling for any suspected defects due to over-compaction.

Please follow and note the above recommendations to help assure a better product performance. Thank you.

Sincerely,

Albert Benedetti, President

Angelo Benedetti, Inc.



| Roads-Project Assessment Committee | Form No. | RPMD-ALL-F-036 |
|---|---|---|
| Quality Audit Report (QAR) | Rev: | 0 |
| Ref No.: RPMD-PAC/YEA-AN/ QAR/08-2022 | Impl. Date | 27ᵗʰ March 2017 |

| | | |
|---|---|---|
| **Project Name: Sitra, Avenue 4** | **Area** | **Capital, Sitra** |
| **Tender No: TCO Job # RPD-21/041 - 08** | | |
| **Main Contractor: UCO Engineering** | | |
| **Asphalt Supplier: UCO Engineering** | **Kerb & Block-Paving Works: N/A** | |
| **Supervising Office: Maintenance Area Engineers (Eng. Zainab Abdulla)** | | |
| **Prepared by: Ali Nashwan & Yassin Eisa Adam - Senior Civil Engineers, RPMD** | | |

## 1. Introduction

This audit report reflects observations noticed by Road's Inspectors while examining quality of asphalt works executed by UCO Engineering on Avenue 4, Sitra District. In-situ Reheating and Recycling (RAR) method was used for resurfacing/overlaying a deteriorated section of the mentioned road.

Remarks made hereon are based on visual inspection carried out on May 12ᵗʰ, 2022 in response to a request sent by the responsible Area Engineer. Also, Quality Data compiled for the mentioned job was used to accomplish the assessment task.

## 2. Observations

No records were presented by the Supervising Team for observations noticed during application, however, based on the visual inspection carried out on completed work revealed the following:

○ _Targeted Layer Thickness:_ Based on measurements taken by QEL (Independent Lab) for core samples recovered from different locations, thickness of the compacted layer was found to be in the range 42mm to 45mm, and this is considered adequate for recycled asphalt layer.

○ _Surface Texture:_ The RAR system was capable to achieve a smooth finished surface in this site. No voids or openings were observed on finished surface, except minor incidents.

○ _Riding Quality:_ Riding quality achieved after recycling the existing wearing course layer reflected difficulties encountered in both East and West Bound driving directions. Noticeable number of irregularities have been recorded as reflected in the Test Report issued by UCO (summary is shown in below Table). For instance, 28 nos. of ups/downs were recorded in 400 m road section of the West Bound Carriageways (i.e., an average of 7 to 8 nos. of irregularities in 100 length). This exceeds the maximum number of irregularities allowed by the Ministry in such road category.

The above measurements were also validated by driving through both lanes of the subject road; driving discomfort was quite noticeable.

On the other hand, the responsible Area Engineer also confirmed receipt of many complaints on the riding quality as raised by local residents being regular users of the subject roads.

EXHIBIT
15

|  Ministry of Works, Municipalities Affairs and Urban Planning | **Roads-Project Assessment Committee**<br>**Quality Audit Report (QAR)**<br>**Ref No.: RPMD-PAC/YEA-AN/ QAR/08-2022** | Form No | RPMD-ALL-F-038 |
|---|---|---|---|
| | | Rev | 0 |
| | | Impl. Date | 27th March 2017 |

Table: Summary for irregularity test report issued by UCO

| Carriageway Direction | No. of Irregularities | |
|---|---|---|
| | Inner Tyre Path | Outer Tyre Path |
| East Bound Carriageway (420 m length) | 24 Including +5mm in 5 locations (construction joints) | 21 Including +5mm and 6mm in 5 locations (construction joints) |
| West Bound Carriageway (420 m length) | 28 Including +/-4, 5 and 6mm in 4 locations (construction joints) | 27 Including +/-5mm in 5 locations (construction joints) |

## 3. Conclusion and Recommendations

(i) Compared to previous field test trials, UCO has managed to achieve considerable progress in achieving requirements set for surface texture and layer thickness. However, the riding quality is still an issue. The riding quality should be achieved consistently in all sites resurfaced using the RAR method.

(ii) Reservations mentioned in this report are of significant importance to advance on using RAR as a reliable resurfacing method. These mentioned reservations should carefully be addressed by UCO in order to improve the practice.

(iii) The affected road section shall be attended to satisfactorily as may decide by the RPMD-RMS. The rectification may be carried out by repeating the work using the RAR method in condition that UCO will ensure delivering a quality product; or instead, the traditional method involving milling-and-overlay maybe used in case of doubts in achieving required level of quality.

(iv) RPMD inspection team shall be notified/invited for another inspection tour when the rectification works are completed.

| Report Prepared By: | Part A: Paving works on the Carriageways | Part B & C: Non-asphalt works and off-carriageway items |
|---|---|---|
| Name | Yassin Eisa Adam | Ali Nihad Nashwan |
| Designation | Senior Civil Engineer | Senior Civil Engineer |
| Date | 2022.06.01 | 2022.06.01 |
| Signature | | |



**KINGDOM OF BAHRAIN**
## Ministry of Works, Municipalities Affairs and Urban Planning

وزارة الأشغال وشؤون البلديات والتخطيط العمراني
مملكة البحرين

Ref.: RPM-M-16.2.RPD-21/MJQ/434/2022
Date: 12th June 2022

**Attn.: Mr. Bader Ahmed Kaiksow**

**UCO ENGINEERING W.L.L**
**P. O Box 70447**
**Kingdom of Bahrain**

Dear Sir,

---

### TERM CONTRACT FOR ASPHALT SURFACING & REINSTATEMENT WORKS (2021-2022)
### CONTRACT NUMBER: RPD-21/041
### PERFORMANCE OF ASPHALT RECYCLING MACHINE

---

Reference to the Quality Report attached herewith, for the Asphalt resurfacing works done at Avenue 4 in Sitra Area using the Asphalt Recycling Machine.

The asphalt recycling machine did several trials during the past few years, all were precisely monitored by our Roads Projects Quality Assessment Division.

The net results showed that the product of this machine was somewhat acceptable for short stretches of roadways (80m or less).

However, the machine failed to give a ride-able asphalt surface in long roadways, and the reason for this is not yet resolved

In all cases, this machine is supposed to be utilized for maintaining long distances of asphalt-paved highways, due to the difficulty in mobilization, which is not defensible for small areas.

We can allow for more trials, if you wish, but this Ministry will not bear the cost of rectifying the failed product of your machine if occurred in future.

Therefore, please decide whether to continue with this scenario until you reach to an acceptable product, or to avoid going into more losses associated with rectification work under your own cost.

Yours faithfully,

**Sayed Bader Alawi**
**Director,**

*Enclosed: Quality Audit Report*

EXHIBIT
16

**KINGDOM OF BAHRAIN**

**Ministry of Works, Municipalities Affairs and Urban Planning**



CC:    - Assistant Undersecretary – Roads
       - Chief Roads Maintenance *MJQ 9/6/2022*
       - Roads Project Assessment Committee

**Oliver L. Herthneck**

| | |
|---|---|
| **From:** | AL BENEDETTI <aldmb1@mac.com> |
| **Sent:** | Sunday, August 27, 2023 5:27 PM |
| **To:** | Hasan Bader Kaiksow |
| **Subject:** | Machine Modifications |

> **CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hello Hassan,

It was a pleasure seeing you last week and thank you for coming to our office and project worksite for the day. After our discussions and visiting an active project, I offer the following for your consideration:

It is our professional opinion that the issues you have experienced in the field are a result of a combination of things. The uniqueness of the larger stone specifically used in the asphalt in the region, the smaller and lighter weight equipment originally requested by the ministry, and a lack of qualified professional operators and laborers to perform the work efficiently. These things are all directly affecting your ability to produce a final product like the one you have recently seen here on your visit. You told me last year that you would like to build a new machine with multiple new and enhanced systems. I have researched and worked with several professional resources on your behalf over the past year to incorporate some of those requested systems into this machine. We have painstakingly worked to implement some of these new systems and modifications to our own equipment. After going through a 12-month trial phase we can successfully demonstrate that these new systems and options work incredibly well, as you have witnessed for yourself on our project.

As you are aware, the climate in the US is a difficult one post covid and during this current administration. It has brought about record-high interest rates and exceedingly long lead times components, making it difficult to get a fair price to sell your equipment. We did receive a verbal offer that was so low (less than $600k USD), I immediately turned it down and didn't even tell you about it because it was offensive. This market is prey to those looking to capitalize on desperate situations. Due to all of this, I feel the best thing would be for us to enhance, update, and modify the equipment you already have. You already own the asset and the majority of complications needed for these modifications are there. We can successfully outfit your existing equipment with these new modified systems to work like the equipment you saw in action and similar to the new one you wanted to order. By outfitting your current machines with these modifications and additions, this would directly resolve the combination of issues experienced. This maximizes both the value of your current asset (machines) and the successful implementation of a successful product in the field with these all-new systems. You would be able to get a more advanced machine like the one you wanted to order, at a fraction of the price. To order a new machine would be over $3.25M USD and take approximately 10-12 months for construction, while this modification and factory restoration would only take approximately 3-6 months and cost around $350-500k USD (accurate pricing to follow). You would also considerably increase the resale value of your machine by making it much more desirable with these new systems and having it be factory-reconditioned to like-new standards.

1

EXHIBIT
17

Due to the extensive modifications and enhancements requested, it would be impossible to list everything in this email but the following is a general overview.

Recycler:  Build a new heavy-duty extended articulating frame structure; add a self-greasing articulation point; new cylinders, hydraulic valves, and electrical harnesses for all new additions; add automatic material feed paddles for automatic asphalt control at the screed; new larger asphalt plant, add 4-bank dividers; complete with all functions and new heat tube; new hydraulic drive motors with plates, wheels, cradles, and end caps; new larger center mill - complete; new larger propane tanks, plumbing-complete; new larger hydraulic tank-complete; new larger rejuvenator tanks; add/replace all burners, cannons, and blocks with smaller contracted forced air burners-complete; modify all ductwork and plumbing; new burner adjustment banks, placed at deck; new furnace ignition with gauges; re-wire electrical for larger more advanced machine; full service; prep and paint.

Pre-Heater:  Add/replace all burners, cannons, and blocks with smaller contracted forced air burners-complete; modify all ductwork and plumbing; new burner adjustment banks, placed at deck; new furnace ignition with gauges; full service; prep and paint.

Of course further training would be included and agreed upon with this proposal, as well as, an invitation for you and your key personnel to visit and learn "hands-on" about all aspects of the equipment while it is being modified.  It is also imperative that we work collectively to address your labor issue and train qualified operators that can become full-time assets to your company.  Moving forward it would be important to designate certain team leaders of both operators and laborers that would be responsible for the most critical parts of the operation.  We would send an experienced team of ours during our off season to help implement new standards that will need to be followed in order to ensure a successful outcome.  I would even offer to visit personally and speak with ministry officials so they too have a better understanding of the newly modified machines, what's different and why, and how to set reasonable expectations for a recycling project.  By modifying the equipment for your specific needs, working closely together throughout the entire process, and training a professional team, I fully expect this to be successful in the region and beyond.

Thank you in advance and please do not hesitate to contact me with any questions.

Best regards,
~Al

**Albert Benedetti, President**
Angelo Benedetti, Inc.
94 First Ave , Bedford OH 44146
P: 440.439.3420  C: 440 554.4524
E: al@angelobenedetti.com

Web: www.angelobenedetti.com

*"Quality...Since 1959"*



This e-mail and any attachments are provided for the sole use of the intended recipient(s) and may contain information that is confidential, privileged, proprietary, or otherwise protected by law.  If you are not an intended recipient of this message, you are not authorized to read, print, retain, copy or disseminate this message or any part of it.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and destroy all copies of the original communication.

**ICC**
**International**
**Court of Arbitration®**

23 December 2024 – ctn/mee/sve

**28835/CPB**
BADER AHMED KAIKSOW GROUP (Bahrain) **vs/ 1.** ANGELO BENEDETTI, LLC
(U.S.A.) **2.** ANGELO BENEDETTI HOLDINGS, INC. (U.S.A.) **3.** Albert E. Benedetti
(U.S.A.)

| Counsel: Ms Colleen Parker Bacquet | (Tel: + 33 1 49 53 28 36) |
| Deputy Counsel: Ms Miracle Eme | (Tel: + 33 1 49 53 28 84) |
| | (Email: ica4@iccwbo.org) |

Clare Ambrose
TWENTY ESSEX
*cambrose@twentyessex.com*
*By ICC Case Connect*

Phillip A. Ciano
Brent S. Silverman
Oliver L. Herthneck
CIANO & GOLDWASSER, LLP
*pac@c-g-law.com*
*bss@c-g-law.com*
*olh@c-g-law.com*
*By ICC Case Connect*

ANGELO BENEDETTI, LLC
*ed@angelobenedetti.com*
*By ICC Case Connect*

Majeed G. Makhlouf
BERNS, OCKNER & GREENBERGER, LLC
*Mmakhlouf@bernsockner.com*
*By ICC Case Connect*

Dear Mesdames and Sirs,

## Advance on Costs

On 20 December 2024, the International Court of Arbitration of the International Chamber of
Commerce ("Court") readjusted the advance on costs and decreased it from US $ 225 000 to
US$ 190 000, subject to later readjustments (Article 37).

We enclose the Financial Table and Payment Requests that indicate the amounts to be paid by
the parties and when such payments are due. We look forward to receiving the requested
payment within the time limit granted, *i.e.*, by **20 January 2025**.

## Terms of Reference

At the same session, the Secretariat transmitted the Terms of Reference signed by the parties
and the arbitral tribunal on 6 December 2024, to the Court (Article 23(2)).

## Procedural Timetable

We also transmitted the procedural timetable to the Court at the same session (Article 24(2)).
Any subsequent modifications of the procedural timetable must be communicated to the Court
and the parties.

.../...

International Chamber of Commerce | Chambre de Commerce Internationale (ICC)
Secretariat of ICC International Court of Arbitration | Secrétariat de la Cour Internationale d'Arbitrage          iccwbo.org/arbitration

**Paris**
33 avenue du Président Wilson
75116 Paris, France
+33 (0)1 49 53 28 28  arb@iccwbo.org

**New York**
in affiliation with Sicana, Inc.
140 East 45th Street, Suite 14C
New York, NY 10017, USA
+1 646 699 5704  ica9@iccwbo.org

**Singapore**
In affiliation with SICAS
28 Maxwell Road #02-01, Maxwell Chambers
Suites, Singapore 069120
+65 6983 5580  ica11@iccwbo.org

**Hong Kong**
Room 102, 1/F., West Wing, Justice Place,
11 Ice House Street, Central, Hong Kong
+852 3954 9504  ica8@iccwbo.org

**Sao Paulo**
in affiliation with SCIAB LTDA.
rua Surubim, 504, Brooklin Novo
CEP 04571-050, Sao Paulo, Brazil
+55 11 3040 8830  ica10@iccwbo.org

**Abu Dhabi**
ADGM Square, Level 2
Al Maryah Island, P.O.
Abu Dhabi, United Arab
+971 56 333 2781  ica1



EXHIBIT
18

**28835/CPB**                                                                                          **Page 2**

### Time Limit for Rendering the Final Award

The Court fixed **31 August 2026** as the time limit for the final award based upon the procedural timetable (Article 31(1)). The Court may extend the time limit for rendering the final award pursuant to a reasoned request from the arbitral tribunal or on its own initiative if it decides it is necessary to do so (Article 31(2)).

The Court expects sole arbitrators to submit draft awards within two months after the last substantive hearing on matters to be decided in the award or the filing of the last written submissions concerning such matters (excluding cost submissions), whichever is later (Article 27). While having the power to extend the time limits, the Court will consider the diligence and efficiency, the time spent, the rapidity of the proceedings, the complexity of the dispute and the timeliness of the submission of the draft award, when fixing the arbitral tribunal's fees (Article 2(2) of Appendix III).

Yours faithfully,

Sophie Varenne
Counsel
Secretariat of the ICC International Court of Arbitration

encl.      - Financial Table
           - Payment Requests



**ICC**
International
Court of Arbitration®

**PAYMENT REQUEST**

**Date: 23 December 2024**

**28835/CPB**
BADER AHMED KAIKSOW GROUP (Bahrain) **vs/ 1.** ANGELO BENEDETTI, LLC (U.S.A.) **2.** ANGELO BENEDETTI HOLDINGS, INC. (U.S.A.) **3.** Albert E. Benedetti (U.S.A.)

### *BADER AHMED KAIKSOW GROUP (Bahrain)*

| | |
|---|---|
| Origin of payments: | **Payments must originate from parties to the case in which the payment has been requested.** |
| Date of Court's decision: | 20 December 2024 |
| Amount to be paid: | **US$ 33 000** |
| Time limit for payment: | **20 January 2025** |
| Beneficiary: | International Chamber of Commerce 33–43 avenue du Président Wilson 75116 Paris France |
| Bank of Beneficiary: | NATIXIS 30 Avenue Pierre Mendes France 75013 Paris France |
| SWIFT/BIC code: | NATXFRPP |
| IBAN: | FR 76 3000 7999 9927 8288 3000 012 |
| Reference of the case: | Include reference **28835/CPB/ Claimant/ BADER AHMED KAIKSOW GROUP** to help ensure that the payment is accurately credited. Payments made without indication of the reference may be rejected. |
| Banking charges: | Banking charges associated with the payment should be borne by the party making such payment. |

…/…

International Chamber of Commerce | Chambre de Commerce Internationale (ICC)
Secretariat of ICC International Court of Arbitration | Secrétariat de la Cour Internationale d'Arbitrage     **iccwbo.org/arbitration**

**Paris**
33 avenue du Président Wilson
75116 Paris, France
+33 (0)1 49 53 28 28   arb@iccwbo.org

**New York**
in affiliation with Sicana, Inc.
140 East 45th Street, Suite 14C
New York, NY 10017, USA
+1 646 699 5704   ica9@iccwbo.org

**Singapore**
in affiliation with SICAS
28 Maxwell Road #02-01, Maxwell Chambers
Suites, Singapore 069120
+65 6983 5580   ica11@iccwbo.org

**Hong Kong**
Room 102, 1/F., West Wing, Justice Place,
11 Ice House Street, Central, Hong Kong
+852 3954 9504   ica8@iccwbo.org

**Sao Paulo**
in affiliation with SCIAB LTDA.
rua Surubim, 504, Brooklin Novo
CEP 04571-050, Sao Paulo, Brazil
+55 11 3040 8830   ica10@iccwbo.org

**Abu Dhabi**
ADGM Square, Level 20, Al Maqam Tower
Al Maryah Island, P.O. Box 111999
Abu Dhabi, United Arab Emirates
+971 56 333 2781   ica12@iccwbo.org

**28835/CPB**                                                         **Page 2**

Bank accounts in the EEA:         The PSD2 Directive which entered into force on 13 January 2018 provides that bank transfers made within the European Economic Area (EEA) are subject to shared banking fees. Therefore, banking fees generated by bank transfers made by ICC to bank accounts within the EEA will be automatically shared between the account holder and the beneficiary of the bank transfer.



**PAYMENT REQUEST**

Date: 23 December 2024

**28835/CPB**

BADER AHMED KAIKSOW GROUP (Bahrain) **vs/ 1.** ANGELO BENEDETTI, LLC (U.S.A.) **2.** ANGELO BENEDETTI HOLDINGS, INC. (U.S.A.) **3.** Albert E. Benedetti (U.S.A.)

*1. ANGELO BENEDETTI, LLC (U.S.A.) or*
*2. ANGELO BENEDETTI HOLDINGS, INC. (U.S.A.) or*
*3. Albert E. Benedetti (U.S.A.)*

| | |
|---|---|
| Origin of payments: | **Payments must originate from parties to the case in which the payment has been requested.** |
| Date of Court's decision: | 20 December 2024 |
| Amount to be paid: | **US$ 95 000** |
| Time limit for payment: | **20 January 2025** |
| Beneficiary: | International Chamber of Commerce<br>33–43 avenue du Président Wilson<br>75116 Paris<br>France |
| Bank of Beneficiary: | NATIXIS<br>30 Avenue Pierre Mendes France<br>75013 Paris<br>France |
| SWIFT/BIC code: | NATXFRPP |
| IBAN: | FR 76 3000 7999 9927 8288 3000 012 |
| Reference of the case: | Include reference **28835/CPB/ Respondents** to help ensure that the payment is accurately credited. Payments made without indication of the reference may be rejected. |
| Banking charges: | Banking charges associated with the payment should be borne by the party making such payment. |

.../...

International Chamber of Commerce | Chambre de Commerce Internationale (ICC)
Secretariat of ICC International Court of Arbitration | Secrétariat de la Cour Internationale d'Arbitrage    iccwbo.org/arbitration

**Paris**
33 avenue du Président Wilson
75116 Paris, France
+33 (0)1 49 53 28 28   arb@iccwbo.org

**New York**
in affiliation with Sicana, Inc.
140 East 45th Street, Suite 14C
New York, NY 10017, USA
+1 646 699 5704   ica9@iccwbo.org

**Singapore**
in affiliation with SICAS
28 Maxwell Road #02-01, Maxwell Chambers
Suites, Singapore 069120
+65 6983 5580   ica11@iccwbo.org

**Hong Kong**
Room 102, 1/F., West Wing, Justice Place,
11 Ice House Street, Central, Hong Kong
+852 3954 9504   ica8@iccwbo.org

**Sao Paulo**
in affiliation with SCIAB LTDA.
rua Surubim, 504, Brooklin Novo
CEP 04571-050, Sao Paulo, Brazil
+55 11 3040 8830   ica10@iccwbo.org

**Abu Dhabi**
ADGM Square, Level 20, Al Maqam Tower
Al Maryah Island, P.O. Box 111999
Abu Dhabi, United Arab Emirates
+971 56 333 2781   ica12@iccwbo.org

**28835/CPB**                                                                    **Page 2**

Bank accounts in the EEA:    The PSD2 Directive which entered into force on 13 January
                             2018 provides that bank transfers made within the
                             European Economic Area (EEA) are subject to shared
                             banking fees. Therefore, banking fees generated by bank
                             transfers made by ICC to bank accounts within the EEA
                             will be automatically shared between the account holder
                             and the beneficiary of the bank transfer.

27 May 2025 – ctn/mee/cce



**ICC**
**International**
**Court of Arbitration®**

**28835/CPB**
BADER AHMED KAIKSOW GROUP (Bahrain) **vs**/ 1. ANGELO BENEDETTI, LLC (U.S.A.) **2**. ANGELO BENEDETTI HOLDINGS, INC. (U.S.A.) 3. Albert E. Benedetti (U.S.A.)

| | |
|---|---|
| <u>Counsel: Ms Colleen Parker Bacquet</u> | (Tel: + 33 1 49 53 28 36) |
| <u>Deputy Counsel: Ms Miracle Eme</u> | (Tel: + 33 1 49 53 28 84) |
| | (Email: ica4@iccwbo.org) |

Phillip A. Ciano
Brent S. Silverman
Oliver L. Herthneck
CIANO & GOLDWASSER, LLP

*pac@c-g-law.com*
*bss@c-g-law.com*
*olh@c-g-law.com*
*By ICC Case Connect*

ANGELO BENEDETTI, LLC

*ed@angelobenedetti.com*
*By ICC Case Connect*

Majeed G. Makhlouf

BERNS, OCKNER & GREENBERGER, LLC

*Mmakhlouf@bernsockner.com*
*rshell@bernsockner.com*
*By ICC Case Connect*

Dear Sirs,

By correspondence dated 7 May 2025, pursuant to Article 37(6), the Secretary General granted the parties a final time limit of 15 days to pay Respondents' share of the advance on costs.

Such time limit expired on **23 May 2025** and we have not received the payment or an objection pursuant to Article 37(6). Therefore, pursuant to Article 37(6), the claims are considered withdrawn as of 26 May 2025.

We will inform the Court of the withdrawal of the claims and invite it to fix the costs of arbitration.

**Documents**

We may destroy any documents, communications or correspondence submitted (Article 1(8) of Appendix II), unless a party or an arbitrator requests that we return the same within **30 days**. If a party or an arbitrator does so, we will ask the requesting party or arbitrator to pay all related costs and expenses. Disbursements in connection with additional services may also be charged to the parties.

…/…

International Chamber of Commerce | Chambre de Commerce internationale (ICC)
Secretariat of ICC International Court of Arbitration | Secrétariat de la Cour internationale d'Arbitrage
**iccwbo.org/arbitration**

**Paris**
33 avenue du Président Wilson
75116 Paris, France
+33 (0)1 49 53 28 28  arb@iccwbo.org

**New York**
in affiliation with Sicana, Inc.
140 East 45th Street, Suite 14C
New York, NY 10017, USA
+1 646 699 5704  ica9@iccwbo.org

**Singapore**
in affiliation with SICAS
28 Maxwell Road #02-01, Maxwell Chambers
Suites, Singapore 069120
+65 6983 5580  ica11@iccwbo.org

**Hong Kong**
Room 102, 1/F., West Wing, Justice Place,
11 Ice House Street, Central, Hong Kong
+852 3954 9504  ica8@iccwbo.org

**Sao Paulo**
in affiliation with SCIAB LTDA.
rua Surubim, 504, Brooklin Novo
CEP 04571-050, Sao Paulo, Brazil
+55 11 3040 8830  ica10@iccwbo.org

**Abu Dhabi**
ADGM Square, Level 20,
Al Maryah Island, P.O. Bo
Abu Dhabi, United Arab
+971 56 333 2781  ica12@



**EXHIBIT**
**19**

**28835/CPB** **Page 2**

Yours faithfully,

Miracle Eme
Deputy Counsel
Secretariat of the ICC International Court of Arbitration

c.c. _By ICC Case Connect:_
- Clare Ambrose _cambrose@twentyessex.com_