# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| BADER AHMED KAIKSOW GROUP, | ) | Case No. 1:25-cv-01093 |
| | ) | |
| | ) | Judge J. Philip Calabrese |
| Plaintiff, | ) | |
| | ) | Magistrate Judge |
| v. | ) | Jennifer Dowdell Armstrong |
| | ) | |
| ANGELO BENEDETTI, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiff Bader Ahmed Kaiksow Group ("BAK Group") brings this action against Defendants Angelo Benedetti, LLC, Angelo Benedetti Holdings, Inc., and Albert E. Benedetti alleging that Defendants fraudulently induced Plaintiff to enter into contracts for the purchase of an asphalt reheating and recycling machine designed to repave roadways in Bahrain and the Gulf Cooperation Council region, resulting in significant performance issues.  Pursuant to the parties' arbitration agreement, the dispute was pending before the International Chamber of Commerce but was dismissed after Defendants refused to pay their share of the arbitration costs. Now Defendants move to compel arbitration and for judgment on the pleadings. Plaintiff seeks leave to file a surreply to Defendant's motion to compel arbitration.  In this ruling, the Court takes up all three motions.

## STATEMENT OF FACTS

On Defendants' motions to compel arbitration and for judgment on the pleadings, the complaint alleges the following facts, which the Court accepts as true and construes in the light most favorable to Plaintiff as the non-moving party, as it must in the present procedural posture.  "In addition to the pleadings, courts may consider any documents referenced in the complaint that are central to the dispute." *Estate of Q.W. v. Lucas Cnty. Child. Servs.*, 682 F. Supp. 3d 671, 680 (N.D. Ohio 2023) (citing *United Food & Com. Workers, Loc. 1995 v. Kroger Co.*, 51 F.4th 197, 202 (6th Cir. 2022)).  Included with the complaint are multiple agreements and correspondence that feature prominently in Plaintiff's allegations.  (ECF No. 1, PageID #30–119.)  Further, the parties included with their briefs correspondence with the ICC regarding the non-payment of arbitration fees.  (ECF No. 15-1; ECF No. 17-1, PageID #228–60.)  Neither party objects to consideration of these materials.  Because these documents are integral to the allegations of the complaint, the Court considers these documents without converting the motions into one for summary judgment.

### A.    The Purchase Agreement

BAK Group is a collection of businesses registered in the Kingdom of Bahrain that provides, among other things, construction, renovation, and professional engineering services in international markets.  (ECF No. 1, ¶ 1, PageID #3.)  Angelo Benedetti, LLC is a Cleveland company that manufactures and sells re-heat recycling machines to lay recycled asphalt.  (*Id.*, ¶ 2, PageID #3.)

2

### A.1.   Initial Negotiations

Sometime in 2012, the director of BAK Group, Hasan Bader Kaiksow, reached out to Benedetti to inquire about purchasing one of its products, the "REHEAT Machine." (*Id.*, ¶ 11, PageID #5.)  Mr. Kaiksow was in discussions with the Ministry of Works, Road Projects, and Maintenance Department for Bahrain regarding the use of the REHEAT Machine for "Ministry tenders" in which vendors bid to work on government projects. (*Id.*, ¶ 12, PageID #5.)  According to BAK Group, it intended to purchase the REHEAT Machine from Benedetti to "perform demonstrations for the Ministry and for other departments of work in the GCC Region" so that they would require its use for government projects. (*Id.*, ¶ 13, PageID #5.)

On August 24, 2012, BAK Group and Benedetti executed a letter of understanding, which BAK Group claims acted as a "precursor to the Purchase Agreement and a companion representative agreement." (*Id.*, ¶ 14, PageID #5 & #50.) According to BAK Group, Mr. Kaiksow informed Benedetti multiple times of his intended use of the REHEAT Machine to "repave long stretches of roadway in Bahrain and in other areas of the GCC region." (*Id.*, ¶¶ 15–16, PageID #5–6.)

On October 10, 2012, BAK Group and Benedetti entered into a sales representation agreement, which appointed BAK Group as Benedetti's "exclusive representative to secure sales of Benedetti, LLC REHEAT Machines in Bahrain and the GCC Region." (*Id.*, ¶ 17, PageID #6 & #51–60.)  Benedetti agreed to pay BAK Group a five percent commission for its sales of the REHEAT Machine. (*Id.*, ¶ 18, PageID #6.)  BAK Group intended to perform demonstrations to prospective customers of the REHEAT Machine to earn its commission. (*Id.*, ¶ 19, PageID #6.)

That month, Benedetti informed BAK Group that it would begin to manufacture its equipment upon receipt of payment.  (*Id.*, ¶ 20, PageID #6.)

In mid-2013, BAK Group brought members of the Ministry to Cleveland to view a demonstration of the REHEAT Machine.  (*Id.*, ¶ 21, PageID #6.)  However, Benedetti allegedly only showed the Ministry "various roadways and claimed that the asphalt on those roadways had been recycled using a REHEAT Machine."  (*Id.*, ¶ 22, PageID #6.)  In July 2013, BAK Group requested that Benedetti build a new REHEAT Machine following the Ministry's specifications and intended use, which Benedetti promised to build.  (*Id.*, ¶ 23, PageID #6–7.)  On September 12, 2013, the Ministry issued a correspondence that included the Benedetti REHEAT Machine specifications as one of its tender jobs, which Mr. Kaiksow shared with the president of Benedetti, Albert Benedetti.  (*Id.*, ¶ 24, PageID #7 & #61–66.)

### A.2.   The Purchase Agreement

On January 15, 2014, BAK Group and Benedetti entered into a purchase agreement, which listed the intended use of the REHEAT Machine as being "for use to lay new recycled road asphalt in Bahrain, Kuwait, United Arab Emirates, Oman, and Qatar and Saudi Arabia."  (*Id.*, ¶ 25, PageID #7 & #30.)  BAK Group agreed to purchase a new "ReHeat Asphalt Pavement Heater" and new "ReHeat Recycler" for a total purchase price for the equipment and delivery to Bahrain of $2,575,000.  (*Id.*, ¶¶ 26–27, PageID #7, #43–44 & #67.)

To make this purchase, BAK Group secured a line of credit with Kuwait Finance House, to which Benedetti was named the beneficiary.  (*Id.*, ¶¶ 28–29, PageID #8.)  Benedetti received four draws for $643,750 each against the line of credit

4

through PNC Bank. (*Id.*, ¶ 29, PageID #8 & #68–70.) In October 2013, Benedetti confirmed receipt of the first installment payment and indicated that it would begin manufacturing the equipment. (*Id.*, ¶ 30, PageID #8.) Benedetti provided BAK Group with a build schedule, which included a timeline of the manufacturing of the new equipment. (*Id.*, ¶ 31, PageID #8 & #71.)

Over the course of the manufacturing process, BAK Group requested photographs of the equipment, and Benedetti provided what it claimed to be photographs of the new equipment being manufactured. (*Id.*, ¶ 32, PageID #8 & #72–79.) Unbeknownst to it at the time, BAK Group claims that these photographs depicted "the building of another REHEAT Machine," not the equipment that BAK Group had purchased. (*Id.*, ¶ 33, PageID #8.)

### B.    Demonstration and Performance

On May 5, 2014, the equipment was delivered to BAK Group in Bahrain. (*Id.*, ¶ 34, PageID #8.)

### B.1.    Early Demonstrations

BAK Group scheduled a demonstration of the equipment for the Ministry and paid for members of Benedetti to travel from Cleveland to Bahrain to view the demonstration. (*Id.*, ¶ 35, PageID #8–9.) On June 20, 2014, BAK Group performed the demonstration for the Ministry. (*Id.*, ¶ 35, PageID #9.) According to BAK Group, the equipment "failed to adequately perform" at the demonstration. (*Id.*)

On July 10, 2014, Benedetti informed BAK Group that it would need to purchase additional tools to "ensure performance of the Equipment" for $6,670. (*Id.*, ¶ 36, PageID #9.) Within two weeks, on July 23, 2014, BAK Group informed

5

Benedetti of "continued performance issues with the Equipment," to which Benedetti allegedly responded that it "was normal for REHEAT Machines to have issues the first time they are used." (*Id.*, ¶ 37, PageID #9.)

In September 2014, BAK Group scheduled another demonstration, this time with representatives of the United Arab Emirates Public Works and Services Department. (*Id.*, ¶ 38, PageID #9.)  It paid for members of Benedetti to travel to the United Arab Emirates to inspect and service the equipment to "ensure the Equipment was in good working order" and assist with the demonstration. (*Id.*, ¶ 39, PageID #9.)  Benedetti again told BAK Group that it could remedy issues with the equipment by purchasing additional equipment, which BAK Group purchased. (*Id.*, ¶¶ 40–41, PageID #9.)  The September 2014 demonstration took place over a 100-meter stretch of road, and the equipment "performed adequately." (*Id.*, ¶ 42, PageID #9.)

In November 2014, BAK Group informed Benedetti that it was in the process of trying to secure partnerships with Saudi Arabia and the United Arab Emirates that would involve REHEAT Machines in their department of transportation tenders. (*Id.*, ¶ 43, PageID #10.)  That same month, BAK Group informed Benedetti that "the Equipment was not functioning properly" and that it "could not secure commitments from the Ministry, other governmental authorities in the GCC Region, and potential customers per the Sales Rep Agreement." (*Id.*, ¶ 44, PageID #10.)  Benedetti told BAK Group that it would need to purchase additional parts and equipment to "ensure performance of the Equipment" and that it would need to secure experienced operators. (*Id.*, ¶ 45, PageID #10.)

6

### B.2.   The United Arab Emirates Job

In December 2014, the United Arab Emirates Public Works and Services Department awarded BAK Group a job to repave a 16 kilometer stretch of road for roughly $1.4 million.  (*Id.*, ¶ 46, PageID #10 & #80–81.)  BAK Group and the UAE memorialized this award in a signed agreement on January 22, 2015.  (*Id.*, ¶ 47, PageID #10 & #82–90.)  The same month, Benedetti informed BAK Group that it would send two representatives to the UAE to "provide professional labor service on the Equipment" for $8,500 because of continued performance issues.  (*Id.*, ¶ 48, PageID #10.)

In February 2015, two members of Benedetti traveled to the UAE and performed services on the equipment.  (*Id.*, ¶ 49, PageID #11.)  The same month, BAK Group began to perform the UAE job, but claimed that, "[a]lmost immediately," the equipment "did not perform as expected."  (*Id.*, ¶¶ 50–51, PageID #11.)  In March 2015, the UAE Department told BAK Group that it would cancel the job contract if BAK Group did not correct the performance issues within two weeks.  (*Id.*, ¶ 52, PageID #11.)  Benedetti blamed the performance issues on "improper road selection." (*Id.*, ¶ 53, PageID #11.)

On April 26, 2015, the UAE Department sent a letter to BAK Group in which it stated that it would inspect the UAE job and the performance of the equipment on April 30, 2015.  (*Id.*, ¶ 55, PageID #11 & #91–93.)  On May 3, 2015, the UAE Department sent BAK Group a letter which stated that, "following repeated field visit by [its] technical team, it ha[d] been found that the quality of the executed works [was] technically unacceptable despite giving [it] more than one opportunity to

improve the execution performance" and that the contract was cancelled.  (*Id.*, ¶ 56, PageID #11–12 & #94–96.)

### B.3.  Further Performance Issues Alleged

According to BAK Group, the performance issues with the equipment continued through 2015 and 2016.  (*Id.*, ¶ 57, PageID #12.)  In February 2016, Benedetti informed BAK Group that it needed to purchase valves for the equipment to "ensure performance" for $6,200 along with shipping costs, which BAK Group purchased.  (*Id.*)  In September 2016, Benedetti informed BAK Group that it needed to purchase a flow meter for the equipment to "ensure performance" for $6,458, which BAK Group purchased.  (*Id.*, ¶ 58, PageID #12.)

### B.4.  The May 2017 Demonstration

BAK Group claimed that, by December 2016, it "made significant progress towards becoming an approved contractor with the Ministry."  (*Id.*, ¶ 59, PageID #12.)  BAK Group informed Benedetti that, if it performed a successful road demonstration for the Ministry, the Ministry "would include the REHEAT Machine specification in all Ministrey tenders," which would require any bidding contractor to either purchase the equipment through BAK Group as Benedetti's representative or lease the equipment from BAK Group.  (*Id.*)  BAK Group informed Benedetti that it intended to renew efforts to include the REHEAT Machine specification with tenders with the UAE and Saudi Arabia as well.  (*Id.*, ¶ 60, PageID #13.)

In May 2017, BAK Group shared its concerns about the performance of the equipment with Benedetti, who suggested that BAK Group make "several passes on the roadway with the Equipment" or purchase another re-heater.  (*Id.*, ¶ 62, PageID

8

#13.)  On May 21, 2017, the equipment failed to perform adequately during the demonstration, and the Ministry decided not to include the REHEAT Machine with its government tenders.  (*Id.*, ¶ 63, PageID #13.)

In February 2018, BAK Group found prospective purchasers for REHEAT Machines in Bahrain.  (*Id.*, ¶ 65, PageID #13.)  However, according to BAK Group, because of the failure of the equipment during the Ministry demonstration, the prospective purchasers decided not to purchase the REHEAT Machines.  (*Id.*)

### B.5.   Further Demonstrations

In July 2018, the Ministry sent BAK Group a letter of intent to include the REHEAT Machine specification in all Ministry tenders.  (*Id.*, ¶ 66, PageID #14 & #97–98.)  This commitment was contingent on a successful demonstration of the equipment.  (*Id.*, ¶ 67, PageID #14.)

In October 2018, BAK Group informed Benedetti that it "had not made a single dollar on its investment due to the Equipment's repeated failures to perform."  (*Id.*, ¶ 68, PageID #14.)  In March 2019, BAK Group purchased $3,000 worth of valves from Benedetti in an attempt to remedy performance issues.  (*Id.*, ¶ 69, PageID #14.)

After a delay of several years because of the Covid-19 pandemic, BAK Group renewed its efforts to complete a demonstration for the Ministry in 2022.  (*Id.*, ¶ 71, PageID #14.)  On May 20, 2022, Benedetti sent instructions to the Ministry regarding how to correct the performance issues.  (*Id.*, ¶ 72, PageID #14 & #99–104.)  After a demonstration, on June 1, 2022, the Ministry sent BAK Group a "Quality Audit Report" which provided observations by the Roads-Project Assessment Committee.  (*Id.*, ¶ 73, PageID #14 & #105–06.)  The report indicated a "[n]oticeable number of

9

irregularities" and "many complaints on the riding quality . . . as raised by local residents being regular users of the subject roads." (*Id.*, ¶ 74, PageID #15 & #105.)

On June 12, 2022, the Ministry sent BAK Group a letter in response to further demonstrations of the equipment stating that the equipment "failed to give a ride-able asphalt surface in long roadways," despite the fact that the equipment was "supposed to be utilized for maintaining long distances of asphalt-paved highways." (*Id.*, ¶ 76, PageID #15 & #107–08.) The Ministry indicated that it "[would] not bear the cost of rectifying the failed product . . . if occurred in [the] future." (*Id.*, ¶ 76, PageID #15 & #107.)

### B.6 End of the Relationship

On July 13, 2022, Mr. Kaiksow sent Benedetti an email discussing the continued performance issues, detailing a recent failure of the equipment during another demonstration for the Ministry, claiming that BAK Group had not recouped a "dollar on its investment," and requesting assistance. (*Id.*, ¶ 77, PageID #15–16.) Benedetti responded that the performance issues could be remedied if BAK Group purchased $3,500 worth of tools and equipment to help with rideability issues. (*Id.*, ¶ 78, PageID #16.)

According to BAK Group, it continued correspondence with Benedetti about performance issues, often resulting in BAK Group purchasing additional tools and equipment. (*Id.*, ¶ 79, PageID #16.) However, BAK Group claimed that "the performance issues remained." (*Id.*)

On August 27, 2023, Benedetti sent BAK Group an email acknowledging the performance issues with the equipment and suggesting that BAK Group should

10

either purchase a new REHEAT Machine for roughly $3.25 million or modify the equipment for between $350,000 and $500,000. (*Id.*, ¶¶ 80–81, PageID #16 & #109–11.) Benedetti sent BAK Group an invoice for proposed modifications to the equipment for $486,000. (*Id.*, ¶ 82, PageID #16.) BAK Group declined the proposal and decided not to spend more money to cure problems with the equipment. (*Id.*, ¶¶ 83–84, PageID #16–17.) According to BAK Group, the equipment remains stored in its storage facilities and has not been used. (*Id.*, ¶ 84, PageID #17.)

### C. Alleged Fraud

In Spring 2024, BAK Group claims that it first learned of what it alleges to be "extensive fraud that had been perpetrated on it by Defendants." (*Id.*, ¶ 85, PageID #17.) According to BAK Group, sometime in 2012, before its purchase of the equipment, Benedetti contracted to build and sell the equipment to another customer in the United States. (*Id.*, ¶ 86, PageID #17.) That customer hd requested a REHEAT Machine for use in parking lots that should be "smaller and lighter than a typical REHEAT Machine." (*Id.*, ¶ 87, PageID #17.) BAK Group claims that the smaller and lighter machine was not suitable for long stretches of roadways because it would bounce up and down and create rideability issues. (*Id.*, ¶ 89, PageID #17.)

BAK Group claims that the other customer returned the equipment to Benedetti in 2012, which coincided with when BAK Group expressed an interest in the design and purchase of a new REHEAT Machine. (*Id.*, ¶ 91, PageID #18.) BAK Group claims that Benedetti did not build a new machine for BAK Group despite its promise to do so, but instead "passed off the Equipment as being new and sold it to BAK Group." (*Id.*, ¶ 92, PageID #18.)

11

Allegedly, Benedetti and Mr. Benedetti did not disclose to BAK Group that the equipment had been used, was built for another customer, was returned by that customer, was smaller and lighter than a typical REHEAT Machine, and was made to pave parking lots.  (*Id.*, ¶ 93, PageID #18.)  Further, BAK Group claims that Benedetti and Mr. Benedetti failed to disclose to BAK Group that the equipment was not built for the intended use of paving long stretches of roadway, was modified with larger cutting blades, a road paving screed, and a rear furnace to appear that it was intended for that intend use, and "was insufficient to perform long road paving."  (*Id.*)

In addition, BAK Group claims that Benedetti and Mr. Benedetti failed to disclose to BAK Group that the performance issues were likely due to the manufacture and design of the equipment and that Benedetti employees told Mr. Benedetti and other employees that the equipment was too small and too light to accomplish the intended use.  (*Id.*)  Finally, BAK Group claims that Benedetti and Mr. Benedetti failed to disclose to BAK Group that Benedetti's proposed solutions to the performance issues would not solve the problems and that the photographs of what Benedetti claimed was the new REHEAT Machine were not of that machine.  (*Id.*)

BAK Group claims that Benedetti sold the equipment to BAK Group to "avoid the cost associated with building a new REHEAT Machine" for the intended use and concealed the alleged scheme from BAK Group.  (*Id.*, ¶¶ 94–95, PageID #18–19.)

12

### D. ICC Arbitration

Pursuant to the arbitration provision in the parties' purchase agreement, BAK Group initiated arbitration with Benedetti on July 25, 2024. (*Id.*, ¶ 96, PageID #19.) The arbitration provision reads in relevant part:

> All disputes arising out of or in connection with this Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules.

(*Id.*, ¶ 97, PageID #19 & #40.)  BAK Group paid a $5,000 non-refundable filing fee when it filed the arbitration. (*Id.*, ¶ 98, PageID #19.)

Pursuant to Article 37(1) of the ICC Arbitration Rules, on or about August 7, 2024, the ICC requested a provisional advance on costs in the amount of $62,000. (*Id.*, ¶¶ 99–100, PageID #19.)  On August 27, 2024, BAK Group paid $57,000, and its non-refundable $5,000 filing fee was credited toward the provisional advance. (*Id.*, ¶ 101, PageID #19.)  On October 3, 2024, Defendants filed their answer. (*Id.*, ¶ 102, PageID #19.)

According to BAK Group, it incurred significant attorneys' fees related to the selection of an arbitrator, negotiation of a schedule for case management and preparation for the case management conference, development of its evidence and witness testimony, negotiation of the draft arbitration terms of reference, and discovery. (*Id.*, ¶ 103, PageID #20.)

Pursuant to Article 37(2) of the ICC Arbitration Rules, on December 23, 2024, the ICC requested an advance on costs to cover the fees and expenses of the arbitrators, administrative expenses, and other expenses related to the arbitration in

the amount of $190,000 in equal shares to the parties. (*Id.*, ¶¶ 104–05, PageID #20 & #112–17.)

Pursuant to Article 37(6) of the ICC Arbitration Rules, if the parties did not comply with their payment obligations regarding an advance on costs, the arbitration claims would be withdrawn. (*Id.*, ¶¶ 106–07, PageID #20.) On January 13, 2025, BAK Group paid its share of the ICC advance on costs of $33,000. (*Id.*, ¶ 108, PageID #21.) According to BAK Group, after the ICC provided Defendants with multiple extensions and notifications to make payment, Defendants did not make their payment, which BAK Group claims was a "concerted effort to cause the Arbitration claims to be withdrawn." (*Id.*, ¶¶ 109–10, PageID #21; ECF No. 15-1; ECF No. 17-1, PageID #228–60.)

On May 27, 2025, the ICC informed the parties that the arbitration claims were considered withdrawn as of May 26, 2025 due to a lack of payment. (*Id.*, ¶ 111, PageID #21 & #118–19.)

### STATEMENT OF THE CASE

Based on these events, on May 28, 2025, Plaintiff filed suit in federal court against Defendants, alleging fraudulent inducement, misrepresentation, and concealment against all Defendants (Count One); breach of contract against Benedetti, LLC (Count Two); breach of the purchase agreement's arbitration agreement against all Defendants (Count Three); tortious interference with contractual and business relations against all Defendants (Count Four); negligent

misrepresentation against Benedetti, LLC (Count Five); and personal liability on the part of Albert Benedetti (Count Six).  (ECF No. 1, ¶¶ 112–163, PageID #21–27.)

Defendants moved for judgment on the pleadings and moved to compel arbitration.  (ECF No. 14; ECF No. 15.)  Both motions are fully briefed.  On November 17, 2025, Plaintiff moved for leave to file a surreply to Defendant's motion to compel arbitration.  (ECF No. 22; ECF No. 23.)

## ANALYSIS

First, the Court addresses Plaintiff's motion to file a surreply to Benedetti's motion to compel arbitration.  (ECF No. 22.)  Then, the Court will turn to Benedetti's motion to compel arbitration.  (ECF No. 15.)  Finally, the Court will assess Defendants' motion for judgment on the pleadings.  (ECF No. 14.)

## I.     Motion for Leave to File Surreply

Plaintiff moves for leave to file a surreply to Benedetti's reply in support of its motion to compel arbitration.  (ECF No. 22.)  Pursuant to Section 9.D. of the Court's Civil Standing Order, "[n]o surreplies will be permitted absent leave of Court, which will be given rarely and only for truly good cause."  Section 9.C. of the Court's Civil Standing Order states that, "[a]bsent unusual or extraordinary circumstances, reply briefs should *not* present new evidence or arguments."

Plaintiff contends that Benedetti misstated the amount of damages that Plaintiff sought.  (ECF No. 22, PageID #318.)  But the complaint claims damages, and no surreply is necessary to correct or clarify the record in that regard.  Also, Plaintiff argues that the Court should grant leave to file a surreply because Benedetti's reply provides new arguments that the ICC arbitration was withdrawn

15

due to a failure by BAK Group to substitute payment and that Plaintiff's damages demand was exorbitant and constituted an abuse of process. (ECF No. 22, PageID #318.) In response, Benedetti maintains that it raised those arguments in its initial brief. (ECF No. 23, PageID #325–26.) Based on the Court's review of Benedetti's initial brief, the Court agrees that these arguments, although not presented verbatim, are present in Benedetti's initial brief. (*Compare* ECF No. 15, PageID #203 *with* ECF No. 20, PageID #294–95 (arguing that Plaintiff failed to pursue remedies); *compare* ECF No. 15, PageID #197 *with* ECF No. 20, PageID #295–96 (arguing that Plaintiff inflated its damages).) Therefore, including these arguments in reply is proper.

For these reasons, the Court determines that Plaintiff has not demonstrated "truly good cause" for the Court to grant it leave to file a surreply pursuant to Section 9.D. of the Court's Civil Standing Order. Accordingly, the Court **DENIES** Plaintiff's motion for leave to file a surreply. (ECF No. 22.)

## II.     **Motion to Compel Arbitration**

Benedetti moves to dismiss or stay these proceedings pending arbitration under the Federal Arbitration Act. (ECF No. 15.) A "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . shall be valid, irrevocable, and enforceable[.]" 9 U.S.C. § 2. The "principal purpose" of the Federal Arbitration Act is to ensure "that private agreements to arbitrate are enforced according to their terms." *Volt Info. Scis., Inc. v. Board of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989); *see also Stolt-Nielsen S.A. v. AnimalFeeds*

*Int'l Corp.*, 559 U.S. 662, 664 (2010).  Section 2 of the Act "makes arbitration agreements 'valid, irrevocable, and enforceable' as written."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011).

Where an action is referable to arbitration, a court "shall on application of one of the parties stay" the case pending arbitration.  9 U.S.C. § 3; *see Smith v. Spizzirri*, 601 U.S. 472, 473–74 (2024).  Section 3 of the Act does not permit the Court to dismiss the case instead of issuing a stay where the dispute is subject to arbitration and a party requests a stay pending arbitration.  *Smith*, 601 U.S. at 478.

"Congress enacted the FAA to replace judicial indisposition to arbitration with a 'national policy favoring [it.]'"  *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581 (2008) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)).  The Act embodies "a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary."  *Concepcion*, 563 U.S. at 346 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  The language of the Act creates "a body of federal substantive law of arbitrability."  *Moses*, 460 U.S. 1 at 24.

Typically, courts have four tasks when considering a motion to stay proceedings pending arbitration under the Federal Arbitration Act:  (1) "determine whether the parties agreed to arbitrate"; (2) "determine the scope of that agreement"; (3) if a party asserts federal statutory claims, "consider whether Congress intended those claims to be nonarbitrable"; and (4) if the court concludes that some, but not all, of the claims in the action are subject to arbitration, "determine whether to stay

the remainder of the proceedings pending arbitration." *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000).  However, Plaintiff does not dispute Benedetti's argument that these factors are met.  (*See generally* ECF No. 17.)  Indeed, pursuant to the arbitration provision in the parties' purchase agreement, Plaintiff already initiated arbitration once before.  (ECF No. 1, ¶ 96, PageID #19.)

The parties dispute whether Benedetti defaulted in arbitration when it failed to pay the ICC fees in advance, resulting in withdrawal of the claims.  (ECF No. 15, PageID #202–03; ECF No. 17, PageID #218–23; ECF No. 20, PageID #292–96.)

### II.A.  Default

The Federal Arbitration Act provides that a court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."  9 U.S.C. § 3.  "A party defaults on an arbitration agreement when it takes actions that are 'completely inconsistent' with an intent to arbitrate."  *Schnatter v. 247 Group, Inc.*, 155 F.4th 543, 555 (6th Cir. 2025) (quoting *Kloosterman v. Metropolitan Hosp.*, 153 F.4th 501, 506 (6th Cir. 2025); *see also O.J. Distrib., Inc. v. Hornell Brewing Co.*, 340 F.3d 345, 356 (6th Cir. 2003) (describing a similar analysis for waiver) (quoting *General Star Na'l. Ins. Co. v. Administratia Asigurarilor de Stat*, 289 F.3d 434, 438 (6th Cir. 2002)) (abrogated on other grounds by *Morgan v. Sundance, Inc.*, 596 U.S. 411, 419 (2022)).

### II.B.  Defendants' Failure to Pay Arbitral Fees

"Failure to pay arbitration fees constitutes a 'default' under § 3."  *Pre-Paid Legal Servs., Inc. v. Cahill*, 786 F.3d 1287, 1298 (10th Cir. 2015).

### II.B.1. ICC Rules

To try to avoid this result, Benedetti contends that the letter from the ICC withdrawing the claims from arbitration did not constitute a dismissal with prejudice because she stated that it was pursuant to Article 37(6) of the ICC Arbitration Rules. (ECF No. 15, PageID #202; ECF No. 1, ¶ 111, PageID #21 & #118–19.)  That rule reads that, if claims are withdrawn because an advance on costs had not been paid, "[s]uch a party shall not be prevented, on the ground of such withdrawal, from reintroducing the same claims at a later date in another proceeding."  Article 37(6) of the ICC Rules (2021).  The Court agrees with Benedetti that, based on the plain language of the rule, Plaintiff's claims may be filed again.

Also, Benedetti contends that Article 37(5) provided Plaintiff with a remedy for Benedetti's refusal to pay.  (ECF No. 15, PageID #203.)  Specifically, that rule provides that "any party shall be free to pay any other party's share of any advance on costs should such other party fail to pay its share."  Article 37(5) of the ICC Rules (2021).  Further, Article 37(6) provides that, "[s]hould the party in question wish to object to [withdrawal due to failure to pay], it must make a request within [a certain time] period for the matter to be decided by the Court."  Article 37(6) of the ICC Rules (2021).  The arbitrator advised Plaintiff's counsel of these options in an email on February 26, 2025.  (ECF No. 15-1.)

But "the absence of a formal finding of default by the arbitrators does not preclude the district court from making that determination under § 3." *Pre-Paid Legal Servs.*, 786 F.3d at 1298.  In *Pre-Paid Legal Services*, 786 F.3d at 1294, the tribunal terminated the arbitration between the parties because the defendant failed

19

to pay the arbitration fees.  The defendant argued that the court could not determine that he was in default because "the arbitrators did not make a formal finding of default when they terminated the proceedings." *Id.* at 1295.  But the Tenth Circuit determined that courts were free to make such a determination pursuant to Section 3 of the Federal Arbitration Act where:  (1) the arbitrator "repeatedly asked [the defendant] to pay";  (2) the defendant "did not show he was unable to afford payment"; (3) the defendant did not "ask the arbitrators to modify his payment schedule"; and (4) the defendant did not "move for an order requiring [the plaintiff] to pay his share for him so that arbitration could continue." *Id.* at 1294.  The Tenth Circuit concluded that, "by refusing multiple requests to pay, [the defendant] allowed arbitration to terminate" and, therefore, defaulted. *Id.*  On the record presented, the Court finds the Tenth Circuit's analysis persuasive.

Benedetti was asked multiple times to pay the outstanding arbitration fees. (ECF No. 17-1, PageID #228–60.)  Further, Benedetti did not argue that it was unable to afford the payment, just that it refused to "pay an artificially inflated cost share." (ECF No. 20, PageID #296.)  Arbitration is expensive.  That is just one of the many downsides of arbitration.  There is no evidence in the record, and Benedetti does not argue, that it asked the arbitrators to modify its payment schedule.  Nor does Benedetti provide any reason to believe that a second arbitration would turn out any differently.  That is, Benedetti provides no assurance that, this time, it is prepared to pay its share of arbitral fees.

Finally, although the ICC Rules and the arbitrator presented the option of Plaintiff paying Benedetti's outstanding arbitration fees, Benedetti cites no authority requiring Plaintiff to do so.  (*See generally* ECF No. 15; ECF No. 20.)  Nor is the Court aware of any.  Nothing in the ICC's rules or correspondence suggests that a plaintiff's failure to pay all the fees, including those of another party, attributes any default to it.  Any rule to that effect makes little sense and creates an endless loop: "The same offending party could then default a second time, and the prejudiced party's sole remedy, again, would be another order compelling arbitration." *Sink v. Aden Enters., Inc.*, 352 F.3d 1197, 1199 (9th Cir. 2003).  Defendants' arguments are inconsistent with "the expeditious resolution of disputes" which "Congress was no doubt aware that the Act would encourage." *Volt Info. Scis.*, 489 U.S. at 478.

### II.B.2. Authority Regarding the Arbitral Forum

Benedetti argues that "Plaintiff does not cite a single case arising under ICC Rules—because the ICC rules . . . expressly enabled Plaintiff to advance costs and/or make a motion regarding costs assessment." (ECF No. 20, PageID #292.)  Indeed, Plaintiff's authorities come from JAMS, USA&M, and AAA, not the ICC.  *See, e.g.*, *Noble Capital Fund Mgmt., L.L.C. v. US Capital Global Inv/ Mgmt., LLC*, 31 F.4th 333, 336 (5th Cir. 2022); *Sink v. Aden Enters., Inc.*, 352 F.3d 1197, 1199 (9th Cir. 2003); *5-Star Gen. Store v. Amex*, 759 F. Supp. 3d 317, 322 (D.R.I. 2024).  Based on the Court's review of the case law within and outside the Circuit, little authority addresses the issue of non-payment of arbitration fees under the ICC rules.  But other tribunals operate under a similar rule.  *See, e.g.*, JAMS Rule 31(a) (providing for administrative suspension of an arbitration if one party fails to pay its share of fees).

In any event, Benedetti misses the point of these cases. Regardless of the arbitral forum, courts apply the principles underlying Section 3 of the Federal Arbitration Act to rely on "the record, which showed the defendants had received multiple notices to pay, did not report inability to pay, and had not made genuine efforts to make alternative arrangements." *Pre-Paid Legal Servs.*, 786 F.3d at 1296 (citing *Sink*, 352 F.3d at 119). As noted, Benedetti provides no authority interpreting the relevant ICC Rules as shielding it from a determination that its failure to pay constitutes a default under Section 3. (*See generally* ECF No. 15; ECF No. 20.) What matters for the Court's inquiry is that there "is no arbitration to return this case to and parties may not avoid resolution of live claims through compelling a new arbitration proceeding after having let the first arbitration proceeding fail." *Noble Capital Fund Mgmt.*, 31 F.4th at 336.

*    *    *

For these reasons, the Court determines that Benedetti has acted "'completely inconsistent' with an intent to arbitrate" and, therefore, defaulted in arbitration. *Schnatter*, 155 F.4th at 555 (quoting *Kloosterman*, 153 F.4th at 506); *Pre-Paid Legal Servs.*, 786 F.3d at 1298; 9 U.S.C. § 3. Accordingly, the Court **DENIES** Benedetti's motion to compel arbitration. (ECF No. 15.)

## III.   Motion for Judgment on the Pleadings

"The only difference between Rule 12(c) and Rule 12(b)(6)" is timing. *Hunter v. Ohio Veterans Home*, 272 F. Supp. 2d 692, 694 (N.D. Ohio 2003). Rule 12(c) provides that, once "the pleadings are closed" a party may "move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "A motion for judgment on the pleadings

22

. . . generally follows the same rules as a motion to dismiss the complaint under Rule 12(b)(6)." *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 480 (6th Cir. 2020) (citing *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014)); *see also Holland v. FCA US LLC*, 656 F. App'x 232, 236 (6th Cir. 2016). "In other words, judgment on the pleadings is appropriate where, construing the material allegations of the pleadings and all reasonable inferences in the light most favorable to the non-moving party, the Court concludes that the moving party is entitled to judgment as a matter of law. *Anders v. Cuevas*, 984 F.3d 1166, 1174 (6th Cir. 2021). In construing the pleadings, the Court accepts the factual allegations of the non-movant as true, but not unwarranted inferences or legal conclusions. *Holland*, 656 F. App'x at 236–37 (citing *Gregory v. Shelby Cnty.*, 220 F.3d 433, 446 (6th Cir. 2000)).

While "[t]he court's decision rests primarily upon the allegations of the complaint[,]" "exhibits attached to the complaint may also be taken into account." *JTO, Inc. v. Travelers Indem. Co. of Am.*, 242 F. Supp. 3d 599, 602 (N.D. Ohio 2017) (citation modified). "In addition to the pleadings, courts may consider any documents referenced in the complaint that are central to the dispute." *Estate of Q.W.*, 682 F. Supp. 3d at 680 (citing *United Food & Com. Workers, Loc. 1995*, 51 F.4th at 202). Only "well-pleaded factual allegations" that "plausibly give rise to an entitlement of relief" and "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" will survive. *Bates*, 958 F.3d at 480 (quotation and citation omitted). Conversely, "[m]ere labels and conclusions are not enough[.]"

*Engler*, 862 F.3d at 575.  Nor are facts that are "merely consistent with" liability. *Bates*, 958 F.3d at 480 (quotation omitted).

Benedetti Holdings and Albert Benedetti move for judgment on the pleadings. (ECF No. 14.)  In addition, in a footnote on the first page of their brief, Defendants write that, if the Court denied Benedetti's motion to compel arbitration, then Benedetti, LLC "reserve[d] the right to seek dismissal on the basis that Plaintiff's contract claims are untimely and its fraud-based claims are fatally flawed."  (*Id.*, PageID #181.)  To that end, Defendants include Benedetti, LLC in their arguments regarding Plaintiff's fraudulent inducement claim.  (ECF No. 14, PageID #184–88.) Defendants contend that (1) Plaintiff's fraudulent inducement claim is time-barred and Plaintiff's fraud-based claims lack particularity; (2) Benedetti Holdings and Albert Benedetti were not parties to any contract with Plaintiff; (3) Plaintiff fails to allege the required elements of tortious interference with contractual and business relations as to Benedetti Holdings and Albert Benedetti; and (4) Plaintiff's personal liability claim against Albert Benedetti fails because piercing the corporate veil is not a cause of action under Ohio law.  (ECF No. 14, PageID #184–92.)

### III.A. Fraudulent Inducement

To state a claim for fraudulent inducement, a plaintiff must allege:  (1) a false representation concerning a fact or concealment of a material fact where there is a duty to disclose; (2) knowledge of the falsity of the representation or utter disregard for its truth; (3) intent to induce reliance on the representation; (4) justifiable reliance on the representation; and (5) injury proximately caused by the reliance.  *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 874 (6th Cir. 2007) (citations omitted).

24

Claims for fraud, including for fraudulent inducement, must meet the heightened pleading standard of Rule 9(b).  That Rule requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  To satisfy the Rule, "a plaintiff must (1) specify the allegedly fraudulent statements, (2) identify the speaker, (3) state when and where the statements were made, and (4) explain what made the statements fraudulent."  *Newberry v. Silverman*, 789 F.3d 636, 645 (6th Cir. 2015) (quoting *Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 247 (6th Cir. 2012)) (internal quotations omitted).  But "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

As a threshold matter, Defendants claim that Plaintiff "essentially contends that it was provided with a machine that did not match what was contemplated in the contract . . . [which] is a breach of contract claim, not a fraudulent inducement claim."  (ECF No. 14, PageID #185; ECF No. 21, PageID #305.)  But Plaintiff's complaint alleges that Defendants made multiple misrepresentations regarding the REHEAT Machine, including its intended use and provided false photographs of the machine.  (ECF No. 1, ¶ 93, PageID #18.)  Moreover, alleged misrepresentations to induce parties to enter into a contract resulting in products that do not conform to what the parties agreed to can constitute a fraudulent inducement claim.  *See, e.g., Benedettini Cabinets, L.P. v. Sherwin-Williams Co.*, 695 F. Supp. 3d 948, 956 (N.D. Ohio 2023).

25

Defendants raise multiple arguments regarding why Plaintiff's fraudulent inducement claim should be dismissed.  Defendants claim that it is time-barred.  (ECF No. 14, PageID #185–87.)  Also, Defendants claim that Plaintiff's complaint "is devoid of any allegations about any representations—false or otherwise—by ABH or Albert."  (*Id.*, PageID #185.)  Finally, Defendants allege that Plaintiff's fraudulent inducement claim lacks particularity.  (*Id.*, PageID #187.)

### III.A.1. Statute of Limitations

Under Ohio law, an action for fraud "shall be brought within four years after the cause thereof accrued."  Ohio Rev. Code § 2305.09(C).  However, an action for fraud "shall not accrue until . . . the fraud is discovered."  *Id.*  "[T]his standard does not require the victim of the alleged fraud to possess concrete and detailed knowledge, down to the exact penny of damages, of the alleged fraud; rather, the standard requires only facts sufficient to alert a reasonable person of the *possibility* of fraud."  *Cundall v. U.S. Bank*, 122 Ohio St. 3d 188, 2009-Ohio-2523, 909 N.E.2d 1244, ¶ 30 (citation omitted).  "[C]onstructive knowledge of facts, rather than actual knowledge of their legal significance, is enough to start the statute of limitations running under the discovery rule."  *Id.* (citing *Flowers v. Walker*, 63 Ohio St. 3d 546, 549, 589 N.E.2d 1284 (1992)) (citation modified).

According to Plaintiff, it did not know that Defendants allegedly did not provide the machine that it requested and made false representations about it until Spring 2024.  (ECF No. 1, ¶ 85, PageID #17.)  Because Plaintiff filed this action in May 2025, Plaintiff would be well within the statute of limitations after it discovered Defendants' alleged fraud.

26

Defendants argue that Plaintiff had constructive knowledge of the issues with the REHEAT Machine because Plaintiff "had all the technical and mechanical information for the REHEAT Machine as well as any additional training documents provided by the Benedetti LLC employees." (ECF No. 14, PageID #186.) Further, Defendants claim that Plaintiff did not "make any form of inquiry other than merely complaining about the alleged nonperformance of the machine" and that Plaintiff "had been put on notice that the REHEAT Machine was allegedly 'too small' to meet Plaintiff's intended needs while Plaintiff and Plaintiff's employees were being trained." (*Id.*; ECF No. 21, PageID #306–07.)

Based on the allegations in the complaint, which the Court must accept as true at this stage of the proceedings, Plaintiff had no way to know that the machine was allegedly not the one for which it contracted. As Defendants note, Plaintiff had access to the technical and mechanical information regarding the equipment and was on notice as early as 2014 that the equipment had performance issues (ECF No. 1, ¶ 37, PageID #9), but in the current procedural posture there is no indication that Plaintiff knew, should have known, or could have known why those performance issues were occurring. In other words, had Plaintiff known at the start of its business relationship with Defendants that the new machines for which it contracted were allegedly not new and designed for another use, the near decade of performance issues that followed might have played out differently. And Plaintiff might have filed arbitration much sooner. Instead, based on the facts alleged in the complaint, Defendants provided Plaintiff with correspondence for several years that the machine required

27

additional parts at additional cost to be remedied or that there were other issues with the roads.  (*Id.*, ¶¶ 36, 40–41, 45, 53, 58 69, 78–79 & 80–81, PageID #9–12, #14, #16 & #109–11.)  Further, Defendants told Plaintiff that it would receive new machines and allegedly provided Plaintiff with photographs of the machine that Plaintiff claims that it later learned were in fact not of the machine for which it contracted.  (*Id.*, ¶¶ 26–27 & 93, PageID #7, #18, #43–44 & #67.)  On these facts, taken as true, a reasonable person would not be aware of the possibility of fraud.  *Cundall*, 2009-Ohio-2523, at ¶ 30.  And Defendant can lull Plaintiff into complacency then argue it slept on it rights.

Moreover, the cases on which Defendants rely do not help their argument.  In *Carl L. Brown, Inc. v. Lincoln Nat'l Life Ins.*, 2003-Ohio-2577, ¶ 61 (Ohio Ct. App.), the court determined that the substantial increase in an insurance premium, along with a signed rider, "was sufficient to put [the plaintiff] on notice" regarding billing that was allegedly not proper.  In *Riddick v. Taylor*, 2018-Ohio-171, 105 N.E.3d 446, ¶ 14 (Ohio Ct. App.), the court determined that the plaintiff knew about his allegedly fraudulent diagnosis at the time it was made.  Finally, in *Trohoske v. Chicago Title Ins. Co.*, No. 1:11-cv-877, 2011 WL 6012412, at *8 (N.D. Ohio Nov. 30, 2011), the court determined that settlement statements disclosed material information to the plaintiffs regarding the title insurance.  These cases are distinguishable because each provides an objective point of reference outside the limitations period.  Here, in contrast, Plaintiff could not reasonably have known that the machine provided to it was allegedly not what the one for which it contracted.  For these reasons, the Court

28

determines that the statute of limitations does not bar Plaintiff's fraudulent inducement claim. *Cundall*, 2009-Ohio-2523, at ¶ 30.

### III.A.2. Particularity

Defendants argue that the complaint "is devoid of any allegations about any representations—false or otherwise—by ABH or Albert" and that therefore Plaintiff's fraudulent inducement claim against Benedetti Holdings and Mr. Benedetti cannot survive. (ECF No. 14, PageID #185.)  Further, Defendants claim that Plaintiff fails to allege fraudulent inducement with particularity against Benedetti, LLC.  (*Id.*, PageID #187.)

### III.A.2.i. Benedetti Holdings

A review of the complaint shows that Plaintiff has not satisfied the particularity requirement of Rule 9(b) for Benedetti Holdings.  There are no allegations in the complaint regarding any alleged fraudulent statements made by anyone on behalf of Benedetti Holdings.  Indeed, Benedetti Holdings is not even mentioned in the section of the complaint regarding fraudulent inducement.  (ECF No. 1, ¶¶ 112–21, PageID #22.)  Therefore, Plaintiff has not satisfied any of the elements of particularity for Benedetti Holdings.  *Newberry*, 789 F.3d at 645.

### III.A.2.ii. Albert Benedetti

Although Plaintiff identifies Mr. Benedetti in the complaint, it only claims that he did not disclose to BAK Group certain details about the REHEAT Machine, including that it had allegedly been used, built for another customer, and not built for the contracted or intended purpose. (ECF No. 1, ¶ 93, PageID #18.)  But even if true, Plaintiff only generally alleges that Mr. Benedetti made these omissions

throughout the course of the business relationship and does not specify when and where the statements were made. *Newberry*, 789 F.3d at 645.

The only alleged fraudulent statement that satisfies the time and place requirement is that on January 15, 2014, BAK Group and Benedetti entered into a purchase agreement, which listed the intended use of the REHEAT Machine as being "for use to lay new recycled road asphalt in Bahrain, Kuwait, United Arab Emirates, Oman, and Qatar and Saudi Arabia." (ECF No. 1, ¶ 25, PageID #7 & #30.)  BAK Group agreed to purchase a new "ReHeat Asphalt Pavement Heater" and new "ReHeat Recycler" for a total purchase price of $2,575,000 for the equipment and delivery to Bahrain. (*Id.*, ¶¶ 26–27, PageID #7, #43–44 & #67.)

Defendants claim that Plaintiff admitted in the complaint that Mr. Benedetti was not a party to the contract. (ECF No. 14, PageID #185 (citing Paragraph 25 of the complaint).)  But that is not the case.  Although Mr. Benedetti is not mentioned in that paragraph, Plaintiff alleges later (in Paragraph 93) that Mr. Benedetti took part in the alleged misrepresentation that the REHEAT Machine was new when really it was allegedly not. (ECF No. 1, ¶ 93, PageID #18.)  Mr. Benedetti's signature is on every page of the purchase agreement, including the pages that list a new "ReHeat Asphalt Pavement Heater" and new "ReHeat Recycler." (ECF No. 1, PageID #30–49.)

Therefore, Plaintiff's only claim of fraudulent inducement against Mr. Benedetti pled with particularity is that, on January 15, 2014, Mr. Benedetti represented that Benedetti, LLC would provide new REHEAT machines to Plaintiff.

(ECF No. 1, ¶ 93, PageID #18 & #30–49.)  This is the only allegation that satisfies the heightened pleading standard of Rule 9(b) because it specifies the allegedly fraudulent statements, identifies the speaker, states when and where the statements were made, and explains what made the statements allegedly fraudulent.  *Newberry*, 789 F.3d at 645.

### III.A.2.iii. Benedetti, LLC

As for Benedetti, LLC, although Plaintiff identifies several allegedly fraudulent statements and representations, Plaintiff fails to attribute any of these statements to a speaker.  (*See generally* ECF No. 1.)  Some employee or agent had to make the alleged representations on behalf of Benedetti, LLC, but the only person Plaintiff identifies is Mr. Benedetti, which the Court previously discussed.  (*Id.*, ¶ 93, PageID #18.)  Therefore, any statements that Plaintiff attributes to Benedetti, LLC without listing an employee or agent fail to meet the heightened pleading standard of Rule 9(b).  *Newberry*, 789 F.3d at 645.

*          *          *

Defendants contend only that Plaintiff did not plead its fraudulent inducement claim with particularity.  (ECF No. 14, PageID #184–85 & #187–88.)  Therefore, the Court does not address the remaining elements of fraud.  Plaintiff claims that a "dismissal of a fraud claim based on particularity requirements is inappropriate" without a motion for a more definite statement pursuant to Rule 12(e).  (ECF No. 18, PageID #284.)  Indeed, the Sixth Circuit has determined that, "despite the plaintiffs' failure to satisfy the requirements of Rule 9(b), in the absence of defendants' motion

31

for more definite statement under Rule 12(e), dismissal on this basis alone would not be appropriate." *Coffey v. Foamex L.P.*, 2 F.3d 157, 162 (6th Cir. 1993).

For these reasons, if Plaintiff wants to pursue its fraudulent inducement claim, the Court **ORDERS** Plaintiff to amend its pleading to allege the specific fraudulent statements, speakers, dates, locations, and reasons why such statements were fraudulent no later than February 17, 2026. *Resource Title Agency, Inc. v. Morreale Real Est. Servs., Inc.*, 314 F. Supp. 2d 763, 776 (N.D. Ohio 2004).)

### III.B. Breach of Contract

Under Ohio law, "[t]o establish a claim for breach of contract, a plaintiff must prove: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach." *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019) (citing *Claris, Ltd. v. Hotel Dev. Servs., LLC*, 2018-Ohio-2602, 104 N.E.3d 1076, ¶ 28 (Ohio Ct. App.)).

Defendants argue that Plaintiff's breach of contract claim regarding the purchase agreement's arbitration agreement as to Benedetti Holdings and Mr. Benedetti "fails on its face" because "[n]owhere within the Complaint does Plaintiff allege that either ABH or Albert was a party to the purchase agreement." (ECF No. 14, PageID #187.) Plaintiff argues that Defendants made the same argument before the arbitrator, and the arbitrator determined that they should be included in the arbitration "based on the broad scope of the arbitration provision in the Purchase Agreement." (ECF No. 18, PageID #279.) Plaintiff provides no argument how such a determination would have effect here. (*Id.*) In any event,

32

Plaintiff maintains that the Court should "consider the language of the contract and the attending circumstances" in determining whether Benedetti Holdings and Mr. Benedetti were parties to the purchase agreement and the arbitration provision. (*Id.* (quoting *West v. Household Life Ins. Co.*, 2007-Ohio-845, 170 Ohio App.3d 463, 867 N.E.2d 868, ¶ 13).)

The Sixth Circuit has observed that Ohio law "generally prevents nonparties from enforcing arbitration clauses unless they are intended third-party beneficiaries." *AtriCure, Inc. v. Meng*, 12 F.4th 516, 526 (6th Cir. 2021) (citations omitted). In *AtriCure*, the Sixth Circuit determined that, "although the Distribution Agreement's arbitration clause is broad (it covers claims 'relating to' the agreement), the clause does not expressly say whether it reaches claims against nonparties." *Id.* So too here. There is nothing in the record or the purchase agreement itself that provides for Benedetti Holdings being a party to the agreement. (*See generally* ECF No. 1.)

Regarding Mr. Benedetti, "when a party resisting arbitration is not a signatory to an arbitration agreement, a presumption against arbitration arises." *Peters v. Columbus Steel Castings Co.*, 2006-Ohio-382, 2006 WL 225274, ¶ 11 (Ohio Ct. App.) (citation omitted). But the Court has already determined that Mr. Benedetti's signature is on every page of the purchase agreement. (ECF No. 1, PageID #30–49.) Therefore, Mr. Benedetti was a party to the purchase agreement and its arbitration provision.

For these reasons, because Defendants only argue that Benedetti Holdings and Mr. Benedetti were not parties to the purchase agreement, the Court does not address the other elements of a breach of contract claim.  (ECF No. 14, PageID #187.) Accordingly, the Court determines that Count Three of Plaintiff's complaint survives against Benedetti, LLC and Albert Benedetti, and **DISMISSES** Count Three as to Benedetti Holdings.

### III.C. Tortious Interference

Count Four of Plaintiff's complaint alleges tortious interference with contractual and business relations against all Defendants.  (ECF No. 1, ¶¶ 136–42, PageID #24–25.)  "Ohio law recognizes causes of action for both tortious interference with a business relationship and tortious interference with contract rights."  *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999) (citing *A & B-Abell Elevator Co., Inc. v. Columbus/Central Ohio Bldg. & Constr. Trades Council*, 73 Ohio St. 3d 1, 1995-Ohio-66, 651 N.E.2d 1283, 1294).  The only difference between the two causes of action is that tortious interference with a business relationship "does not require proof of a contractual relationship."  *Id.*  "The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another."  *Id.* (quoting *A & B-Abell*, 651 N.E.2d at 1294).

"Under Ohio law, a cause of action for [tortious interference with business relations] is made out when '. . . one who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or continue, a business

34

relationship with another . . . .'" *Franklin Tractor Sales v. New Holland N. Am., Inc.*, 106 F. App'x 342, 344 (6th Cir. 2004) (quoting *Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130, 1138 (6th Cir. 1995)).  To prevail on this claim, Plaintiff must establish: "(1) the existence or the prospect of a business relationship; (2) that [Defendants] knew of the [Plaintiff's] relationship; (3) that [Defendants] intentionally and materially interfered with the [Plaintiff's] prospective relationship; (4) the interference was without justification; and (5) the interference causes [Plaintiff] to suffer damages." *Bodine Perry, PLLC v. Bodine*, 667 F. Supp. 3d 617, 635 (N.D. Ohio 2023) (citation omitted).

Defendants argue that Plaintiff fails to allege any intentional conduct by Benedetti Holdings and Albert Benedetti.  (ECF No. 14, PageID #188–91; ECF No. 21, PageID #307–08.)

### III.C.1. Benedetti Holdings

There is no specific mention of Benedetti Holdings in the complaint regarding an alleged tortious interference with contractual or business relations.  (*See generally* ECF No. 1.)  Instead, Plaintiff makes a conclusory allegation that "Defendants have knowledge of [Plaintiff's] contractual and business relations" and took "intentional actions including . . . the Fraudulent Conduct in order to cause a breach and/or termination of the contractual and business relations between BAK Group and the Ministry, other governmental entities, and prospective customers." (*Id.*, ¶¶ 138–39, PageID #24.)  Such allegations constitute "[m]ere labels and conclusions," which are "not enough" to state a claim.  *Engler*, 862 F.3d at 575.  Accordingly, the Court

determines that Plaintiff fails to state a claim for tortious interference with contractual and business relations against Benedetti Holdings.

### III.C.2. Albert Benedetti

Plaintiff's complaint alleges several prospective and established business relationships with the Ministry and other government entities, including being awarded at least one job. (ECF No. 1, ¶¶ 13, 24, 38, 43, 52, 59–60, 77, PageID #5, #7, #9–13, #15–16 & #61–66.) Although the majority of references to correspondence with Defendants in the complaint refer to Benedetti only, there is at least one allegation that Plaintiff informed Mr. Benedetti that the Ministry issued correspondence that included the REHEAT Machine specifications as one of its tender jobs in 2013. (*Id.*, ¶ 24, PageID #7 & #61–66.)  Based on the complaint, Mr. Benedetti allegedly knew that the intended use of the REHEAT Machine was for paving long stretches of roadway but provided a machine that was meant for paving parking lots. (*Id.*, ¶ 93, PageID #18.)  Such an omission would likely have to be intentional, and the machine not performing its intended purpose would be material. Defendants provide no alleged privilege or justification for Mr. Benedetti. (*See generally* ECF No. 14; ECF No. 21.)  Finally, Plaintiff alleges that the interference caused it economic damages and that it had not recouped a "dollar on its investment." (ECF No. 1, ¶ 77, PageID #15–16.)

Defendants argue that Plaintiff did not address "the nature of the actor's conduct" and "the actor's motive," citing the factors that the Ohio Supreme Court listed in *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 178–79, 1999-Ohio-260, 707 N.E.2d 853 (citation omitted). (ECF No. 14, PageID #189–90.)  But the

36

Ohio Supreme Court addressed these factors at the summary judgment stage. *Id.* In the procedural posture of Defendants' motion for judgment on the pleadings, Plaintiff's allegations regarding Mr. Benedetti "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bates*, 958 F.3d at 480. Accordingly, Plaintiff's tortious interference claim as to Mr. Benedetti withstands Defendants' motion.

*     *     *

For these reasons, the Court determines that Plaintiff's tortious interference claim as to Mr. Benedetti survives. Further, the Court **DISMISSES** Count Four against Benedetti Holdings.

### III.D. Corporate Veil

Count Six of Plaintiff's complaint brings a claim for piercing the corporate veil against Albert Benedetti. (ECF No. 1, ¶¶ 152–63, PageID #26–27.) But piercing the corporate veil is not an independent cause of action. *Trinity Health Sys. v. MDX Corp.*, 180 Ohio App. 3d 815, 2009-Ohio-417, 907 N.E.2d 746, ¶ 26 (Ohio Ct. App.) (citing *Belvedere Condo. Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St. 3d 274, 287, 1993-Ohio-119, 617 N.E.2d 1075 (1993)). Piercing the corporate veil permits individual shareholder liability for the actions of a corporation. *Id.* at ¶ 26. Accordingly, it requires success or the likelihood of success of the merits of an underlying claim. Although Plaintiff cites two cases in the Sixth Circuit that have not outright dismissed claims for piercing the corporate veil, neither case acknowledges Ohio law to the contrary, and the Court declines to follow the approach of these courts. *RAM Const. Servs. of Michigan, Inc. v. TH Restoration, Inc.*, No. 11

37

CV 2507, 2012 WL 1854703, at *5 (N.D. Ohio May 21, 2012); *Allied Diversified Constr., Inc. v. Elite Mechanical, Inc.*, No. 1:16cv334, 2016 WL 7034238, at *4 (S.D. Ohio Dec. 2, 2016). Therefore, the Court **DISMISSES** Count Six of the complaint.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's motion for leave to file a surreply. (ECF No. 22.) Further, the Court **DENIES** Benedetti's motion to compel arbitration. (ECF No. 15.) Finally, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion for judgment on the pleadings. (ECF No. 14.) Specifically, the Court **DISMISSES** Counts Three and Four as to Benedetti Holdings and Count Six. Regarding Count One, the Court **ORDERS** Plaintiff to amend its pleading to allege the specific fraudulent statements, speakers, dates, locations, and reasons why such statements were fraudulent no later than February 17, 2026.

**SO ORDERED.**

Dated: February 2, 2026

_____
J. Philip Calabrese
United States District Judge
Northern District of Ohio